**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel., MARJORIE PRATHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil No. 3:12-CV-00764** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **BROOKDALE SENIOR LIVING** | ) | |
| **COMMUNITIES, INC., BROOKDALE** | ) | |
| **LIVING COMMUNITIES, INC.,** | ) | |
| **BROOKDALE SENIOR LIVING, INC.,** | ) | |
| **INNOVATIVE SENIOR CARE HOME** | ) | |
| **HEALTH OF NASHVILLE, LLC, and** | ) | |
| **ARC THERAPY SERVICES, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is the defendants' Motion to Dismiss the Amended Complaint pursuant to Rules 12(b)(6) and 9(b) (Docket No. 56), to which the relator has filed a Response in opposition (Docket No. 60), and the defendants have filed a Reply (Docket No. 65). In addition, the United States of America ("United States") has filed a "Statement of Interest Regarding Defendants' Motion to Dismiss" (Docket No. 66), to which the defendants have filed a Response (Docket No. 70). For the following reasons, the defendants' motion will be granted without prejudice.

## BACKGROUND

**I.     The Parties**

Relator Marjorie Prather ("relator" or "Prather") is an individual who resides in Tennessee. Prather is a registered nurse who was employed by Brookdale Senior Living, Inc.

1

("BSLI") as a Utilization Review Nurse ("URN") from September 2011 until November 23, 2012.  The United States is the real party in interest to Prather's action.

Defendant BSLI is a Delaware corporation with a principal address in Brentwood, Tennessee ("Brookdale Main Office").  BSLI provides retirement living services, including home health aide services and skilled nursing services, to recipients of care under the Health Insurance for the Aged and Disabled Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*. ("Medicare").  Defendants Brookdale Senior Living Communities, Inc. and Brookdale Living Communities, Inc. (together, "Brookdale Communities Defendants") are Delaware corporations with principal addresses at the Brookdale Main Office.  The Brookdale Communities Defendants provide retirement living services, including skilled nursing services, to Medicare recipients.  Defendant Innovative Senior Home Health of Nashville, LLC ("ISC Home Health") is a Delaware limited liability company with a principal address at the Brookdale Main Office.  ISC Home Health provides home health care to Medicare recipients.  Defendant ARC Therapy Services, LLC ("ARCTS") is a Tennessee limited liability company with a principal address at the Brookdale Main Office.  ARCTS provides outpatient therapy services to Medicare recipients.

## II.  Legal Background

The False Claims Act ("FCA") imposes civil liability for knowingly presenting, or causing to be presented, false or fraudulent claims to the United States government for payment or approval.  31 U.S.C. § 3729(a)(1)(A).  The FCA also imposes liability for knowingly making or using a false record or statement that is material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B).  In addition, the FCA imposes liability for knowingly or improperly avoiding or

decreasing an obligation to pay or transmit money to the United States – what is known as a "reverse" false claim. 31 U.S.C. § 3729(a)(1)(G). In layman's terms, a reverse false claim occurs when a party owes funds to the government (such as in the case of an overpayment) but acts so that it does not meet its obligation to return those funds. Finally, the FCA provides for a cause of action for conspiracy to commit violations thereunder. 31 U.S.C. § 3729(a)(1)(C). Those who violate the FCA are liable for civil penalties and treble damages.

To promote enforcement of the FCA, private individuals (called "relators") can bring *qui tam* actions on behalf of the United States.[1] 31 U.S.C. § 3730(b). After the relator files a complaint, the United States has the option of intervening and conducting the litigation itself. 31 U.S.C. § 3730(b)(4). If the government opts not to intervene, the relator may proceed individually. 31 U.S.C. § 3730(c)(3). Successful relators are awarded a portion of the recovery ranging from ten to thirty percent, depending upon the relator's role in the case and whether or not the government chose to intervene. 31 U.S.C. § 3730(d). This award encourages "whistle blowers to act as private attorneys-general in bringing suits for the common good." *U.S. ex rel. Poteen v. Medtronic, Inc.*, 552 F.3d 503, 507 (6th Cir. 2009) (citing *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005)) (internal quotation marks omitted).

The FCA applies to claims submitted by healthcare providers to Medicare; "indeed, one of its primary uses has been to combat fraud in the health care field." *U.S. ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 731 (M.D. Tenn. 2013) (citing *U.S. ex rel. Chesbrough v. VPA P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)).

---

[1] The Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur* (often shortened to *qui tam*) means "who as well for the king as for himself sues in the matter." Black's Law Dictionary, 1368 (9th ed. 2009).

Medicare is a health insurance program administered by the United States that is funded by taxpayer revenue. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS"). Medicare is designed to provide for the payment of, *inter alia*, hospital services, medical services and durable medical equipment to persons over sixty-five years of age, and for certain others who qualify under special terms and conditions. Reimbursement for Medicare claims is made by the United States through CMS, which contracts with private insurance carriers known as fiscal intermediaries ("FIs") to administer and pay claims from the Medicare Trust Fund. *See generally* 42 U.S.C. § 1395u. The most basic requirements for reimbursement eligibility under Medicare are that the service provided must be reasonable and medically necessary. *See*, *e.g.*, 42 U.S.C. §§ 1395y(a)(1)(A); 1396, *et seq.*; 42 C.F.R. § 410.50.

Individuals who receive benefits under Medicare are commonly referred to as "beneficiaries." Medicare beneficiaries who are homebound can receive certain medically necessary services at home. *See* 42 U.S.C. §§ 1395f(a)(2)(C); 1395n(a)(2)(A). These services generally include skilled nursing, physical therapy, speech-pathology therapy, and occupational therapy.

Home health agencies' patients are referred for home health services by their physicians. The physician is required to certify that the patient is under his or her care, that the physician has established and will periodically review a sixty-day plan of care, that the patient is homebound, and that the patient requires one of the types of home health services that qualifies for Medicare. The certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who

4

establishes the plan. *See* 42 C.F.R. § 424.22. A physician is also required to certify that an appropriate face-to-face encounter occurred with the individual. *See id*. Face-to-face documentation must be a separate and distinct section of, or an addendum to, the certification and must be clearly titled, dated, and signed by the certifying physician. *See id.*

After receiving a patient referral, a home health agency is required to provide its own patient-specific, comprehensive assessment, called an Outcome and Assessment Information Set ("OASIS"). 42 C.F.R. § 484.55. During this initial assessment, the home health agency must determine the immediate care and support needs of the patient and, for Medicare patients, determine eligibility for the Medicare home health benefit, including homebound status. *Id.* The comprehensive OASIS assessment must be completed "in a timely manner, consistent with the patient's immediate needs, but no later than [five] calendar days after the start of care." 42 C.F.R. § 484.55(b).

A sixty-day plan of care is called an "episode." After each episode, a patient must be recertified to receive funds from Medicare. To be recertified, the patient's physician must review and sign the patient's plan of care, making any necessary changes, and the home health agency must complete a new assessment and determine that the patient is still eligible to receive Medicare-funded home health services. *See* 42 C.F.R. § 424.22; 42 C.F.R. § 484.55.

A Medicare beneficiary is homebound if, due to underlying illness or injury, the beneficiary has conditions that restrict the ability to leave the home. Medicare Benefit Policy Manual, ch. 7, § 30.1.1. Homebound status does not require a beneficiary to be bedridden; instead, a beneficiary is considered homebound if leaving their residence requires considerable or taxing effort. *Id.*

Home health agencies are not paid per service rendered. Instead, Medicare pays them

under a prospective payment system that provides a predetermined amount for the entire sixty-day episode.[2]  *See* 42 U.S.C. § 1395fff *et seq.*; 42 C.F.R. § 484.205 *et seq*.  Medicare reimbursement is typically paid in two parts – home health providers may submit a request for payment ("RAP") to the FI to be paid a percentage of the final Medicare sixty-day episode payment up front, with the balance of the payment to be made at the end of the episode.  *See* 42 C.F.R. § 484.205(b)(1), (2).  If the RAP is based on physician verbal orders for home health services, the verbal order must be recorded in the plan of care, include a description of the patient's condition and the services to be provided by the home health agency, include an attestation by the recipient of the verbal order, and the plan of care must be copied and immediately submitted to the physician.  *See* 42 C.F.R. § 409.43(c).  Before submitting a claim for the final percentage payment, the plan of care must be signed and dated by a qualifying physician.  *See* 42 C.F.R. § 409.43(c)(3).  Similarly, oral orders must be countersigned and dated before the final bill is submitted.  42 C.F.R. § 409.43(d).

Certain additional adjustments are made to the reimbursement rate, including a low utilization payment adjustment and an outlier payment adjustment.  The reimbursement rate is subject to a low utilization payment adjustment when the home-health agency visits the patient four or fewer times during a sixty-day episode.  *See* 42 C.F.R. §§ 484.205(c); 484.230.  In such a situation, Medicare will calculate its payment using a per-visit amount.  *Id.*  An outlier adjustment is the opposite – CMS makes an additional payment for a visit-intensive episode for which the cost is estimated to exceed a predicted threshold amount for the beneficiary's

---

[2] Adjustments are made to a standard national episode rate to account for the type of care the patient requires as well as the geographic location.  *See* 42 U.S.C. §§ 1395fff(b)(4)(B), 1395fff(b)(4)(C).  These adjustments are made based on the OASIS forms, which are submitted to the government through an FI for payment.

representative case-mix group (as determined by CMS via a series of national calculations).  *See* 42 C.F.R. §§ 484.205(e); 484.240.  In short, when a home-health agency reaches a certain number of visits during a given sixty-day episode, Medicare will increase the reimbursement paid on the patient's behalf.

Medicare conditions payment on the physician's certification that the beneficiary is homebound and in need of skilled services.  42 C.F.R. § 409.41(b).  Medicare also conditions payment on the beneficiary's actually being homebound and actually needing skilled services.  42 C.F.R. § 409.41(c) (conditioning payment on all requirements contained in §§ 409.42–409.47 being met, including 42 C.F.R. § 409.42(a)).  Additionally, Congress has statutorily prohibited the payment of any Medicare claim for services that are not medically reasonable and necessary.  42 U.S.C. § 1395y(a)(1) (A)(stating that "no payment may be made for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member").

## III.    <u>Allegations of the Amended Complaint</u>

BSLI owns retirement communities and assisted living facilities throughout the United States; it offers skilled nursing services to Medicare patients.  (Docket No. 52 at ¶ 68.)  BSLI is a principal of ISC Home Health and ARCTS.  (*Id*. at ¶ 69.)  BSLI, the Brookdale Communities Defendants, ISC Home Health, and ARCTS share the same corporate office.  (*Id*.)  As mentioned *supra*, Prather was employed as a URN from September 2011 through November 23, 2012.  (*Id*. at ¶ 70.)  Prior to September 2011, each office location of ISC Home Health and ARCTS (commonly known as "agencies") submitted its own claims directly to Medicare.  (*Id*. at ¶ 71.)  But in the September 2011 time frame, BSLI made the decision to centralize the billing of most

of the agencies into the Brookdale Main Office.  (*Id*.)

In September 2011, BSLI had a large backlog of about 7,000 unbilled Medicare claims worth approximately $35 million dollars.  (*Id*. at ¶ 72.)  These claims were referred to as "held claims."  (*Id*.)  These claims were allegedly backlogged because they were not in compliance with Medicare rules, primarily because they related to care that was provided without properly certified plans of care or without required face-to-face encounter documentation.  (*Id*.)  Copies of patient charts concerning the held claims were forwarded to the Brookdale Main Office to be audited and billed to Medicare.  This was referred to as the "held claims project."  (*Id*. at ¶ 73.)  The defendants issued weekly reports, called the "Home Health Held Claims Report," that showed how many claims had been released for billing to Medicare.  (*Id*. at ¶ 74.)

Prather was directly involved in the held claims project.  Prather's primary responsibilities included: (1) pre-billing chart reviews in order to ensure compliance with the requirements and established policies of the defendants, as well as state, federal and insurance guidelines; (2) working directly with the BSLI Regional Director, BSLI Director of Professional Services, and BSLI clinical associates to resolve documentation, coverage, and compliance issues; (3) acting as resource person to the agencies for coverage and compliance issues; (4) reviewing visits utilization for appropriateness pursuant to care guidelines and patient condition; and (5) keeping BSLI Directors of Professional Services apprised of problem areas requiring intervention.  All of these responsibilities directly related to the defendants' efforts to bill the held claims to Medicare.  (*Id*. at ¶ 75.)

Prather worked with Denise Tucker, a fellow URN, on the held claims project.  (*Id*. at ¶ 76.)  The URNs reported directly to Lance Blackwood, Senior Director of Home Health Product

Line for ISC Home Health ("Blackwood").  (*Id*. at ¶ 77.)  BSLI also hired a group of temporary employees to help audit the held claims.  Diana Sharp, Interim Director of Professional Services for ISC Home Health, headed up the group of temporary employees.  (*Id*. at ¶ 78.)

The purpose of the URNs' work was to review held claims for a variety of items necessary to submit claims for billing, including signed orders, completed face-to-face documentation, and completed therapy reassessments.  (*Id*. at ¶¶ 70, 75, 81, 84, 103.)  Initially, the URNs sent attestation forms to doctors for them to sign to correct the problem of missing signatures, but the URNs received only a few signed and completed forms back from doctors.  (*Id*. at ¶ 79.)  Thereafter, in January 2012, Shad Morgheim ("Morgheim"), Senior Vice-President of ISC Home Health, moved the audit process back to the BSLI agencies' offices, so that the agencies would complete the claims that were older than one hundred and twenty days.  (*Id*. at ¶ 80.)  The agencies were instructed to get the doctors to sign the old documents, as well as ask them to complete the face-to-face documentation.  (*Id*.)  Once the agencies received the signed documents, they forwarded them to the URNs, who completed the final reviews and checklists in order to release the claims for billing to Medicare.  (*Id*. at ¶ 81.)  The URNs were instructed to only do a "quick review" for missing signatures and dates and were specifically instructed not to look for any other problems related to Medicare billing; when the URNs noted problems, they were told to ignore them.  (*Id*. at ¶ 82.)

Prather alleges that she raised concerns about the manner in which the agencies were auditing the beneficiaries' charts, because she was finding compliance problems with face-to-face documentation, doctors' orders and plans of care, and therapy evaluations.  (*Id*. at ¶ 83.)  In response, Blackwood told Prather that it was the agencies' responsibility to correct the charts.

(*Id*.)  Blackwood allegedly further instructed the URNs to not read documents (such as plans of care and face-to-face documentation), but only to make sure that orders affecting billing were signed and dated, that the plans of care were signed and dated by a physician, and that face-to-face documentation contained an encounter date in the right time period, clinical findings, and a reason why the patient was homebound.  (*Id*. at ¶ 84.)  The URNs were instructed not to read any other substantive content, other than to confirm that the documentation did not say such things as "not homebound."  (*Id*. at ¶ 85.)

Prather alleges that the URNs were instructed to ignore whether the reason for home care documented by the physician's office matched the start of care order and the plan of care orders. (*Id*. at ¶ 86.)  According to the Amended Complaint, in many of the plan of care orders (known in Medicare parlance as "485s"), the primary diagnosis justifying home health care billing to Medicare was inconsistent with the care actually provided to the patient.  (*Id*. at ¶ 87.)  For example, Patient A, a dementia patient who was a resident of a secured memory unit in a BSLI facility in Chandler, Arizona, was diagnosed with "abnormality of gait" on the plan of care order, but she did not receive physical therapy.  (*Id*.)  In addition, the skilled nursing services that Patient A received included medication teaching that was inconsistent with a diagnosis of dementia, because Patient A received her medication from a nurse.  (*Id*.)  Prather further alleges that, although Patient A received home health care services from December 14, 2011, through February 11, 2012, no doctor certified the plan of care until June 29, 2012.  (*Id*.)  Prather suggests, but does not directly allege, that Patient A's bills were submitted to Medicare.  (*See id*. ("As these services were not provided under a doctor certified plan of care, they should not have been billed to Medicare."))

Prather alleges that the result of these practices was that, with many of the plan of care orders, the primary diagnosis justifying home health care billing to Medicare was inconsistent with the care actually provided to the patient. (*Id*. at ¶ 87.) Prather further alleges that it was a common practice for the defendants to submit a request for payment without having a signed verbal order from a physician to start care or a signed plan of care. (*Id*. at ¶ 88.) In addition, Prather alleges that, in a large number of claims involved in the held claims project, Medicare was billed for therapy and home health care services that were not provided under a doctor certified plan of care. (*Id*. at ¶ 89.) In addition to Patient A, the Amended Complaint cites Patient E as another example. (*Id*.) Patient E was a resident of the Freedom Square Brookdale community in Tampa, Florida, and he received physical therapy, occupational therapy, and skilled nursing services from September 9, 2011, to November 7, 2011. (*Id*.) Prather alleges that "all of this care was provided without properly certified orders from a physician." Specifically, the Amended Complaint alleges that the start of care order and the face-to-face encounter documentation were not signed by the doctor until June 4, 2012, and no physician certified a plan of care until July 10, 2012, several months after the patient had been discharged. (*Id*.)

Prather alleges that she observed charts reflecting reassessments performed by therapist assistants, who did not actually see the patients, rather than therapists. (*Id*. at ¶ 91.) Prather further alleges that she observed charts reflecting instances where multiple therapy reassessments were performed simultaneously, but Medicare was billed separately for each reassessment. (*Id*. at ¶ 92.) Prather claims to have shared this information with Blackwood. (*Id*.) The Amended Complaint alleges that the URNs noted that therapy reassessments were not timely performed under Medicare regulations but, rather, were "recreated" from visit notes for purposes

11

of billing Medicare; Prather observed charts containing therapy reassessments with dates that had been altered prior to Medicare being billed.  (*Id*. at ¶ 93.)  Prather raised these concerns numerous times with her supervisors in the Brookdale Main Office.  (*Id*. at ¶ 94.)  One supervisor, David Simmons, told Prather that "there [wa]s such a push to get the claims through."  (*Id*.)

Prather also alleges that registered nurses visited therapy patients only to complete the OASIS forms for Medicare, but then billed the visits as skilled nursing.  (*Id*. at ¶ 95.)  Additionally, Prather alleges that the URNs noted that face-to-face encounter documentation was often incomplete and, in many cases, was not completed until after the care was provided.  (*Id*. at ¶ 96.)  Furthermore, the Amended Complaint alleges that BSLI and ISC Home Health implemented a policy pursuant to which nurses completing OASIS assessments were instructed to estimate the number of therapy visits based upon a purported "historic utilization pattern," rather than information specific to the patient.  (*Id*. at ¶ 97.)  Using this rubric, all patients who received physical therapy and occupational therapy were estimated to require eight physical therapy visits and six occupational therapy visits.  (*Id*.)  Prather alleges that, pursuant to this practice, the need for therapy was consistently overestimated on OASIS forms, resulting in overpayment by Medicare under the sixty-day episode for payment formula.  (*Id*. at ¶ 98.)  Prather alleges that the URNs had identified a pattern in which patients were provided either fourteen cumulative therapy visits or twenty cumulative therapy visits.[3]  (Id. at ¶ 99.)

The Amended Complaint offers several examples of this pattern.  First, Patient B was a resident at a Brookdale Senior Living community in Tampa, Florida.  (*Id*.)  Patient B's

---

[3] Medicare reimbursement increases once a patient receives fourteen or twenty combined visits.  (Docket No. 52 at ¶ 97.)

certification period was from October 28, 2011 through December 26, 2011. (*Id.*) Prather alleges that, although the ISC Home Health director noted that Patient B's principal diagnosis on the plan of care – open wound of upper arm – was not related to any need for therapy, Patient B was provided with 20 combined physical therapy and speech therapy visits (in addition to 8 skilled nursing visits for treatment of the wound). (*Id.*) Second, Patient C was a resident at the Homewood at Boynton Beach, Florida facility operated by Brookdale Senior Living. (Id. at ¶ 100.) Patient C, who suffered from dementia and was diagnosed with debility, received physical therapy, occupational therapy and skilled nursing services provided by ISC Home Health from March 30, 2012 to May 28, 2012. (*Id.*) Prather alleges that Patient C received duplicative therapeutic services where, for example, she received physical therapy for walking at the same time as skilled nursing for use of an assistive device in walking. (Id.) Finally, Patient D was a resident in the Brookdale Senior Living community in Austin, Texas. (Id. at ¶ 101.) Patient D received skilled nursing services, physical therapy and occupational therapy from ISC Home Health from July 25, 2011 to September 22, 2011. Patient D's plan of care reflected a primary diagnosis of pressure ulcer, with a secondary diagnosis of weakness. (*Id.*) According to the Amended Complaint, although therapy was not indicated for his pressure ulcer, and the OASIS assessment reflected no need for therapy, Patient D received 12 combined therapy visits. (Id.) Patient D also received 24 skilled nursing visits. (*Id.*) Following this initial episode, Patient D was re-certified for another 60 day episode from September 23, 2011 to November 21, 2011, when he received skilled nursing services, occupational therapy, and physical therapy. (*Id.*)

Prather alleges that, as time passed, BSLI continued to apply pressure to motivate the processing of held claims. BSLI allegedly implemented incentive programs for the completion of

home care plans. (*Id*. at ¶ 102.) For example, a staff member received one hundred dollars a week if ten claims were submitted to the utilization review department for billing and twenty-five dollars for every claim over and above the first ten. (*Id*.) One staff member, Angela Spalding, allegedly told Prather that, during the week of July 9 through 13, 2012, she completed more than fifty releases to URNs, resulting in a bonus to her of $1,200 that she shared among her office peers. (*Id*.) Prather also alleges that BSLI implemented a policy to compensate doctors for signing orders to facilitate billing to Medicare of old claims. (Id. at ¶ 105.) Pursuant to this policy, Defendants paid physicians to review outstanding held claims and sign orders for previously provided care at a rate of compensation of $150 an hour with a one-half hour minimum. (*Id*.)

Blackwood allegedly showed Prather an email on April 2, 2012, from Morgheim, in which he asked if the URNs were doing just a "quick review" on the billing release checklists to release claims. (*Id*. at ¶ 103.) Blackwood allegedly said that he thought the charts were being reviewed too closely and informed Prather that the URNs needed only to make sure the orders are signed, the face-to-face documentation is complete, and the therapy reassessments are present in the charts; he stated that the URNs should ignore any compliance issues regarding the information in the records. (*Id*.) Prather told Blackwood and others that she had discovered problems that needed to be addressed and that she was not comfortable forwarding claims she felt were incorrect for billing to Medicare. (*Id*. at ¶ 104.) On several occasions, Brandi Tayloe, Regional Vice President East-Central Division for ISC Home Health, responded to Prather's concerns by stating that "[BSLI] can just argue in our favor if we get audited." (*Id*.)

The Amended Complaint alleges that BSLI has in place a system that resulted in the

billing of Medicare for medically unnecessary services. According to Prather, ISC Home Health and ARCTS maintain offices on-site at facilities operated by BSLI and the Brookdale Communities Defendants, and those offices solicit referrals from the retirement community staff members on a daily basis, despite the fact that the Medicare beneficiary residents of those facilities already receive paid-for nursing care and therapy services from the staff of those facilities. (*Id*. at ¶¶ 106-07.) For example, Prather alleges that, if ISC Home Health is located on site at an assisted living facility, ISC Home Health nurses treat skin tears and bill Medicare, whereas the skin tear treatment would otherwise have been provided by the assisted living facility nurses at no cost to Medicare. (*Id*. at ¶ 109.)

Furthermore, Prather alleges that, to generate additional home health care and therapy revenue, BSLI offered wellness "checks" or "screenings" in order to identify patients for home care and therapy services. (Id. at ¶ 110.) According to ISC Home Health, its "reigning philosophy should be that most every resident would benefit from therapy or nursing intervention at some point. This is the key to what makes ISC successful, much like visiting your doctor, you will need therapy or nursing intervention at some point." (*Id*.) To that end, BSLI communities held collaborative care meetings to identify patients for services to be billed to Medicare. (*Id*. at ¶ 111.) The Amended Complaint also alleges that the ISC Home Health and ARCTS "70/30" business model also promotes over-utilization of services to be billed to Medicare. (*Id*. at ¶ 112.) The training manual for this model explains: "We also have the ability to leverage our current customer base in senior living with expanded ancillary services and share in the revenue produced." (*Id*.) The manual states that "ISC [Home Health]'s approach to care is both reactive and proactive in nature. Our clinical experience has shown that some thirty percent

of seniors' needs are obvious while seventy percent must be uncovered through continual screening and assessment, thus our 70/30 theory." (*Id*.)

Prather alleges that many examples of fraudulent Medicare billing relating to these corporate policies are included in the claims involved in the held claims project. (Id. at ¶ 113.) Prather claims that, "while these claims were nationwide in scope," several specific examples originated at the Brookmont Terrace facility in Nashville, Tennessee. (*Id*.) Jack Castellano ("Castellano") was the Therapy Coordinator at this facility. (*Id*.) Castellano conducted monthly collaborative care meetings in which managers were instructed to bring their "top 5" candidates for therapy and home health services. (*Id*.) This information was distributed through a form called the "top 5 list." (*Id*.)

The Amended Complaint alleges that, under the direction of Castellano, many residents at Brookmont Terrace were provided with medically unnecessary care that was billed to Medicare. (*Id*. at ¶ 114.) The Amended Complaint cites several patients as examples. The first is Patient F, a resident at Brookmont Terrace who was provided with therapy in December 2011. (*Id*.) Patient F complained to Castellano when she discovered that Medicare had been billed for 8 therapy visits when she actually only had 2 visits; she allegedly stated "this is what's wrong with the government." (*Id*.) The second is Patient G, another resident at Brookmont Terrace, who wanted to ride the exercise bike at the facility. (*Id*. at ¶ 115.) Although Patient G was able to walk without difficulty, Castellano directed that he receive therapy and a cane that were billed to Medicare. (*Id*.) The third and fourth are Patients H and I, who moved into Brookmont Terrace in December 2011. (*Id*. at ¶ 116.) These men were fit enough to walk their large dogs (approximately 90 pounds) on a daily basis, but they were provided with therapy that was billed

to Medicare. (*Id*.) The fifth is Patient J, a resident at Brookmont Terrace who suffered from Alzheimer's Disease. (*Id*. at ¶ 117.) Prather alleges that Patient J was not impaired beyond Alzheimer's but that he or she was provided with extensive therapy that was billed to Medicare. (*Id*.) The final example is Patient K, a resident at Brookmont Terrace who was able to ambulate without difficulty or assistance. (*Id*. at ¶ 118.) Prather alleges that Patient K was provided with unnecessary therapy and an unnecessary walker, for which Medicare was billed. (*Id*.) According to the Amended Complaint, Patient K had the walker for approximately 3 years, during which she refused to use it because she did not need it.[4] (*Id*.)

## IV.   **Prather's *Qui Tam* Claims**

Prather brings four counts against the defendants. Count One alleges that the defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A). Prather generally alleges four fraudulent schemes within Count One: (1) a "certification" scheme, whereby the defendants allegedly billed Medicare for home health care services that were not provided pursuant to appropriate plans of care, physician orders, or physician certifications; (2) a "medical necessity" scheme, whereby the defendants allegedly provided and billed Medicare for medically unnecessary services; (3) a "reassessments" scheme, whereby the defendants allegedly performed improper reassessments (for various reasons) and billed Medicare therefor; and (4) an "OASIS" scheme, whereby the defendants allegedly billed Medicare for skilled nursing visits when the only purpose of those visits was to

---

[4] Eventually, Patient K's condition deteriorated to the point where she was moved into the Alzheimer's unit around October 2011, and she began to use the walker at that time.

complete OASIS assessments.

Count Two alleges that the defendants knowingly made or used, or caused to be made or used, false records or false statements material to false or fraudulent claims paid by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B), and that the United States paid Medicare claims based upon those false records or statements that would otherwise have not been allowed.[5] Count Three alleges that the defendants knowingly made, used, or caused to be made or used false records or statement, in violation of 31 U.S.C. § 3729(a)(1)(G). The gravamen of Count Three – which is commonly known as "reverse false claim" – is that the defendants knew that they had been overpaid by Medicare, but they did not take the necessary steps to satisfy the obligation owed to the United States by informing it of the overbilling and refunding or returning overpayments. Finally, Count Four alleges that, in violation of 31 U.S.C. § 3729(a)(1)(C), the defendants conspired together to violate the FCA and took action in furtherance of that conspiracy.

## V.    Procedural History

On July 24, 2012, Prather filed her *qui tam* Complaint. (Docket No. 1.) As required under the FCA, the Complaint was filed under seal and *ex parte*, to afford the United States Department of Justice the opportunity to investigate the allegations asserted in the Complaint and reach a determination as to whether the United States would intervene. The United States

---

[5] In the context of the FCA, the "terms 'knowing' and 'knowingly' mean that a person, with respect to information (I) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud." *See* 31 U.S.C. § 3729(b)(1). "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *See* 31 U.S.C. § 3729(b)(4).

subsequently sought and received several extensions of time to consider intervention.  (Docket Nos. 5, 8, 17.)  In May 2013, the relator's counsel obtained employment with the government of Florida, which precluded continued participation in this matter.  (Docket Nos. 9, 10.)  At the request of the United States, the court partially lifted the seal to allow the relator to seek new counsel.  (Docket No. 12.)  In July 2013, the relator obtained new counsel and the United States continued its consideration of intervention.  (Docket No. 14.)

On April 8, 2014, the United States filed a Notice of Election to Decline Intervention, in which the United States advised the court that it had decided not to intervene in this action and requested that the court unseal the Complaint (Docket No. 23), which it did (Docket No. 24).  On August 4, 2014, replacement counsel for the relator filed a motion to withdraw, in which he stated that Prather desired to continue this action but wished to do so with another new counsel. (Docket No. 39.)  On September 29, 2014, the court granted this request and ordered Prather to secure new representation within forty-five days.  (Docket No. 45.)  The third counsel for the relator entered their appearances thereafter.  (Docket Nos. 48, 53.)

On November 21, 2014, Prather filed the Amended Complaint.  (Docket No. 52.)  On December 22, 2014, all defendants jointly filed a Motion to Dismiss, accompanied by a Memorandum of Law and the Declaration of Brian D. Roark.  (Docket Nos. 56-58.)  On January 29, 2015, Prather filed a Response, accompanied by the Declaration of Patrick Barrett.  (Docket Nos. 60, 61.)  On February 12, 2015, the defendants filed a Reply.  (Docket No. 65.)

On February 24, 2015, the United States filed a "Statement of Interest Regarding Defendants' Motion to Dismiss."  (Docket No. 68.)  On March 9, 2015, the defendants filed a Response thereto.  (Docket No. 70.)

## ANALYSIS

## I.     Legal Standards

### A.     Rule 12(b)(6) Standard

In deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

A complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.

## B.    <u>Rule 9(b) and FCA Actions</u>

Complaints alleging FCA violations must also comply with Rule 9(b)'s requirement that fraud be pled with particularity. *Chesbrough*, 655 F.3d at 466 (citing *U.S. ex rel. Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)). This is so because defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts. *Id.* Rule 9(b) requires that, in alleging fraud under the FCA, a relator must state with particularity the circumstances constituting the alleged misconduct. *Id.* (citing *U.S. ex rel. Bledsoe v. Cmty Health Sys., Inc.*, 501 F.3d 493, 509 (6th Cir. 2007)). This heightened pleading standard is designed to prevent "fishing expeditions," to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters. *Id.* (citing *U.S. ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 504 (6th Cir. 2008)).

Moreover, "pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)." *Bledsoe*, 501 F.3d at 504. It is insufficient to merely plead a fraudulent scheme. *Id.* Under Rule 9(b), therefore, the circumstances constituting fraud for the purpose of the FCA must include an averment that a specific false or fraudulent claim for payment or approval has been submitted to the government. As stated by the Sixth Circuit, a fraudulent claim itself "is the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Sanderson v. HCA*, 447 F.3d 873, 878 (6th Cir. 2006). In sum, to properly plead fraud under the FCA, a relator must allege with particularity (1) "the time, place, and content of the alleged misrepresentation" (including a specific fraudulent claim(s)), (2) "the fraudulent scheme," (3) the defendant's fraudulent intent, and (4) the resulting injury of inducing the government to pay a false claim to the defendant. *Bledsoe*, 501 F.3d at 504; *SNAPP*, 532

F.3d at 504.  As to the "false scheme" element, a relator must plead with particularity as to each

scheme alleged in a complaint and provide specific examples of fraudulent conduct for each

scheme.  *See Bledsoe*, 501 F.3d at 509; *U.S. ex rel. White v. Gentiva Health Servs.*, No. 3:10-CV-

394-PLR-CCS, 2014 WL 2893223, at *15 (E.D. Tenn. June 25, 2014).  A complaint's failure to

comply with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule

12(b)(6).  *U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-cv-00484, 2013 WL

146048, at *7 (M.D. Tenn., Jan. 14, 2013).

## II.   **Motion to Dismiss**

### A.   **Count One**

The defendants have moved to dismiss Count One of the Amended Complaint on the

grounds that Prather has failed to plead with particularity as required by Rule 9(b).  The

defendants contend that Prather has failed to identify actual, representative false claims allegedly

submitted to the government for payment pursuant to any of the allegedly false schemes.  The

defendants maintain that the factual allegations concerning Patient A through Patient K fall well

short of allegations of the presentment of false claims necessary to proceed under Rule 9(b).

Rather, the defendants argue that Prather has merely made the type of generalized accusations of

wrongdoing concerning sample patients that Rule 9(b) precludes.

Because the false claim itself is a requirement of a FCA cause of action, it is not sufficient

that the Amended Complaint alleges underlying fraudulent conduct with particularity; it must

also allege the presentation of a false claim for payment to the government with the same

particularity.  *Chesbrough*, 655 F.3d at 472 ("In *Bledsoe*, *Sanderson*, and *Marlar*, we imposed a

strict requirement that relators identify actual false claims."); *Sanderson*, 447 F.3d at 878; *U.S. ex*

*rel. Marlar v. BWXT Y-12, LLC,* 525 F.3d, 439, 446 (6th Cir. 2008) ("A plaintiff must identify the specific claims that were submitted to the United States. . . . "); *Bledsoe*, 501 F.3d at 504 ("A clear and unequivocal requirement that a relator allege specific false claims emerges from the conjunction of Rule 9(b) and the statutory text of the FCA."); *Mcfeeters v. Nw. Hosp., LLC*, No. 3:13-0467, 2015 WL 328212, at *3 (M.D. Tenn. Jan. 23, 2015) ("The relator must plead with sufficient particularity that the defendants knowingly presented to the United States government a false or fraudulent claim for payment or approval.").  It is only the submission of a false claim for payment that converts an improper financial relationship into an act of fraud upon the government and forms the basis of a FCA cause of action.  Thus, even if Prather alleges some underlying fraudulent scheme that would render claims false, she can only avoid dismissal by also identifying actual false claims that were submitted to the government.  *See Bledsoe*, 501 F.3d at 515 (holding that, where relator had alleged a "complex and far-reaching scheme," it was insufficient to simply plead a scheme because relator also had to identify a representative false claim that was actually submitted to government).

Prather's Response to the defendants' motion consists of twenty-five pages.  Twenty of these pages are a paragraph-by-paragraph recitation of the Amended Complaint that does not respond to the defendants' motion.  The remaining five pages are a scattershot series of brief responses to isolated points made by the defendants.  Absent from the relator's Response, however, is any answer whatsoever to the defendants' argument that Prather has failed to plead with particularity by identifying actual false claims submitted to the government for payment.  *See generally* Relator's Resp. Br. at pp. 20-25.  Prather has therefore waived her arguments in opposition to this aspect of the motion to dismiss.  *See Humphrey v. U.S. Atty General's Office*,

279 F. App'x 328, 331 (6th Cir. 2008). To be clear: Prather does not contest that she fails to plead that any actual, specific fraudulent claims for reimbursement were made to Medicare. Accordingly, Count One of the Amended Complaint is insufficient to overcome the motion to dismiss and must fail under Rule 9(b).

Even if Prather's waiver were not fatal to Count One, a careful paragraph-by-paragraph review of the Amended Complaint reveals that the defendants are correct when they argue that Prather has failed to allege the "indispensible element" of a FCA action under Rule 9(b) – the presentment of actual claims to the government for payment. Aside from general allegations not tied to any particular beneficiaries, the Amended Complaint references eleven patients, identified as Patient A through Patient K. As summarized below, Prather provides only limited information about each Patient:

- Patient A: location and nature of treatment received; dates of care and certified plan of care; an implication that unidentified bills were submitted to Medicare;
- Patient B: location and nature of treatment received; dates of certified plan of care;
- Patient C: location and nature of treatment received; dates of care; statement that Medicare was billed for unspecified therapy;
- Patient D: location and nature of treatment received; dates of care and recertified plan of care;
- Patient E: location and nature of treatment received; dates of care; dates of signature of start of care order, fact-to-face documentation, and certified plan of care;
- Patient F: location of patient and statement that she received unspecified "therapy" that "was billed to Medicare";
- Patient G: location of patient and statement that he received unspecified "therapy" and a cane that "was billed to Medicare";
- Patient H: location of patient and statement that he received unspecified "therapy" that "was billed to Medicare";
- Patient I: location of patient and statement that he received unspecified "therapy" that "was billed to Medicare";
- Patient J: location of patient and statement that he or she received unspecified "therapy" that "was billed to Medicare";
- Patient K: location of patient and statement that she received unspecified

"therapy" and a walker that "was billed to Medicare";

These allegations are insufficient under Rule 9(b) to survive the defendants' motion to dismiss as to presentment of actual false claims. As an initial matter, there are no allegations of submitted claims (false or otherwise) for Patients B, D, or E, and those individuals may therefore be set aside for purposes of evaluating the sufficiency of the Amended Complaint. Patient A, who is tied to unspecified Medicare billing by mere implication (*e.g.*, "[these services] should not have been billed to Medicare"), rather than by any degree of particularity required by Rule 9(b), must also be set aside. As to the remaining individual patients – C, F, G, H, I, J, and K – despite referencing, in boilerplate fashion, "Medicare billing," for *none* of these patients does Prather allege *any* specific claim that was submitted to Medicare for payment (including the basis of such claim, date of such claim, any amount billed in such claim, or any amount paid on such claim). In short, Prather's allegations concerning these examplar patients fall far short of pleading the presentment of actual false claims to the government for payment. It is insufficient for Prather to name a patient and state "Medicare was billed." This statement could be made about any (and every single) patient treated by BSLI and cannot, alone, meet the pleading with particularity standard of Rule 9(b). Prather is obligated to plead the particulars of actual false claims (such as dates, amounts, services rendered, authorizations, payments received, etc.), and she does not do so for any exemplar patient or at any other point in the Amended Complaint.

Prather's lack of specific allegations makes the Amended Complaint little more than an aggregation of generalized grievances. *U.S. ex. rel. Dennis. v. Health Management Associates* is instructive in such a situation. In *Dennis*, a relator alleged that a health care institution had, *inter alia*, engaged in billing fraud in violation of the FCA and submitted false claims regarding the

treatment of Medicare beneficiaries. *Dennis*, 2013 WL 146048, at *1. The allegations in the *Dennis* amended complaint were, as here, based on the relator's personal knowledge. *Id.* at *2. The court found that the relator had not properly alleged the purported fraudulent schemes with particularity. *Id.* at *12-14. But beyond that, the court also found that the relator's entire claim for relief under the FCA was subject to dismissal because the relator had "failed to allege with the required particularity that any false claim was ever presented to the government for payment." *Id.* at *14. The court stressed the Sixth Circuit's strict admonitions that a relator must (1) identify actual false claims and (2) specify the "who, what, when, where, and how" of the alleged fraud. *Id.* at *15 (citing *Chesborough*, 655 F.3d 461; *Sanderson*, 447 F. 3d at 877). The court found that, instead of providing the required specificity, the complaint focused almost exclusively, and superficially, on the allegedly fraudulent activity – making only very general and conclusory allegations regarding the submission of specific claims by the defendants. *Id.* For example, the relator broadly alleged that the defendants presented, and caused to be presented, hundreds of thousands of false claims to the government and that the defendants had submitted false cost reports to the United States. *Id.* Nowhere in the amended complaint, however, did the relator offer additional detail about the presentation of allegedly false claims for payment, such as when the claims were submitted to the government, or what payment from the government was obtained as a result of such claims. *Id.* In sum, the court concluded that the relator failed to identify a single false claim for reimbursement that was actually presented to the government for payment. *Id.*

The Amended Complaint here is similarly deficient. While the Amended Complaint contains references to broad schemes to defraud Medicare by the general means of filing

unnecessary claims and inflating reimbursement mechanisms, as in *Dennis*, the Amended

Complaint lacks particularity as to any actual false claims presented to the government. The

references to claims associated with most of the sample patients are boilerplate references to

"billing Medicare" that do not contain any information as to the "who, what, when, where, and

how" of false claims purportedly presented to the government. Rather, the Amended Complaint

does not contain reference to actual purportedly false claims filed with an FI. Rule 9(b) does not

allow Prather to escape a motion to dismiss on the *presumption* alone that a false claim may,

likely was, or even must have been presented to the government as part of an overarching

nefarious scheme. *Id.* at *14 (citing *Chesbrough*, 655 F.3d at 472 (affirming Rule 9(b) dismissal

of FCA claims where "one must assume tests performed on Medicare patients could have been

billed to the government") (emphasis added); *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d

1301, 1311 (11th Cir. 2002) ("Rule 9(b) does not permit relator to state claims based on

allegation that "illegal payments must have been submitted, were likely submitted, or should have

been submitted to the Government")).[6]

_____

[6] In *Bledsoe*, the Sixth Circuit left open the possibility that there may be limited circumstances in which the court might relax the rule requiring the pleading of actual false claims – specifically, where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator. *Chesbrough*, 655 F.3d at 470 (quoting *Bledsoe*, 501 F.3d at 504 n.12). An example of this type of situation might be where a relator (1) is able to allege fraud in extreme detail, (2) possesses great first-hand knowledge that false claims had actually been submitted to the government, (3) is able to identify specific confidential documents that contained the evidence of false claims (such as billing invoices), and (4) alleges that those specific documents were in the exclusive control of the defendant (and unavailable to the relator). *Bledsoe*, 501 F.3d at 504 n.12; *accord Sanderson*, 447 F.3d at 878 ("[A]lthough courts have permitted allegations of fraud based upon information and belief, the complaint must set forth a factual basis for such belief, and the allowance of this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.") (internal quotation marks omitted). In the present case, Prather has not alleged facts to warrant relaxation of Rule 9(b)'s

In sum, the Amended Complaint does not allege actual facts to support Prather's first claim for relief under the FCA because it contains insufficient specific factual allegations regarding the presentment of actual false claims to the government arising from alleged fraudulent schemes.  The first claim for relief is therefore subject to dismissal on this basis.[7]

### B.    Count Two

To establish a claim for relief under Section 3729(a)(1)(B), Prather must allege that the defendants knowingly made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  As set forth above, Prather fails to adequately identify any false or fraudulent claim.  On that basis alone, Prather's second claim for relief is subject to dismissal.

Beyond this, however, as with a claim under other provisions of Section 3729, a claim for relief under Section 3729(a)(1)(B), to satisfy Rule 9(b) scrutiny, must provide sufficient detail regarding the time, place and content of the defendants' alleged false statements and the claim for payment.  *Dennis*, 2013 WL 146048, at *17 (citing *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100

_____

strict requirement that relator's identify actual false claims.  The Amended Complaint does not allege that Prather is able to allege fraud in any special detail, possesses any special first-hand knowledge of false claims actually submitted to the government, is able to identify specific confidential documents containing evidence of actual false claims, or did not have access to confidential documents.  Indeed, the Amended Complaint suggests that BSLI did *not* keep its documents appropriately confidential and that Prather had access to them.  In short, Prather has not pleaded facts that create such a "strong inference" that fraud occurred that the strictures of Rule 9(b) should be relaxed.  *See Chesborough* 655 F.3d at 471; *Dennis*, 2013 WL 146048, at *16.  If the relator wishes to rely upon this exception in any Second Amended Complaint, she should be sure to address the factors enumerated herein.

[7] The defendants have also moved to dismiss Count One on the grounds that each of the four fraudulent schemes alleged by Prather are insufficiently pleaded under Rule 9(b).  Because the court has resolved Count one on the ground of insufficient pleading of actual false claims with particularity, it need not rule on these other bases.  The defendants may raise any such issues in response to a Second Amended Complaint.

(6th Cir. 2010)).  The Amended Complaint fails to allege any particular facts regarding what false

statements were made by the defendants to the government, when those false statements were

prepared or made, who prepared or made the false statements, or the contents of the false

statements.  Furthermore, the Amended Complaint makes no allegations regarding what

reimbursement the defendants allegedly received from the government as a result of any false

statements.  For example, the Amended Complaint alleges that BSLI staff misrepresented the

purpose of their OASIS visits as skilled nursing visits when seeking reimbursement therefor.

This naked allegation – devoid of any detail as to the who, what, when, and how of the allegedly

related false statements and related reimbursements – is alone insufficient to maintain a claim

under Section 3729(a)(1)(B).  Because bare-bones allegations about the alleged submission of

false claims, devoid of any particularized facts, are insufficient as a matter of law under Rule

9(b), the claim under § 3729(a)(1)(B) is subject to dismissal.

     **B.**     **<u>Count Three</u>**

     The FCA's reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G), prohibits the

knowing avoidance of an obligation to pay money to the United States.  Prior to 2008, the reverse

false claims provision (then codified at 31 U.S.C. § 3729(A)(7)) contained a requirement that a

person make or use a false record or statement to avoid, conceal or decrease an obligation to the

United States.  The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-

21, 123 Stat. 1616 (2009), eliminated this requirement by extending liability to persons who

"knowingly and improperly avoid or decrease an obligation to pay or transmit money or property

to the United States."  31 U.S.C. § 3729(a)(1)(G).  Thus, there is no longer a need to show the

affirmative use of a false record or statement in connection with the avoidance of an obligation to

pay money to the United States.

The Amended Complaint recites the post-FERA reverse claims statutory provision, 31 U.S.C. § 3729(a)(1)(G); however, it addresses the pre-FERA standard: "Defendants knowingly made, used, or caused to be made or used false records or statements. . . ." (Docket No. 52 at ¶ 135.) The defendants, in response, directed their Motion to Dismiss at whether Prather had met the Rule 9(b) pleading standard for alleging the use of false records or statements. After the motion briefing was complete, the United States filed its Statement of Interest to highlight the difference between the standard apparently being employed by the parties and the text of the post-FERA reverse claims statute.[8] U.S. Statement at 6-7.

An "obligation" under the FCA includes, *inter alia*, "the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The Amended Complaint includes the allegation that "Defendants knew that they had been overpaid by Medicare, but did not take the required and appropriate steps to satisfy the obligation owed to the United States, refund or return such overpayments, or to inform Medicare of the overbilling, and instead continued to retain the same, and to overbill the Medicare program." (Docket No. 52 at ¶ 135 (emphasis added).) The United States did not take a position as to whether this statement satisfied Rule 9(b). U.S. Statement at 7.

Viewed under either the false record/statement approach advanced by Prather or the "knowingly and improperly avoid or decrease" standard provided for by FERA, the Amended Complaint is insufficient. The allegations in the Amended Complaint include only boilerplate assertions that restate statutory language pertaining to reverse false claims. (*See* Docket No. 52 at

---

[8] In response, the defendants opined that they were aware of the difference and had simply structured their motion practice to match the wording of the Amended Complaint.

¶ 135).  Moreover, that statutory language is unsupported by the alleged facts.  Aside from general allegations of malfeasance and enrichment at the government's expense, nowhere in the Amended Complaint does Prather allege any *specific* obligation actually owed by the defendants to the government that the defendants allegedly sought to conceal or avoid.  It is true that the Amended Complaint contains broad complaints about corporate policies and inflated billing that resulted in overpayments.  However, Prather fails to provide any specific factual allegations about what fraudulent record, statement, or other activities the defendants made or engaged in that caused them to avoid or decrease any specific obligation to repay the government, who made such a record or statement or engaged in such an activity, when it was made or performed, where it was made or performed, or its contents or nature.  In other words, the Amended Complaint pleads only half of a story.  It alleges receipt of overpayments, but then it does not continue on to allege with specifics either (1) what the specific obligations owed were or (2) what actions the defendants purportedly undertook to avoid repaying those obligations – both of which are necessary to survive a motion to dismiss.  As a result, Prather has failed to allege a cause of action for a reverse false claim under § 3729(a)(1)(G) with the specificity required by Rule 9(b).  This claim for relief is therefore also subject to dismissal.

## C.  Count Four

To plead conspiracy to violate the FCA under Section 3729(a)(1)(C), a relator must allege facts that establish the existence of both an unlawful agreement to have a false claim paid and at least one act performed in furtherance of the conspiracy.  *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008).  Rule 9(b)'s heightened pleading standard applies to FCA claims of conspiracy to defraud the government.  *Marlar*, 525 F.3d at 445.  Under Rule 9(b),

general allegations of a conspiracy, without supporting facts to show when, where or how the alleged conspiracy occurred, amount to only a legal conclusion and are insufficient to state a cause of action. *Dennis*, 2013 WL 146048, at *17 (citing *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106–07 (9th Cir. 2003)).

Here, the Amended Complaint fails to allege any of the necessary elements of a conspiracy with the requisite specificity. In fact, any alleged conspiracy is not discussed in the Amended Complaint until the "Claims for Relief," where, in Count Four, Prather states that, "by the foregoing acts and omissions, the defendants agreed and took action in furtherance of their conspiracy." This is a legal conclusion, not a factual allegation sufficient to maintain a cause of action for conspiracy. The Amended Complaint merely sets forth factual allegations describing the ongoing business relationships of a family of corporate entities; it does not allege an agreement or overt acts among those entities to commit fraud upon the United States – indeed, as discussed *supra*, the Amended Complaint fails to allege the presentment of *any* false claim by those entities to the government for payment. The court agrees with the defendants that the bare conclusory statement that the defendants conspired to defraud the government, without specific allegations of an agreement, is insufficient to satisfy the requirements of Rule 9(b). Because the Amended Complaint fails to specifically identify any conspirators, identify any specific plan to violate the FCA, or identify any specific overt acts taken in furtherance of that plan, Prather's conspiracy claim must be dismissed as lacking requisite specificity.[9]

## CONCLUSION

---

[9] The court notes that Prather also failed to respond to the Motion to Dismiss concerning this count and thus waived her opposition.

For the foregoing reasons, the court finds that the Amended Complaint fails to state a claim under the FCA, and so the court will grant the defendants' Motion to Dismiss.[10]

Generally speaking, the failure to properly plead fraud is not grounds for dismissal with prejudice. *Dennis*, 2013 WL 146048, at *19 (citing *U.S. ex rel. Bledsoe*, 342 F.3d 634, 644 (6th Cir. 2003); *Yaldu v. Bank of Am. Corp.*, 700 F. Supp. 2d 832, 848 (E.D. Mich. 2010) ("[D]ismissal with prejudice on the basis of failure to plead with particularity ordinarily should be done only after the plaintiff has a chance to seek leave to amend the complaint."). In her response to the motion to dismiss, the relator specifically requests permission to replead any dismissed claims. Moreover, in its Statement of Interest, the United States also requests that any dismissal not be with prejudice to it as the real party of interest in this matter.

The court finds that, while it may indeed be unlikely that Prather is in possession of facts that will permit her to plead fraud with any greater specificity, she has only amended her complaint once, prior to the defendants' having filed any answer or responsive pleading. The court therefore finds that dismissal with prejudice is inappropriate at this juncture. The dismissal

---

[10] The court declines the defendants' invitation to also grant the pending motion based on the ground that the relator has not adequately pleaded intent. While Rule 8 requires more than legal conclusions couched as factual allegations to support a FCA claim, knowledge need not be pleaded with particularity under Rule 9(b); it need only be pleaded generally and plausibly. *See, e.g.*, *U.S. v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260-61 (5th Cir. 2014) (finding the district court erred by requiring the U.S. to plead the FCA's knowledge element with particularity under Rule 9(b)). Despite the flaws in the Amended Complaint discussed above, Prather has alleged that the defendants generally were aware of violations of Medicare conditions of payment and engaged in behavior that resulted in the submission of some unknown number of non-compliant claims (regardless of whether Prather can properly allege the submission of those specific claims for payment under Rule 9(b)). Prather also alleges various other BSLI policies and activities which suggest the requisite state of mind for a FCA claim. Accordingly, this is not a current basis for dismissal of the Amended Complaint. The defendants are, however, free to raise this issue again upon the filing of a Second Amended Complaint.

will therefore be without prejudice to either Prather or the United States.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge