**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel., MARJORIE PRATHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil No. 3:12-CV-00764** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **BROOKDALE SENIOR LIVING** | ) | |
| **COMMUNITIES, INC.; BROOKDALE** | ) | |
| **LIVING COMMUNITIES, INC.;** | ) | |
| **BROOKDALE SENIOR LIVING, INC.;** | ) | |
| **INNOVATIVE SENIOR CARE HOME** | ) | |
| **HEALTH OF NASHVILLE, LLC; and** | ) | |
| **ARC THERAPY SERVICES, LLC;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is the defendants' Motion to Dismiss the Second Amended

Complaint pursuant to Rules 12(b)(6) and 9(b) (Docket No. 78), to which the plaintiff has filed a

Response in opposition (Docket No. 85), and the defendants have filed a Reply (Docket No. 88).

For the following reasons, the defendants' motion will be granted.

## BACKGROUND

**I.**    **The Parties**

Marjorie Prather ("Prather") is an individual who resides in Tennessee. Prather is a

registered nurse who was employed by the defendant Brookdale Senior Living, Inc. ("BSLI") as a

Utilization Review Nurse ("URN") from September of 2011 until November 23, 2012. The

United States of America is the real party in interest to Prather's action.

BSLI is a Delaware corporation with a principal address in Brentwood, Tennessee ("Brookdale Main Office"). (Docket No. 73 at ¶ 12.) BSLI owns retirement communities and assisted living facilities throughout the United States; it provides retirement living services, including home health services and skilled nursing services, to recipients of care under the Health Insurance for the Aged and Disabled Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare") (*Id.* at ¶ 55.) Defendants Brookdale Senior Living Communities, Inc. and Brookdale Living Communities, Inc. (together, "Brookdale Communities") are Delaware corporations with principal addresses at the Brookdale Main Office. (*Id.* at ¶ 11.) The Brookdale Communities provide retirement living services, including home health services and skilled nursing services, to Medicare recipients.

Defendant Innovative Senior Home Health of Nashville, LLC d/b/a Innovative Senior Care Home Health ("ISC Home") is a Delaware limited liability company with a principal address at the Brookdale Main Office. (*Id.* at ¶ 13.) According to documents provided to Brookdale employees, ISC Home is BSLI's "ancillary rehabilitation and wellness organization." (*Id.*) ISC Home provides home health care to Medicare recipients. Defendant ARC Therapy Services, LLC d/b/a Innovative Senior Care ("ARC/ISC") is a Tennessee limited liability company with a principal address at the Brookdale Main Office. (*Id.* ¶ 14.) ARC/ISC provides outpatient and home health therapy services to Medicare recipients.[1] (*Id.*) BSLI is a principal of ISC Home and ARC/ISC. (*Id.* at ¶ 56.)

---

[1] There is, at times, a lack of clarity in the Second Amended Complaint and the parties' briefing concerning which particular defendants are alleged to have taken certain actions. Accordingly, at certain times throughout this opinion, the court uses the collective term "defendants."

II.    **Legal Background**

A.    **The False Claims Act**

The False Claims Act ("FCA") imposes civil liability for knowingly presenting, or causing to be presented, false or fraudulent claims to the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A). The FCA also imposes liability for knowingly making or using a false record or statement that is material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). In addition, the FCA imposes liability for knowingly or improperly avoiding or decreasing an obligation to pay or transmit money to the United States – what is known as a "reverse" false claim. 31 U.S.C. § 3729(a)(1)(G). In layman's terms, a reverse false claim occurs when a party owes funds to the government (such as in the case of an overpayment) but acts so that it does not meet its obligation to return those funds. Those who violate the FCA are liable for civil penalties and treble damages.

To promote enforcement of the FCA, private individuals (called "relators") can bring *qui tam* actions on behalf of the United States. 31 U.S.C. § 3730(b). After the relator files a complaint, the United States has the option of intervening and conducting the litigation itself. 31 U.S.C. § 3730(b)(4). If the government opts not to intervene, the relator may proceed individually. 31 U.S.C. § 3730(c)(3). Successful relators are awarded a portion of the recovery ranging from ten to thirty percent, depending upon the relator's role in the case and whether or not the government chose to intervene. 31 U.S.C. § 3730(d). This award encourages "whistle blowers to act as private attorneys-general in bringing suits for the common good." *U.S. ex rel. Poteen v. Medtronic, Inc.*, 552 F.3d 503, 507 (6th Cir. 2009) (citing *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005)) (internal quotation marks omitted).

The FCA applies to claims submitted by healthcare providers to Medicare; "indeed, one of its primary uses has been to combat fraud in the health care field." *U.S. ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 731 (M.D. Tenn. 2013) (citing *U.S. ex rel. Chesbrough v. VPA P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)).

**B.      Medicare and Home Health Services**

Medicare is a health insurance program administered by the United States that is funded by taxpayer revenue. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS"). Medicare is designed to provide for the payment of, *inter alia*, hospital services, medical services, and durable medical equipment to persons over sixty-five years of age and for certain others who qualify under special terms and conditions. The Medicare program is divided into multiple parts. Part A of the Medicare program covers certain health services provided by hospitals, skilled nursing facilities, and Medicare-certified home health care agencies, including those provided by the defendants. Reimbursement for claims under Medicare Part A is made by the United States through CMS, which contracts with private insurance carriers, known as fiscal intermediaries ("FIs"), to administer and pay claims from the Medicare Trust Fund. *See generally* 42 U.S.C. § 1395u.

In order to become Medicare certified (*i.e.*, to obtain a Medicare provider number and to be eligible to file a claim for payment with Medicare), a home health care agency must submit a Medicare Enrollment Application for Institutional Providers ("Form 855A"). As part of Form 855A, the home health care agency must sign the following certification:

I agree to abide by the Medicare laws, regulations and program

4

instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form 855A.  The provider must also sign a certification statement that contains the following

provisions:

> 1. I agree to notify the Medicare contractor of any future changes to the information contained in this application in accordance with the time frames established in 42 C.F.R. § 424.516(e);

> 2. I have read and understand the Penalties for Falsifying Information . . . I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punished by criminal, civil or administrative penalties, including but not limited to the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment;

> 3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare; and
> . . .

> 6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

(Docket No. 73 at ¶ 28 (citing Form 855A).)  Claims are subsequently submitted to FIs by home

health care agencies on CMS Form 1450, which contains a certification that the form was prepared in compliance with all Medicare laws are regulations. (Docket No. 73 at ¶¶ 34-35.)

Patients who receive benefits under Medicare are commonly referred to as "beneficiaries." Medicare beneficiaries who are homebound can receive certain medically necessary services at home. *See* 42 U.S.C. §§ 1395f(a)(2)(C); 1395n(a)(2)(A). Home health agencies' patients are referred for home health services by physicians. These services generally include skilled nursing, physical therapy, speech-pathology therapy, and occupational therapy. Medicare conditions payment on the physician's certification that the beneficiary is homebound and in need of skilled services. 42 C.F.R. § 409.41(b). Medicare also conditions payment on a beneficiary actually being homebound and actually needing skilled services. 42 C.F.R. § 409.41(c) (conditioning payment on all requirements contained in §§ 409.42–409.47 being met, including 42 C.F.R. § 409.42(a)). The most basic requirements for reimbursement eligibility under Medicare are that the service provided must be reasonable and medically necessary. *See*, *e.g.*, 42 U.S.C. §§ 1395y(a)(1)(A); 1396, *et seq.*; 42 C.F.R. § 410.50.

Home health agencies are not paid per service rendered. Instead, Medicare pays them under a Home Health Prospective Payment System that provides a predetermined amount to cover a plan of care for a sixty-day treatment period referred to as an "episode."[2] *See* 42 U.S.C. §

---

[2] The amount paid is based on a standard national episode rate that is then adjusted to account for the type of care the patient requires as well as the geographic location. *See* 42 U.S.C. §§ 1395fff(b)(4)(B), 1395fff(b)(4)(C). These adjustments are made based on forms reflecting the home health agency's patient-specific comprehensive Outcome Assessment Information Set ("OASIS"), which are submitted to the government through the FI. Additionally, the reimbursement rate is subject to a low utilization payment adjustment if the home-health agency visits the patient four or fewer times during a sixty-day episode. *See* 42 C.F.R. §§ 484.205(c); 484.230. In this situation, Medicare will calculate its payment using a per-visit amount. *Id.* Conversely, the reimbursement rate is subject to an "outlier adjustment" when the number of

1395fff *et seq.*; 42 C.F.R. § 484.205 *et seq.* After each treatment episode, a patient must be recertified to receive funds from Medicare. To be recertified, the patient's physician must review and re-approve the patient's plan of care, making any necessary changes, and the home health agency must complete a new assessment to determine that the patient is still eligible to receive Medicare-funded home health services.[3] *See* 42 C.F.R. § 424.22; 42 C.F.R. § 484.55. Medicare reimbursement for each episode is typically paid in two parts – home health providers may submit a request for anticipated payment ("RAP") to the FI in order to receive an anticipated percentage of the sixty-day episode payment up front, and then submit a final episode payment billing claim at the end of the episode to the FI in order to receive the balance. *See* 42 C.F.R. § 484.205(b)(1),(2). CMS has the authority to reduce or disapprove RAPs where it deems such action appropriate to insure the integrity of the Medicare program. *See* 42 C.F.R. § 409.43(c)(2).

Upon submission of a RAP, Medicare pays for home health services only if (a) the physician certifies that the patient is under his or her care, (b) the physician has established and will periodically review a sixty-day plan of care, (c) the patient is homebound, and (d) the patient requires one of the types of home health services that qualifies for Medicare. In particular, Medicare regulations require that a certification justifying the need for home health services "must be obtained at the time the plan of care is established or as soon thereafter as possible and

---

visits in episode exceed the number predicted (which is based on a series of calculations derived from representatives of the patient's case-mix group (as determined by CMS via a series of national calculations)). *See* 42 C.F.R. §§ 484.205(e); 484.240. In short, when a home-health agency reaches a certain number of visits to a single patient during a given sixty-day episode, Medicare will increase the reimbursement paid to the home health agency on that patient's behalf.

[3] Home health care under Medicare Part A has no limitation on the number of certified episodes.

must be signed and dated by the physician who establishes the plan." 42 C.F.R. § 424.22(a)(2).

There is, however, no regulatory requirement that plans of care contained in submitted RAPs

contain physician signatures. *See* 42 U.S.C. § 409.43. Medicare regulations allow for the filing

of RAPs based on physician verbal orders as long as, first, the verbal order (a) is recorded in the

plan of care; (b) includes a description of the patient's condition and the services to be provided

by the home health agency; (c) includes an attestation signed and dated by the registered nurse or

qualified therapist responsible for furnishing or supervising the ordered service in the plan of

care; and (d) is copied into the plan of care and the plan of care is immediately submitted to the

physician; and, second, "[t]he oral orders [are] . . . countersigned and dated by the physician

before the [home health agency] bills for the care." 42 U.S.C. § 409.43(c)(1)(i)(A)-(D) and (d).

A physician is also required to separately certify that an appropriate face-to-face

encounter occurred with a home health services patient. *See* 42 C.F.R. § 424.22(a)(1)(v). This

encounter must occur "no more than 90 days prior to the home health start of care date or within

30 days of the start of the home health care." 42 C.F.R. § 424.22(a)(1)(v). "The [signed]

documentation of the face-to-face patient encounter must be a separate and distinct section of, or

an addendum to, the certification, and must be clearly titled, dated and signed by the certifying

physician."[4] *Id.*

---

[4] After receiving a patient referral, a home health agency is also required to provide its
own OASIS assessment. 42 C.F.R. § 484.55. During this initial assessment, the home health
agency must determine the immediate care and support needs of the patient and, for Medicare
patients, determine eligibility for the Medicare home health benefit, including homebound status.
*Id.* The comprehensive OASIS assessment must be completed "in a timely manner, consistent
with the patient's immediate needs, but no later than [five] calendar days after the start of care."
42 C.F.R. § 484.55(b).

III.     **Prather's Factual Allegations**[5]

The defendants provided services to patients that were subject to reimbursement under Medicare Part A as described above.  In submitting Medicare claims for reimbursement however, the defendants – according to Prather – had systems in place that resulted in the submission of claims that were not compliant with Medicare regulations.

A.       **Allegations of Misconduct Regarding Defendants' Provision of Services**[6]

A large number of BSLI and Brookdale Communities facilities offer nursing care and other health care services on site (such as secured memory care units for dementia and Alzheimer's disease patients).  (*Id*. at ¶ 57.)  Residents pay a monthly fee to reside at those facilities and receive the services they provide.  (*Id*.)  ISC Home and ARC/ISC also maintain offices in many of these facilities.  (*Id*.)  According to the Second Amended Complaint ("SAC"), ISC Home and ARC/ISC made referrals for resident patients to also receive home health services from ISC Home and ARC/ISC that the defendants could then bill to Medicare.  (*Id*. at ¶ 58.)

Furthermore, Prather alleges that, to generate additional home health care and therapy revenue, BSLI offered wellness "checks" in its communities as part of a program known as the

---

[5] The facts as described herein are taken from the Second Amended Complaint and are assumed to be true for purposes of the pending Motion to Dismiss.  (*See generally* Docket No. 73.)

[6] Prather makes clear that her "unnecessary services" factual allegations are not the subject of "an independent ground of recovery under the [FCA]" but, rather, "are relevant to the *scienter* requirement" under the FCA.  (Docket No. 85 at pp. 22-23.)  However, the court cannot discern how these alleged allegations of unnecessary services demonstrate *scienter* for any claims other than claims that cover these services themselves.  As noted *infra*, Prather never makes the final connection of tying these allegations to any sufficiently presented claim for reimbursement. The court recites these allegations as background, however, because they led, according to Prather, to the backlog of non-compliant claims actually at issue in this case.

"Care3 Wellness Program," and Brookdale Communities provided free "screenings" in order to identify patients for home care and therapy services. (*Id*. at ¶ 60.) According to ISC Home, its "reigning philosophy should be that most every resident would benefit from [t]herapy or [n]ursing intervention at some point. This is the key to what makes ISC [Home] successful, much like visiting your doctor, you will need therapy or nursing intervention at some point." (*Id*.) To that end, BSLI communities held collaborative care meetings to identify patients for services to be billed to Medicare. (*Id*. at ¶ 61.)

The SAC also alleges that ISC Home and ARC/ISC implemented a "70/30" corporate business model that promoted over-utilization of services billed to Medicare. (*Id*. at ¶ 62.) The training manual for the "70/30" model explains: "We also have the ability to leverage our current customer base in senior living with expanded ancillary services and share in the revenue produced." (*Id*.) The manual states that "ISC [Home]'s approach to care is both reactive and proactive in nature. Our clinical experience has shown that some thirty percent of seniors' needs are obvious while seventy percent must be uncovered through continual screening and assessment, thus our 70/30 theory." (*Id*.)

Ultimately, the SAC alleges that the defendants' aggressive marketing and solicitation policies generated a backlog of thousands of claims for home health care services that Prather alleges could not be successfully billed to Medicare because they "did not comply with Medicare regulations." (*Id*. at ¶ 63.) For many of these claims, the plan of care orders (known in Medicare parlance as "485s") contained primary diagnoses (to justify home health care billable to Medicare) that were inconsistent with the care actually provided to the patient. (*Id*. at ¶ 90.) A large number of these claims were for therapy and home health care services that were not

provided under a properly physician-documented (*i.e.*, signed) plan of care.  (*Id*. at ¶ 92.)

Additionally, face-to-face encounter documentation was often incomplete, and in many cases was

not completed until after the care was provided.  (*Id*. at ¶ 94.)  To facilitate billing Medicare for

these claims, the defendants implemented what they referred to as the "Held Claims Project,"

which sought to remedy this backlog.  (*Id*.)

> **B.      The Held Claims Project**

As mentioned *supra*, Prather was employed by BSLI as a URN from September of 2011

through November 23, 2012.  (*Id*. at ¶ 64.)   Prather was hired to work on the Held Claims

Project and was terminated when it ended.  (*Id*.)  Prior to September of 2011, each office location

("agency") of ISC Home and ARC/ISC submitted its own claims directly to Medicare.  (*Id*. at ¶

65.)  In September of 2011, BSLI made the decision to centralize the billing of most of the

agencies into the Brookdale Main Office.  (*Id*.)

At that time, the defendants had a large backlog of about 7,000 unbilled Medicare claims

worth approximately $35 million.  (*Id*. at ¶ 66.)  These claims were referred to as the "held

claims."  (*Id*.)  According to the SAC, these claims were backlogged because they were not in

compliance with Medicare rules, primarily because they related to care that was provided without

properly certified plans of care or without the required face-to-face encounter documentation.

(*Id*.)  Copies of patient charts concerning the held claims were forwarded to the Brookdale Main

Office to be reviewed, corrected if necessary, and billed to Medicare when made compliant.  (*Id*.

at ¶ 67.)  The defendants issued weekly reports, called the "Home Health Held Claims Report,"

that showed how many claims had been released for billing to Medicare.  (*Id*. at ¶ 68.)

Prather was directly involved in the Held Claims Project.  According to Prather, her

primary responsibilities were: (1) completing pre-billing chart reviews in order to ensure

compliance with the requirements and established policies of the defendants, as well as state,

federal and insurance guidelines; (2) working directly with the BSLI Regional Directors, BSLI

Directors of Professional Services, and BSLI clinical associates to resolve documentation,

coverage, and compliance issues; (3) acting as a resource person to the agencies for coverage and

compliance issues; (4) reviewing visit utilization for appropriateness pursuant to care guidelines

and patient condition; and (5) keeping BSLI Directors of Professional Services apprised of

problem areas requiring intervention.  (*Id*. at ¶ 69.)  All of these responsibilities directly related to

the defendants' efforts to bill the held claims to Medicare.  (*Id*.)

     For each held claim, the defendants used a "billing release checklist" to identify items

that needed to be completed before the claim could be released for final billing to Medicare.  (*Id*.

at ¶ 71.)  Once all items on the checklist associated with a claim were complete, the checklist

would be attached to the "AR Transaction Report," which listed the nursing and therapy visits

and the charges to be billed to Medicare.  (*Id*.)  The combined document would then be given to

the billing employees in the Brookdale Main Office, who would use it to prepare and submit the

final bill to Medicare.  (*Id*.)

     On a daily basis, Prather worked in the Brookdale Main Office on the same floor as other

billing employees known as Central Office Associates ("COAs") and senior managers who also

worked on the Held Claims Project, including:  Debra Dunigan, Regional Vice President ISC

Home; Lance Blackwood ("Blackwood"), Senior Director Home Health Product Line ISC Home;

Denise Tucker, BSLI utilization review nurse; Brandi Tayloe ("Tayloe"), Regional Vice

President ISC Home; Pat Smith, Regional Vice President ISC Home; Jack Carney, Regional Vice

President ISC Home; Sheri Easton-Garrett, Regional Vice President ISC Home; Katy Wiseman, Regional Vice President ISC Home; Zach Zerbonia, Regional Vice President ISC Home; and Shad Morgheim ("Morgheim"), Senior Vice President ISC Home. (*Id*. at ¶ 70.) BSLI hired a group of temporary employees to help audit the held claims. (*Id*. at ¶ 74.) Diana Sharp ("Sharp"), Interim Director of Professional Services for ISC Home, headed up the group of temporary employees. (*Id*.) Sharp's responsibilities also included supervision of the BSLI employees who inputted data onto spreadsheets that monitored the progress of the Held Claims Project. (*Id*.) The spreadsheets were updated on a daily basis. (*Id*.) Prather regularly worked with the spreadsheets as part of her duties as a URN. (*Id*.)

Prather worked with Denise Tucker, a fellow BSLI URN, on the Held Claims Project. (*Id*. at ¶ 72.) The URNs reported directly to Blackwood. (*Id*. at ¶ 73.) The purpose of the URNs' work was to review held claims for a variety of items necessary to submit claims for billing, including physician signed care plan orders and completed physician face-to-face encounter documentation. Initially, the URNs sent attestation forms to doctors for them to sign to correct the problem of missing signatures, but the URNs received only a few signed and completed forms back from doctors. (*Id*. at ¶ 75.) The defendants' management felt that this was "a slow process." (*Id*.)

On April 2, 2012, Blackwood allegedly showed Prather an email from Morgheim, in which Morgheim asked if the URNs were doing just a "quick review" on the billing release checklists to release claims. (*Id*. at ¶ 76.) Blackwood allegedly said that he thought the charts were being reviewed too closely and informed Prather that the URNs needed only to make sure that the orders were signed, the face-to-face documentation was complete, and the therapy

reassessments were present in the charts; he stated that the URNs were to ignore any compliance issues regarding the substantive information in the records. (*Id*.)

Thereafter, on April 25, 2012, Morgheim sent an email announcing the decision to move the audit process back to the agency offices for all claims that were older than one hundred and twenty days. (*Id*. at ¶ 77.) Morgheim explained that "[m]ost held claims that are older than 120 days, typically are being held up for [face-to-face documentation], orders, or certifications," and "we need to get these released in a quicker fashion." (*Id*.) The agencies were instructed to get the doctors to sign the old documents, as well as ask them to complete the face-to-face documentation. (*Id*.) Morgheim emphasized that "[t]here is a high sense of urgency to get these released ASAP." (*Id*.) Attached to Morgheim's April 25, 2012, email was a document named "Held Claims Initiative.doc." (*Id*. at ¶ 78.) This document explained that:

> Most claims over 120 days held are being held due to orders out of compliance, unsigned 485s or FTF needs. In other words most of the 120 [plus] day held claims have all of their visit notes entered and are waiting on the agency to finalize physician related issues. . . . Since so many of these claims are so old, the COA literally has to "refresh" themselves on the outstanding items. This results in inefficiency.

(*Id*.) Once the agencies received the signed documents, they forwarded them to the URNs, who completed the final reviews and checklists in order to release the claims for billing to Medicare. (*Id*. at ¶ 79.) The URNs were instructed to only do a "quick review" for missing signatures and dates and were specifically instructed not to look for any other problems related to Medicare billing; when the URNs noted problems, they were told to ignore them. (*Id*. at ¶ 80.)

Prather alleges that she raised concerns about the manner in which the agencies were auditing the beneficiaries' charts because she was finding compliance problems with face-to-face

documentation, doctors' orders and plans of care, and therapy evaluations. (*Id*. at ¶ 81.) In response, Blackwood told Prather that it was the agencies' responsibility to correct the charts (not hers). (*Id*.) Blackwood allegedly further instructed the URNs to not read documents (such as plans of care and face-to-face documentation), but only to make sure that orders affecting billing were signed and dated, that the plans of care were signed and dated by a physician, and that face-to-face documentation contained an encounter date in the right time period, clinical findings, and a reason why the patient was homebound. (*Id*. at ¶ 82.) The URNs were instructed not to read any other substantive content, other than to confirm that the documentation did not say such things as "not homebound." (*Id*. at ¶ 83.)

Prather repeatedly told Blackwood and others that she had discovered problems that needed to be addressed and that she was not comfortable believing that the claims were not compliant but still forwarding them for billing to Medicare. (*Id*. at ¶ 99.) On more than one occasion during these discussions, Tayloe responded that "[w]e can just argue in our favor if we get audited." (*Id*.) Prather raised her concerns numerous times with COA supervisors at the Brookdale Main Office. (*Id*. at ¶ 85.) Prather spoke to David Simmons, a COA supervisor, and was told that "there is such a push to get the claims through." (*Id*.) On May 17, 2012, Morgheim sent an email to Prather, and others working on the Held Claims Project, thanking the employees for the momentum they had developed in releasing stale claims for billing to Medicare. (*Id*. at ¶ 86.) Nevertheless, Morgheim acknowledged that the defendants faced a "looming financial crisis related to the held claims issue." (*Id*.) In order to expedite the process of releasing the oldest held claims, Morgheim announced a new "strategy to help compensate physicians for the time they will spend with us to release these claims." (*Id*.)

On May 23, 2012, Morgheim sent a follow-up email to the same recipients outlining a program to compensate doctors for signing orders to facilitate the billing of old claims to Medicare. (*Id*. at ¶ 87.) According to the SAC, pursuant to this policy, the defendants paid physicians to review outstanding held claims and sign orders for previously provided care. (*Id*.) The set rate of physician compensation was one hundred and fifty dollars an hour with a one half-hour minimum. (*Id*.) Morgheim's second email included several attachments, including a "Physician Consulting Power Point," a "[Face to Face] Physician Tip Sheet," and sample invoices and check requests. (*Id*.) The Physician Consulting Power Point contained guidance for employees who encountered physicians who did "not want to sign a document," stating that "if the physician is not comfortable with signing a document then we can not force this process." (*Id*.)

On June 21, 2012, Sharp sent an email to ISC Home management, Prather, Tucker, and others, stating: "[we] have processed and released over **10,000** claims since 2/7!!" (*Id*. at ¶ 88 (emphasis in original).) Attached to that email was a spreadsheet titled "RELEASED CLAIMS 6-21-2012.xls." (*Id*.)

Prather alleges that, as time passed, BSLI continued to pressure employees to speed up the processing of held claims. BSLI allegedly implemented incentive programs for COAs and the management of agencies for the completion of home care plans that could be billed to Medicare. (*Id*. at ¶ 89.) For example, a staff member received one hundred dollars a week if ten claims were submitted to the utilization review department for billing and twenty-five dollars for every claim over and above the first ten. (*Id*.) One COA, Angela Spalding, allegedly told Prather that, during the week of July 9 through 13, 2012, she completed more than fifty releases

to URNs, resulting in a bonus to her of $1,200 that she shared among her office peers.  (*Id*.)

### C.  Exemplar Patients

The SAC provides 4 exemplars – patients A through D, discussed more fully below – patients for whom claims were submitted to Medicare that were allegedly not compliant in the ways described above.[7]

Patient A, a dementia patient who was a resident of a secured memory unit in a BSLI facility in Chandler, Arizona, was diagnosed with "abnormality of gait" on the plan of care order, but she did not receive physical therapy.  (*Id*.)  In addition, the skilled nursing services that Patient A received included medication teaching that was unnecessary and inconsistent with her diagnosis of dementia, because Patient A received her medication from a nurse.  (*Id*.)  Prather further alleges that, although Patient A received home health care services from December 14, 2011, through February 11, 2012, no doctor signed the plan of care documentation until June 29, 2012.  (*Id*.)  In December of 2011, the defendants submitted a RAP for Patient A for that treatment episode (for sixty percent of the episodic rate).  (*Id*. at ¶ 91.)  The SAC alleges that this care was provided without signed certifications and orders and that, at the time the RAP was submitted, (1) no physician had signed Patient A's certification of need for home health care services (and that this did not occur until June 29, 2012); and (2) there was no properly attested verbal order from a physician to start care or a signed plan of care.  (*Id*.)  Additionally, on July 10, 2012, the defendants billed Medicare eight hundred dollars for the final episode payment for

_____

[7] The First Amended Complaint had identified Patients A through H for whom Prather alleged that the defendants Brookdale had submitted final episode claims that were false. (*See* Docket No. 52 at ¶¶ 87-89, 96, 99-101, 114-118.) The SAC drops Patients E-H but adds detail for Patients A-D.

Patient A for that same treatment episode. (*Id*.) Sally Horvath, ISC's Regional Director, released the claim for final billing. (*Id*.)

Patient B was a resident at the Freedom Square Brookdale Community in Tampa, Florida, and he received physical therapy, occupational therapy, and skilled nursing services from September 9, 2011 through November 7, 2011. (*Id*.) Prather alleges that all of this care was provided without proper signed documentation – *i.e.*, that the start of care order and the face-to-face encounter documentation were not signed by the doctor until June 4, 2012, and no physician signed the certification that Patient B needed home health services until July 10, 2012, several months after the patient had been discharged. (*Id*.) On September 9, 2011, the defendants submitted a RAP for Patient B for that treatment episode (for sixty percent of the episodic rate). (*Id*. at ¶ 93.) The SAC alleges that this care was provided without proper signed certifications and orders and that, at the time the RAP was submitted, (1) no physician had signed Patient B's certification of need for home health care services (and that this did not occur until July 10, 2012); and (2) there was no properly attested verbal order from a physician to start care or a signed plan of care. (*Id*.) Additionally, on July 12, 2012, the defendants billed Medicare $3,200 for the final episode payment for Patient B for that treatment episode. (*Id*.) Alina Moser, RN, released the claim for final billing. (*Id*.) Furthermore, Patient B's home health care services were provided from December 14, 2011, through February 11, 2012, but her face-to-face encounter documentation was allegedly not signed by a physician until February 24, 2012. (*Id*.)

Patient C was a resident in the Brookdale Senior Living Community in Austin, Texas. (*Id*. at ¶ 95.) Patient C received skilled nursing services, physical therapy and occupational therapy from ISC Home from July 25, 2011 to September 22, 2011. Patient C's plan of care

reflected a primary diagnosis of pressure ulcer, with a secondary diagnosis of weakness. (*Id.*) According to the SAC, although therapy was not indicated for his pressure ulcer, and the OASIS assessment reflected no need for therapy, Patient C received twelve combined therapy visits. (*Id.*) Patient C also received twenty-four skilled nursing visits. (*Id.*) On July 25, 2011, the defendants submitted a RAP for Patient C for that treatment episode (for sixty percent of the episodic rate). (*Id.* at ¶ 96.) The SAC alleges that this care was provided without proper certifications and orders and that, at the time the RAP was submitted, no physician had signed Patient C's certification documentation (and that this did not occur until December 12, 2011). (*Id.*) Additionally, on July 5, 2012, the defendants billed Medicare $5,760 for the final episode payment for Patient C for this treatment episode. (*Id.*)

Following this initial episode, Patient C was re-certified for another sixty-day episode, from September 23, 2011 to November 21, 2011, when he received skilled nursing services, occupational therapy, and physical therapy. (*Id.*) The SAC alleges that no physician properly documented Patient C's certification for home health care services until December 12, 2011. (*Id.*) On September 23, 2011, the defendants submitted a RAP for that second treatment episode, thereby billing Medicare for fifty percent of the episodic rate. (*Id.* at ¶ 97.) The SAC alleges that this care was provided without proper certifications and orders and that, at the time the RAP was submitted, no physician had signed Patient C's certification for home health care services (and this did not occur until December 12, 2011). (*Id.*)

Patient D was a resident of a Brookdale facility[8] in Denver, Colorado. (*Id.* at ¶ 98.)

---

[8] The SAC is non-specific as to the name of the facility and whether it was a BSLI or Brookdale Communities property.

Patient D's certification period was from January 10, 2012, through March 9, 2012.  (*Id*.)  On

January 10, 2012, the defendants submitted a RAP for Patient D for that treatment episode

(billing Medicare for fifty percent of the episodic rate).  (*Id*.)  On June 22, 2012, the defendants

billed Medicare $1,920 for the final episode payment for Patient D for this treatment episode.

(*Id*.)  Prather herself released this claim for final billing at the instructions of the defendants.

(*Id*.)  The SAC alleges that the doctor did not properly document Patient D's certification until

June 12, 2012, several months after Patient D had been discharged.  (*Id*.)

### D.    Patients Listed in Exhibits A and B

In addition to the exemplar patients discussed above, Prather has identified 489 claims

that were allegedly submitted to Medicare in violation of the Medicare rule that signed physician

documentation of the certification of a patient's need for home health services must be obtained

at the time the plan of care is established or as soon thereafter as possible.  (*Id*. ¶¶ 101-02.)

Prather has also identified 771 claims that were allegedly submitted to Medicare in violation of

the condition of payment that an appropriate physician document a face-to-face encounter with

the patient.  (*Id*. at ¶ 103-05.)  According to the SAC, these claims were processed through the

Held Claims Project.

These claims are described in two Exhibits to the SAC, which set forth claims by patient,

treatment dates, the ISC Home network that provided the home health services (using the

defendants' internal abbreviations), and the Brookdale Community where the patient received the

home health services (using the defendants' internal abbreviations).[9]  (*Id*.)  The SAC alleges that,

---

[9] Patient names are redacted subject to entry of an appropriate protective order.  (Docket
No. 73 at ¶ 100.)

for every claim listed, the defendants did not timely obtain a signed document – either the required physician plan of care certification (Exhibit A patients) or the face-to-face encounter documentation (Exhibit B patients) – until after (and, in many instances, several months after) the treatment episode was complete or the patient was discharged but submitted RAPs for these patients, knowing this condition was not satisfied, and received Medicare reimbursement.  (*Id*. at ¶¶ 101-05.)  The SAC does not make allegations concerning final episode payment claims for the patients listed in Exhibits A or B.  (*See id*.)

IV.     **Procedural History and Claims in the Second Amended Complaint**

On July 24, 2012, Prather filed a *qui tam* Complaint under the FCA.  (Docket No. 1.)  As required under the FCA, the Complaint was filed under seal and *ex parte*, to afford the United States Department of Justice the opportunity to investigate the allegations asserted in the Complaint and reach a determination as to whether the United States would intervene.  The United States subsequently sought and received several extensions of time to consider intervention.  (Docket Nos. 5, 8, 17.)  In May 2013, the relator's counsel obtained employment with the government of Florida, which precluded continued participation in this matter.  (Docket Nos. 9, 10.)  At the request of the United States, the court partially lifted the seal to allow the relator to seek new counsel.  (Docket No. 12.)  In July 2013, the relator obtained new counsel and the United States continued its consideration of intervention.  (Docket No. 14.)

On April 8, 2014, the United States filed a Notice of Election to Decline Intervention, in which the United States advised the court that it had decided not to intervene in this action and requested that the court unseal the Complaint (Docket No. 23), which it did (Docket No. 24).  On August 4, 2014, replacement counsel for Prather filed a motion to withdraw, in which he stated

that Prather desired to continue this action but wished to do so with another new counsel. (Docket No. 39.)  On September 29, 2014, the court granted this request and ordered Prather to secure new representation within forty-five days.  (Docket No. 45.)  Prather's new counsel entered their appearances thereafter.  (Docket Nos. 48, 53.)

On November 21, 2014, Prather filed an Amended Complaint.  (Docket No. 52.)  On December 22, 2014, all defendants jointly filed a Motion to Dismiss, accompanied by a Memorandum of Law and the Declaration of Brian D. Roark.  (Docket Nos. 56-58.)  On January 29, 2015, Prather filed a Response, accompanied by the Declaration of Patrick Barrett.  (Docket Nos. 60, 61.)  On February 12, 2015, the defendants filed a Reply.  (Docket No. 65.)

On February 24, 2015, the United States filed a "Statement of Interest Regarding Defendants' Motion to Dismiss."  (Docket No. 68.)  On March 9, 2015, the defendants filed a Response thereto.  (Docket No. 70.)

On March 31, 2015, the court issued a Memorandum and Order ("First Memorandum") granting the defendants' Motion to Dismiss without prejudice and granting Prather leave to amend.  (Docket Nos. 71, 72.)

On June 1, 2015, Prather filed the SAC.  (Docket No. 73.)  The SAC brings three counts against the defendants.

Count One alleges that the defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).  Under this cause of action, the SAC alleges that the defendants violated the FCA concerning both RAPs and

final episode billing claims.[10]  The SAC provides detail for Patients A through D and alleges that the defendants submitted both false RAPs and final claims for them.  (*Id*. at ¶¶ 90-98.) Additionally, as discussed above, the SAC includes two lists of patients, for whom Prather alleges only that the defendants submitted RAPs that were false (but does not allege that the defendants also submitted false final episode billing claims).  (*Id*. at Exs. A, B.)

Count Two alleges that the defendants knowingly made or used, or caused to be made or used, false records or false statements material to false or fraudulent claims paid by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B), and that the United States paid Medicare claims based upon those false records or statements that would otherwise have not been allowed.[11]

Count Three alleges that the defendants knowingly made, used, or caused to be made or used, false records or statements in violation of 31 U.S.C. § 3729(a)(1)(G).  The gravamen of Count Three – the subject of which is commonly known as a "reverse false claim" – is that the defendants knew that they had been overpaid by Medicare as a result of their submission of improper RAPs and final payment requests, but they did not take the necessary steps to satisfy the obligation owed to the United States by informing it of the overbilling and refunding or returning the overpayments.

---

[10] Prather has dropped the "medical necessity," "reassessments," and "OASIS" schemes that were pled as additional bases for Count One in the First Amended Complaint.  (*Cf.* Docket No. 52.) Prather has also dropped her conspiracy claim.  (*Id*.)

[11] In the context of the FCA, the "terms 'knowing' and 'knowingly' mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud."  See 31 U.S.C. § 3729(b)(1).  "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  See 31 U.S.C. § 3729(b)(4).

On July 8, 2015, the defendants filed the pending Motion to Dismiss, accompanied by a Memorandum of Law.  (Docket Nos. 78, 79.)  On August 4, 2015, Prather filed a Response, accompanied by the Declaration of Patrick Barrett.  (Docket Nos. 85, 86.)  On August 25, 2015, the defendants filed a Reply.  (Docket No. 88.)

## LEGAL STANDARDS

### I.    Rule 12(b)(6) Standard

In deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

A complaint's allegations, however, "must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.

## II.   Rule 9(b) and FCA Actions

Complaints alleging FCA violations must further comply with Rule 9(b)'s requirement that fraud be pled with particularity. *Chesbrough*, 655 F.3d at 466 (citing *U.S. ex rel. Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)). This is because defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts. *Id.* Rule 9(b) requires that, in alleging fraud under the FCA, a relator must state with particularity the circumstances constituting the alleged misconduct. *Id.* (citing *U.S. ex rel. Bledsoe v. Cmty Health Sys., Inc.*, 501 F.3d 493, 509 (6th Cir. 2007)). This heightened pleading standard is designed to prevent "fishing expeditions," to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters. *Id.* (citing *U.S. ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 504 (6th Cir. 2008)).

Moreover, "pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)." *Bledsoe*, 501 F.3d at 504. It is insufficient to merely plead a fraudulent scheme. *Id.* Under Rule 9(b), therefore, the circumstances constituting fraud for the purpose of the FCA must include an averment that a specific false or fraudulent claim for payment or approval has been submitted to the government. As stated by the Sixth Circuit, a fraudulent claim itself "is the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Sanderson v. HCA*, 447 F.3d 873, 878 (6th Cir. 2006). In sum, to properly plead fraud under the FCA, a relator must allege with particularity (1) "the time, place,

and content of the alleged misrepresentation" (including specific fraudulent claim or claims), (2) "the fraudulent scheme," (3) the defendant's fraudulent intent, and (4) the resulting injury of inducing the government to pay a false claim to the defendant. *Bledsoe*, 501 F.3d at 504; *SNAPP*, 532 F.3d at 504. As to the "false scheme" element, a relator must plead with particularity any scheme alleged in a complaint and provide specific examples of fraudulent conduct for the scheme. *See Bledsoe*, 501 F.3d at 509; *U.S. ex rel. White v. Gentiva Health Servs.*, No. 3:10-CV-394-PLR-CCS, 2014 WL 2893223, at *15 (E.D. Tenn. June 25, 2014).

A complaint's failure to comply with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6). *U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-cv-00484, 2013 WL 146048, at *7 (M.D. Tenn., Jan. 14, 2013).

## MOTION TO DISMISS ANALYSIS

The defendants have moved to dismiss the entire SAC based upon the grounds that Prather has failed to plead with particularity as required by Rule 9(b). As to Count One, the defendants' argument consists of two parts: first, that Prather fails to plead presentment of actual false claims regarding RAPs with the specificity required by law[12] and, second, that Prather fails to plead the requisite legal falsity of both the RAPs and final episode payment claims that Prather alleges that the defendant improperly presented to the government. As to Count Two, the defendants contend that, because Prather cannot identify any actual false claims, she likewise cannot identify any false statement that was used to support the making of a false claim. Finally, as to Count Three, the defendants argue that Prather fails to make out a cause of action for a

---

[12] This is the basis upon which the defendants successfully secured dismissal of the First Amended Complaint.

reverse false claim because she has not made any sufficient allegations of specific payments made by the government in response to false claims that were improperly received and retained by the defendants. The court examines these arguments in turn.

## I.     Count One

### A.     Pleading Presentment of Actual False Claims Based on RAPs

The defendants contend that, although the SAC introduces the submission of false RAP claims as a theory of liability, Prather fails to satisfy her Rule 9(b) pleading-with-particularity obligations because she does not plead the presentment of the RAPs as false claims with sufficient specificity.  (*See* Docket No. 79 at pp. 10-13.)   The defendants argue that Prather "does not allege details regarding presentment of RAPs for any patient, including the basis for the claim, the form or method used to submit the claim, who submitted or authorized the RAP, the date of submission of the RAP, the actual amount billed, or any amount paid.  Recitation of the start of care date and the statutory percentage paid is insufficient under Rule 9(b)."  (Docket No. 79 at p. 12.)  Rather, the defendants contend that, as to her RAP claims,[13] Prather continues to make the type of generalized accusations of wrongdoing that Rule 9(b) precludes.

#### 1.     Patients Listed in Exhibits A and B

The SAC alleges that "Defendants submitted a RAP" that violated a Medicare condition of payment at "the beginning of the [treatment] episode" for each of the patients listed in

---

[13] The defendants do not contend that the SAC fails to plead the submission of final episode claims for payment with requisite particularity under Rule 9(b), but they seek dismissal as to those claims on the grounds of failure to plead falsity, as discussed *infra*.

Exhibits A and B.[14]  (*See* Docket No. At ¶¶ 101, 104.)  In addition, Exhibits A and B contain six columns of information: (1) an arbitrary patient number (assigned by counsel in this litigation); (2) patient name; (3) [treatment] episode begin date; (4) [treatment] episode end date; (5) ISC Home [entity] name (*i.e.*, the name of the defendant entity that provided care to the patient); and (6) Brookdale Community name (*i.e.*, the name of the Brookdale Community at which the patient resided).[15]  (See Docket Nos. 73-1, 73-2.)

The defendants contend that these factual allegations fall short of the presentment of false claims necessary to plead those claims with requisite specificity for the patients listed in Exhibits A and B. (*Id.*)  Prather responds that, taken together, the SAC and Exhibits A and B sufficiently identify the "who" (*i.e.*, the patient and the specific ISC Home entity that provided the home health care services); the "what" (*i.e.*, home health care services); the "when" (*i.e.*, the specific time period in which the home health care services were provided and the dates the RAPs were submitted); the "where" (*i.e.*, the specific Brookdale Community where the patient received the home health care services); and the "how" (*i.e.*, RAPs were submitted in violation of Medicare conditions of payment) of the alleged false claims. (*See* Docket No. 85 at p. 16 (citing Docket No. 73 at ¶¶ 100-105 at Exs. A, B).)  Prather contends, therefore, that her claims based on the submission of RAPs for the patients listed in Exhibits A and B should not be dismissed on the grounds of failure to plead actual presentment of false claims with particularity.

Because the false claim itself is a requirement of a FCA cause of action, it is not

---

[14] Regarding the patients listed in Exhibits A and B, Prather alleges only FCA violations regarding the submission of RAPs (*i.e.*, not claims regarding final episode payments).

[15] The SAC appends no copies of either submitted RAPs or internal documentation that the SAC generally references was utilized as part of the Held Claims Project.

sufficient that the Amended Complaint alleges underlying fraudulent conduct with particularity; it must also allege the presentation of false claims for payment to the government with the same particularity. *Chesbrough*, 655 F.3d at 472 ("In *Bledsoe*, *Sanderson*, and *Marlar*, we imposed a strict requirement that relators identify actual false claims."); *Sanderson*, 447 F.3d at 878; *U.S. ex rel. Marlar v. BWXT Y-12, LLC,* 525 F.3d, 439, 446 (6th Cir. 2008) ("A plaintiff must identify the specific claims that were submitted to the United States. . . . "); *Bledsoe*, 501 F.3d at 504 ("A clear and unequivocal requirement that a relator allege specific false claims emerges from the conjunction of Rule 9(b) and the statutory text of the FCA."); *see also Mcfeeters v. Nw. Hosp., LLC*, No. 3:13-0467, 2015 WL 328212, at *3 (M.D. Tenn. Jan. 23, 2015) ("The relator must plead with sufficient particularity that the defendants knowingly presented to the United States government a false or fraudulent claim for payment or approval."). It is only the submission of a false claim for payment that converts an improper financial relationship into an act of fraud upon the government and forms the basis of a FCA cause of action. Thus, even if Prather alleges some underlying fraudulent scheme that would render claims false, she can only avoid dismissal by also identifying actual false claims that were submitted to the government. *See Bledsoe*, 501 F.3d at 515 (holding that, where relator had alleged a "complex and far-reaching scheme," it was insufficient to simply plead a scheme because relator also had to identify a representative false claim that was actually submitted to government).

In this case, the First Amended Complaint was dismissed, in significant part, because Prather did not allege any specific claim that was submitted to Medicare for payment, including "the basis of such claim, date of such claim, any amount billed in such claim, or any amount paid on such claim." (Docket No. 71 at pp. 26-27.) The court held that: "[i]t is insufficient for

Prather to name a patient and state 'Medicare was billed.' This statement could be made about any (and every single) patient treated by BSLI and cannot, alone, meet the pleading with particularity standard of Rule 9(b). Prather is obligated to plead the particulars of actual false claims (such as dates, amounts, services rendered, authorizations, payments received, etc.). . . ." (*Id*. at p. 25.)

The court finds that, while Exhibits A and B do show the individuals for whom Prather alleges false RAPs were submitted, the remainder of the necessary information is missing. The additional information that is provided by Prather – where the patients resided, who provided the patients' care, and when the patients received care – is both too general and too attenuated from the Medicare billing process to satisfy the requirements of the law concerning the presentment of specific false claims. Importantly, Prather does *not* allege in the SAC, Exhibit A, or Exhibit B: (1) the basis of any patient's RAP, (2) the billing date of any patient's RAP submission (which is not (nor alleged to be) the same as a treatment begin or end date), (3) the form or method used to submit any RAP, (4) any corporate authorization for any RAP,[16] (5) any amount requested/billed in any RAP, or (6) any amount paid to the defendants by the government in response to any RAP.[17] These are critical omissions in pleading presentment of actual false claims as to the alleged RAP scheme for the patients listed in Exhibits A and B.

---

[16] It is not alleged that the ISC Home entity that provided the services (as listed in Exhibits A and B) had the authority to authorize or submit the RAPs. Indeed, given the centralization and subsequent de-centralization during the Held Claims Project, it is unclear from the SAC what entity Prather contends actually submitted any particular RAP.

[17] Because payment of RAPs by CMS is discretionary, there can be instances in which the percentage/amount paid is less than the amount requested in the RAP. *See* 42 C.F.R. § 409.43(c)(2).

As this court noted in its prior Motion to Dismiss ruling, Rule 9(b) does not allow Prather to escape a motion to dismiss on the *presumption* alone that a false claim may, likely was, or even *must* have been presented to the government as part of an overarching nefarious scheme. (Docket No. 71 at p. 27 (citing *Chesbrough*, 655 F.3d at 472 (affirming Rule 9(b) dismissal of FCA claims where "one must assume tests performed on Medicare patients could have been billed to the government") (emphasis added); *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) ("Rule 9(b) does not permit relator to state claims based on allegation that "illegal payments must have been submitted, were likely submitted, or should have been submitted to the Government")).[18] Rather, there is a strict requirement that Prather

---

[18] The court has previously discussed how, in *Bledsoe*, the Sixth Circuit left open the possibility that there may be limited circumstances in which the court might relax the rule requiring the pleading of actual false claims – specifically, where a relator demonstrates that she cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator. *Chesbrough*, 655 F.3d at 470 (quoting *Bledsoe*, 501 F.3d at 504 n.12). An example of this type of situation might be where a relator: (1) is able to allege fraud in extreme detail, (2) possesses great first-hand knowledge that false claims were submitted to the government, (3) is able to identify specific confidential documents that contained the evidence of false claims (such as billing invoices), and (4) alleges that those specific documents were in the exclusive control of the defendant (and unavailable to the relator). *Bledsoe*, 501 F.3d at 504 n.12; *accord Sanderson*, 447 F.3d at 878 ("[A]lthough courts have permitted allegations of fraud based upon information and belief, the complaint must set forth a factual basis for such belief, and the allowance of this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.") (internal quotation marks omitted). In considering the First Amended Complaint, the court did not find any of these circumstances present. In response to the pending Motion to Dismiss the SAC, Prather raises this defense and claims that she "worked directly with billing department personnel and was intimately familiar with [BSLI's] billing procedures, as well as the internal confidential documents that contained evidence of false claims" but has not had access to those documents since November of 2012. (Docket No. 85 at pp. 16-17.) The court finds that Prather has not alleged facts to warrant relaxation of Rule 9(b)'s strict requirement that relators identify actual false claims. While the SAC alleges first-hand knowledge of Prather's involvement in the Held Claims Project, it largely alleges second-hand knowledge of much of BSLI's billing procedures and revenue strategies. The SAC does not identify specific confidential documents containing evidence of actual false claims or claim that Prather did not

identify "actual false claims." *Chesbrough*, 655 F.3d at 472. It is insufficient for Prather to point

to a patient that received home health care services and allege that a RAP was, or must have

been, submitted, by some corporate authorization, for some amount, at some date around the date

of treatment, and that some payment was likely received in return from the government, based

just on the generally delineated circumstances of the patient's receipt of home health services

from a defendant entity.

Accordingly, in the absence of other allegations, Prather's RAP-based claims concerning

the patients listed in Exhibits A and B are subject to dismissal.

### 2. Exemplar Patients A-D

For exemplar patients A-D, the SAC additionally alleges that the RAPs were submitted

"on or about" the date or month of admission and that the RAPs were billed for the statutory rate

(50 or 60 percent), (Docket No. 73 at ¶¶ 91, 93, 96, 98), which Prather contends is sufficient

detail to survive a motion to dismiss. The defendants, to the contrary, argue that, "[w]hile the

SAC has added detail regarding the presentment of final episode claims, . . . the SAC does not

contain a similar level of detail relating to actual presentment of any of the [allegedly false]

RAPs." (Docket No. 79 at p. 11 (emphasis added).)

Furthermore, Prather argues that the "defendants ignore the reasonable inference taken

from [Prather's] allegations regarding the amounts of the RAPs for [p]atients A-D. [Prather] has

have access to confidential documents (to the contrary, the SAC makes clear that Prather had that
very access). The fact that Prather has not had access to BSLI's documents since the time she
left its employ and filed this lawsuit is not sufficient reason to relax the requirements of Rule
9(b). In short, Prather has not pleaded facts that create such a "strong inference" that fraud
occurred that the strictures of Rule 9(b) should be relaxed. *See Chesborough* 655 F.3d at 471;
*Dennis*, 2013 WL 146048, at \*16.

identified the amounts of the final episode payments, which were percentages of total episode payments, and it is entirely reasonable to infer the amounts of the RAPs using these numbers." (Docket No. 85 at pp. 15-16.) Prather uses the example of the fact that the defendants are known to have billed Medicare eight hundred dollars for Patient A's final episode payment. (*Id.*) Prather contends that, since the final episode payment was forty percent of the total episode payment (*see* Complaint ¶ 91), "it is reasonable to infer from [Prather's] allegations that the amount of the RAP for Patient A was $1,200." (*Id.*) In other words, Prather suggests that the missing facts regarding RAP submissions can be supplemented through "reasonable inferences" drawn from facts alleged about final episode payments.

However, backward-looking inferences are not fodder for pleading presentment. Prather is incorrect that inferences based upon the details of the final episode payments may supplant the required rigorous presentment analysis regarding prior RAPs. Indeed, as discussed *supra*, drawing inferences in lieu of specific allegations regarding the presentment of actual false claims is *precisely* what precedent cautions against in setting such a high bar for pleading presentment of *actual* false claims for any scheme alleged by a relator. *See Chesbrough*, 655 F.3d at 472; *Marlar*, 525 F.3d at 446; *Clausen,* 290 F.3d at 1311. Again, Rule 9(b) does not allow Prather to escape a motion to dismiss on the presumption alone that a false claim may, likely was, or even must have been presented to the government.[19] *Chesbrough*, 655 F.3d at 472*; Bledsoe*, 501 F.3d

---

[19] The practical result of this is that if – for example – Medicare is billed in multiple ways over time for a patient, it is a relator's burden to sufficiently allege presentment of every type of billing false claim associated with that patient, as opposed to sufficiently alleging a "final bill" and working backwards by implication to support a bare allegation that prior bills were fraudulent if the final bill was allegedly fraudulent. Prather has offered no precedent to the contrary.

at 504.

With respect to exemplar patients A-D, Prather asks the court to accept generalized dates of submission that are tied loosely to treatment dates, and, as with the patients listed on Exhibits A and B, to again overlook the absence of (1) the basis of Patient A-D's RAPs, (2) the form or method used to submit Patient A-D's RAPs, (3) any corporate authorization for Patient A-D's RAPs, or (4) any amount paid to the defendants by the government in response to Patient A-D's RAPs. The court finds these allegations of presentment of actual false claims for the RAPs of patients A-D to be of insufficient detail to survive the requirements of Rule 9(b).[20]

In sum, the Amended Complaint does not allege actual facts to support Prather's first claim for relief under the FCA regarding RAPs, because it contains insufficient specific factual allegations regarding the presentment of actual false RAPs to the government arising from the defendants' alleged fraudulent scheme. Accordingly, the entire first claim for relief based on RAPs is subject to dismissal on this basis under Rule 9(b).[21]

**B.      Pleading Legal Falsity of Final Episode Payment Claims**

As discussed above, and as the defendants concede, Prather's final episode payment claims are sufficiently pleaded as to presentment. The court, therefore, will review whether those claims are sufficiently alleged to have been legally false. Prather's final episode payment claim

---

[20] The court further notes that this lack of detail stands in comparison to the SAC's allegations regarding final episode payments, which include the actual date of submission, who submitted the claim, and the amount billed on the final claim. (*See, e.g.,* Docket No. 73 at ¶ 98.)

[21] Because the failure to plead presentment is grounds for dismissal without deciding whether the legal falsity of these claims is sufficiently pleaded, the court need not address any other issues regarding Prather's RAP-based claims, For this reason, despite Prather's arguments, the court will not address the contention that she has alleged that the defendants have submitted RAPs in violation of Medicare conditions of payment.

allegations are that those claims were not in compliance with Medicare requirements because: (1) the signed documentation of the physician's certification of the patient's need for home health services was not obtained at the time the plan of care was established or "as soon thereafter as possible" and (2) the signed documentation of the physician's face-to-face encounter with the patient was not obtained in a timely manner. The defendants contend that these allegations are insufficient to plead violations of applicable Medicare regulations or laws that would render the final episode claims submitted by them legally false for purposes of the FCA. (Docket No. 79 at pp. 13-17.)

In addition to obvious cases of fraud, as where a provider bills for procedures or services that were not rendered or not necessary, a claim may be false under a "false certification" theory, such as "when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for [g]overnment payment." *U.S. ex rel. Hobbs v. MedQuest Assocs. Inc.*, 711 F.3d 707, 714 (6th Cir. 2013) (citing *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011)); *see also Chesbrough*, 655 F.3d at 467 (6th Cir. 2011). The success of a false certification claim depends on whether it is based on "conditions of participation" in the Medicare program (which do not support an FCA claim) or on "conditions of payment" from Medicare funds (which do support FCA claims). *Hobbs*, 711 F.3d at 714 (citing *Wilkins*, 659 F.3d at 309; *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008); *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 701-02 (2d Cir. 2001)).

False certifications may be express or implied. *Hobbs*, 711 F.3d at 714. In an express false certification, the defendant is alleged to have signed or otherwise certified to compliance

with some law or regulation on the face of the claim submitted. Under an implied certification theory, a facially truthful claim can be construed as false if the claimant "violates its continuing duty to comply with the regulations on which payment is conditioned." *Chesbrough*, 655 F.3d at 468 (quoting *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002)). Courts do not look to the claimant's actual statements; rather, the analysis focuses on "the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Conner*, 543 F.3d at 1218. A false certification theory only applies where the underlying regulation is a "condition of payment," meaning that the government would not have paid the claim had it known the provider was not in compliance. *See Chesbrough*, 655 F.3d at 468. "Of course, a regulation may in some cases be both a condition of payment and a condition of participation." *Hobbs*, 711 F.3d at 714 (citing *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1176 (9th Cir. 2006)).

Here, Prather cannot point to an express certification made by the defendants that they were in compliance with the Medicare rules at issue. Statements in the Medicare enrollment application do not, as argued by Prather, constitute certifications that would support an FCA action. *Hobbs*, 711 F.3d at 714. Specifically, the Medicare enrollment application requires only a certification that home health care providers would "abide by the Medicare laws, regulations and program instructions." *See* CMS Form 855A. However, the falsity of a claim for purposes of the FCA is determined at the time of submission, not at the prior time of enrollment. *Hobbs*, 711 F.3d at 714-15 (citing *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 438–39 (3d Cir. 2004)). Prather has not alleged that the defendants intended to violate Medicare regulations at the time they applied to participate in the program. Moreover, the enrollment

application does not contain language conditioning payment on compliance with any particular law or regulation.[22] *See* CMS Form 855A. Accordingly, the defendants' statements in their enrollment applications do not constitute certifications that would support an FCA action. Because Prather does not point to an express certification made by the defendants that they were in compliance with the physician documentation requirements contained in 42 C.F.R. § 424.22, she has no viable *express* certification claim based on the SAC's allegations of failure to comply.

Prather's *implied* certification theory rests on the assertion that the defendants implicitly, and falsely, certified compliance with the physician documentation requirements contained in 42 C.F.R. § 424.22 – which Prather characterizes as Medicare conditions of payment – when they submitted final episode payment requests for exemplar patients A-D. The defendants, however, argue that Section 424.22 merely contains regulatory conditions of participation. The parties hotly debate this issue and understandably so. Indeed, Section 424.22 is partially entitled "Conditions of Payment," yet it contains a number of provisions that could be interpreted as mere regulatory requirements to be fulfilled prior to final billing. And in fact, there has been similar debate over how to characterize other Medicare rules and regulations that has been playing out in *qui tam* actions and courts throughout the country. However, this court need not decide this question here because, as explained more fully below, where final episode payment claims are concerned,[23] Prather has not pleaded that the defendants have violated the physician

---

[22] In response to the Motion to Dismiss, Prather does not make any claim or argument concerning the compliance language contained in CMS Form 1450. (*See* Docket No. 85.)

[23] As discussed above, the court need not address any other issues regarding Prather's RAP-based claims. The impact of Section 424.22 upon RAPs – an issue briefed by the parties in the event that Prather's claim survived the defendant's motion to dismiss on presentment grounds – therefore remains an open question. Accordingly, the court's decision as to final billing

documentation conditions *at all*.

### 1.     Plan of Care Physician Certification Documentation

Medicare regulations state that "[t]he certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan." 42 C.F.R. § 424.22(a)(2). Medicare does not define "as soon thereafter as possible." However, CMS permits claims to be filed up to one year after the date of service. *See* 42 C.F.R. § 424.44(a). In 2011 (the relevant time period for purposes of the SAC), CMS provided specific guidance that, for purposes of billing Medicare, the physician signature only needed to be obtained prior to the submission of the final claim. *See* Medicare General Information, Entitlement, and Eligibility Manual ("MGIEEM") (CMS Pub. 100-01, Ch. 4, § 30.1 (April 2011) (stating that "the attending physician signs and dates the POC/certification *prior to the claim being submitted for payment*") (emphasis added). Moreover, in 2013, in connection with CMS and the Medicare Learning Network, the American Medical Association published advisory guidance to the same extent. *See* Medicare Learning Network, MLN Matters Article SE1436 at p. 4, available at http://*www.cms.gov*/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE1436.pdf ("The certification must be complete *prior to when an HHA bills Medicare for reimbursement*.") (emphases added). FIs – the contractors working under CMS supervision who must comply with Medicare billing rules – have also issued similar guidance. *See, e.g.*, Ask-the-Contractor (ACT) Questions and Answers, June 21,

---

payment claims should not be read to reach any conclusion as to (a) the application of a similar standard to RAPs or (b) a conclusion as to whether any or all provisions of Section 424.22 are Medicare conditions of payment or conditions of participation.

2015 at No. 5 (citing MLN Matters Article SE1436 and CMS Pub. 100-01, Ch. 4, § 30.1) ("The

physician certification must be signed prior to billing. . . . *The physician certification must be*

*signed before the final claim is submitted*.") (available at

https://www.cgsmedicare.com/hhh/education/faqs/act/act_qa062415.html) (emphasis added).

Prather does not offer a compelling interpretation to the contrary.[24]

       Prather does point to the fact that CMS has recently stated that:

> The certification must be complete prior to when a [home health services
> agency] bills Medicare for reimbursement; however, physicians should
> complete the certification when the plan of care is established, or as soon
> as possible thereafter. This is longstanding CMS policy as referenced in
> Pub 100-01, Medicare General Information, Eligibility, and Entitlement
> Manual, chapter 4, section 30.1.  It is not acceptable for [home health
> services agencies] to wait until the end of a 60-day episode of care to
> obtain a completed certification/recertification.

Medicare Benefit Policy Manual (CMS Pub 100-02), Ch. 7, § 30.5.1 (May 2015).  This language

does not alter the outcome here.  First, CMS did not introduce this statement until November of

2014.  *See* 79 Fed. Reg. 66032, 66047-48 (Nov. 6, 2014).  Under retroactivity principles, this

new guidance does not apply to conduct that occurred before that date and is therefore not

appropriately directed at the defendants' conduct in 2011.  *See Hughes Aircraft Co. v. U.S. ex rel.*

*Schumer*, 520 U.S. 939, 946 (1997) (in an FCA action, noting that there is a "presumption

against [applying] retroactive legislation [that] is deeply rooted in our jurisprudence" and

"apply[ing] this time-honored presumption unless Congress has clearly manifested its intent to

the contrary"); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("The 'principle

---

[24] In response, Prather does not address the defendants' arguments concerning the
substance of her final episode claims.  Prather concedes that the physician documentation must
be obtained prior to the claim for final payment but does not discuss the fact that she does not
allege otherwise for exemplar patients A-D.  (*See generally* Docket No. 85.)

that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'"); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (finding retroactive application of Medicare regulation to make cost adjustments by Department of Health and Human Services to be inappropriate because "[r]etroactivity is not favored in the law").

Second, the 2015 version of the manual specifically cited as "longstanding CMS policy" in this CMS guidance reads: "The physician must sign and date the plan of care (POC) and the certification *prior to the claim being submitted for payment*; rubber signature stamps are not acceptable." *See* MGIEEM, Ch. 4, § 30.1 (May 2015) (emphasis added).  In 2011, the same Manual section read: "[t]he attending physician signs and dates the POC/certification *prior to the claim being submitted for payment*; rubber signature stamps are not acceptable." *See* MGIEEM, Ch. 4, § 30.1 (April 2011) (emphasis added).  Therefore, even if the court were to find that the new CMS guidance retroactively applies here, it would support the defendants' position, as reflected in Section 424.22, that "longstanding CMS policy" has been that physician documentation need only be signed "as soon thereafter as possible" and before the final bill is submitted.

Prather does not allege that the defendants submitted final episode claims without physician certifications for the eligibility of patients for care, the necessity of care, or for patients being under a plan of care.  Indeed, Prather does not allege that the defendants submitted final episode claims without signed physician documentation.  Rather, Prather alleges that signatures on certification documentation were obtained late, before being incorporated into final episode claims.  However, this theory of FCA liability is not supported by the law.  Indeed, Prather offers

no precedent in which a court has imposed FCA liability for failure to obtain signed physician documentation "as soon thereafter as possible" but in time for final episode billing. Accordingly, the court finds that Prather has not alleged a violation of Medicare regulations or laws concerning physician plan of care signed documentation and final episode payment claims sufficient to plead legal falsity under Rule 9(b).

### 2. Face-to-Face Encounter Documentation

Medicare regulations state that face-to-face physician encounters must occur no more than ninety days prior to the start of care or within thirty days after that date. 42 C.F.R. § 424.22(a)(1)(v). However, Medicare regulations do not require that the physician *signature* on the face-to-face documentation be obtained within that date range. *See* 42 C.F.R. § 424.22. The signed documentation, which is intended to be an addendum to the certification of the need for home health services discussed above, need only be obtained prior to the submission of the final claim. *See id.*; MGIEEM, Ch. 4, § 30.1 (April 2011). Prather makes no allegations regarding the dates of the face-to-face encounters and does not allege that the face-to-face encounters did not occur within the required 120-day time range. Rather, Prather merely alleges that the physician documentation certifying the face-to-face encounters was obtained outside of that time range and included in final episode billing claims. (*See, e.g.*, Docket No. 73 at ¶ 92.) Accordingly, the court finds that Prather has not alleged any violation of Medicare regulations or laws concerning face-to-face physician encounter documentation and final episode claims sufficient to plead legal falsity as required by Rule 9(b).

## II. Count Two

To establish a claim for relief under Section 3729(a)(1)(B), Prather must allege that the

41

defendants knowingly made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim. Beyond this, however, as with a claim under other provisions of Section 3729, a claim for relief under Section 3729(a)(1)(B), to satisfy Rule 9(b) scrutiny, must provide sufficient detail regarding the time, place and content of the defendants' alleged false statements and the claim for payment. *Dennis*, 2013 WL 146048, at *17 (citing *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010)). As set forth above, Prather fails to adequately identify any false or fraudulent claim. On that basis alone, Prather's second claim for relief is subject to dismissal. Furthermore, the SAC fails to allege any particular facts regarding what false statements were made by the defendants to the government, when those false statements were prepared or made, who prepared or made the false statements, or what reimbursement the defendants received.

Prather's arguments to the contrary are unpersuasive. First, Prather contends that the defendants made false statements when physicians used "prospective language" on CMS Form 485. (Docket No. 85 at p. 23.) As the defendants correctly indicate, this "prospective language" claim is absent from the SAC and must be disregarded. Second, Prather cites to two paragraphs of the SAC and suggests that they support a claim that a false Form 485 was submitted to the government. Paragraph 90 of the SAC states: "With many of the held claim plan of care orders (the "485s"), the primary diagnosis justifying home health care billing to Medicare was inconsistent with the care actually provided to the patient." (Docket No. 71 at ¶ 90.) Paragraph 95 of the SAC states: "The 485 plan of care reflected a primary diagnosis of pressure ulcer, with a secondary diagnosis of weakness. Although therapy was not indicated for his pressure ulcer, and the OASIS assessment reflected no need for therapy, he received 12 combined therapy

visits." (*Id*. at ¶ 95.)  These allegations simply do not plead specific false statements made to the government.  Rather, they plead conclusory judgments about the nature of the care needed by patients based on Prather's subjective judgment.[25]  Because bare-bones allegations about the alleged submission of false claims, devoid of any particularized facts, are insufficient as a matter of law under Rule 9(b), Prather's claim under § 3729(a)(1)(B) is subject to dismissal.

## III.   <u>Count Three</u>

The FCA's reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G), prohibits the knowing avoidance of an obligation to pay money to the United States.  An "obligation" under the FCA includes, *inter alia*, "the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  The SAC's overpayment claims are exclusively related to the submission of RAPs:  "For every claim identified in Exhibit A, Defendants wrongfully retained reimbursements obtained through RAPs that were submitted notwithstanding the fact that no doctor had certified the need for home health services as required by 42 C.F.R. § 424.22(a)(2) and 42 C.F.R. § 409.41(b).  For every claim identified in Exhibit B, Defendants wrongfully retained reimbursements obtained through RAPs that were submitted notwithstanding the fact that there was no documentation of the required face-to-face encounter."  (Docket No. 71 at ¶ 121.)  As discussed *supra*, the court has found that Prather has failed to plead presentment of false RAPs with particularity as required by Rule 9(b).  Accordingly, Prather cannot maintain a cause of action premised upon the theory that the defendants improperly retained payments it received based upon those same RAPs.  Prather's

---

[25] As discussed *supra* note 6, Prather is not bringing an FCA claim based on an "unnecessary services" scheme, and, therefore, cannot allege the use of false statements concerning unnecessary services in support of anything other than the alleged false certification scheme.

claim for relief under 31 U.S.C. § 3729(a)(1)(G) is therefore subject to dismissal.

## CONCLUSION

For the foregoing reasons, the court finds that the SAC fails to state a claim under the FCA. The court will therefore grant the defendants' Motion to Dismiss.

Generally speaking, the failure to properly plead fraud is not grounds for dismissal with prejudice. *Dennis*, 2013 WL 146048, at *19 (citing *Bledsoe.*, 342 F.3d at 644; *Yaldu v. Bank of Am. Corp.*, 700 F. Supp. 2d 832, 848 (E.D. Mich. 2010) ("[D]ismissal with prejudice on the basis of failure to plead with particularity ordinarily should be done only after the plaintiff has a chance to seek leave to amend the complaint.")). However, in this case, the court has already afforded Prather an opportunity to cure the substantial deficiencies of the First Amended Complaint. Prather significantly altered her allegations and legal claims for the purposes of the SAC and, despite additional time and detail, has still failed to survive a Motion to Dismiss on any claim. The defendants have, therefore, requested that dismissal of the SAC be with prejudice. Prather, on the other hand, requests leave to file a third amended complaint "to address any concerns the court may have." (Docket No. 85 at p. 24.)

Upon review of the First Amended Complaint, SAC, relevant briefing, and pertinent law and precedent, the court finds that Prather's pleading and legal insufficiencies are unlikely to be cured by the filing of a third amended complaint, and that further attempts at amendment would likely be futile. Furthermore, the court finds that it would be prejudicial, from both a resources and reputational standpoint, to the defendants to require them to keep responding to public complaints alleging fraud in the conduct of their business, given the lack of viable FCA allegations to date. Accordingly, this action will de dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge