| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.,* **)** | |
| **MARJORIE PRATHER,** ) | |
| ) | |
| **Plaintiffs,** ) | **Civil Case No. 3:12-cv-00764** |
| ) | |
| **v.** ) | **Judge Aleta A. Trauger** |
| ) | |
| **BROOKDALE SENIOR LIVING** ) | |
| **COMMUNITIES, INC., et al,** ) | |
| ) | |
| **Defendants.** ) | |

---

## THIRD AMENDED COMPLAINT

---

## INTRODUCTION

Plaintiff-Relator Marjorie Prather ("Plaintiff" or "Relator"), by and through her undersigned attorneys, on behalf of the United States of America, alleges as follows for her Third Amended Complaint against Defendants:

1.     This is an action brought on behalf of the United States of America by Relator against Defendants pursuant to the *qui tam* provisions of the Civil False Claims Act, 31 U.S.C. § § 3729-33 ("FCA").

2.     As a direct, proximate and foreseeable result of Defendants' fraudulent course of conduct set forth herein, and conducted on a national scale, Defendants knowingly submitted,

and caused to be submitted, thousands of false or fraudulent statements, records, and claims to Medicare seeking reimbursement for health care services from at least 2011 through the present.

3.     Defendants are interconnected corporate siblings who operate senior communities, assisted living facilities and home health care providers. Through aggressive marketing practices, Defendants implemented a policy of enrolling as many of their assisted living facility residents as possible in home health care services that were billed to Medicare. According to Defendants, their "reigning philosophy should be that most every resident would benefit from Therapy or Nursing intervention at some point."

The aggressive solicitation of their senior community and assisted living facility residents ultimately generated thousands of Medicare claims that were "held" because they did not meet basic Medicare requirements, including the clear rule that doctors must certify that patients need home health services at the outset of the episode of care, as well as the face-to-face encounter documentation requirement. When faced with the "looming financial crisis" presented by these non-compliant claims, Defendants chose to ignore the concerns of employees such as Relator, and pushed the claims through notwithstanding their violation of Medicare conditions of payment.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this Complaint. Even to the extent there has

been any such public disclosure, Relator meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B). Specifically, Relator voluntarily disclosed to the Government the information upon which the allegations or transactions at issue in this Complaint are based prior to any purported public disclosure under 31 U.S.C. § 3730(e)(4)(A). Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided the information to the Government before filing the Complaint. Relator therefore qualifies as an "original source" of the allegations in this Complaint such that the so-called public disclosure bar set forth in 31 U.S.C. §3730(e)(4) is inapplicable.

5.     Relator concurrently served upon the Attorney General of the United States and the United States Attorney for the Middle District of Tennessee the original Complaint and a written disclosure summarizing the known material evidence and information in the possession of Relator concerning the original Complaint, in accordance with the provisions of 31 U.S.C. § 3730(b)(2). The disclosure statement is supported by material evidence, and documentary evidence has been produced with the disclosure. The documents referenced in the disclosure statement, and those produced in connection therewith or subsequently in a supplemental disclosure, are incorporated herein by reference.

6.     Plaintiff shall serve upon the Attorney General of the United States and the United States Attorney for the Middle District of Tennessee a copy of this Third Amended Complaint.

7.     This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of

3

process and because each Defendant has minimum contacts with the United States. Moreover, Defendants can be found in, reside, and transact business in this District.

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because each Defendant transacts business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this District. Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).

## PARTIES

9.      The real party in interest to the FCA *qui tam* claims herein is the United States of America. Accordingly, Relator is pursuing her cause of action on behalf of the United States on the FCA *qui tam* claims set forth herein.

10.     Relator Marjorie Prather is a citizen of the State of Tennessee. Relator is a Registered Nurse ("RN") who was employed by Brookdale Senior Living, Inc. as a Utilization Review Nurse from September of 2011 until November 23, 2012.

11.     Defendants Brookdale Senior Living Communities, Inc. and Brookdale Living Communities, Inc. ("Brookdale Communities") are Delaware corporations with principal addresses at Suite 400, 111 Westwood Place, Brentwood, Tennessee 37027-5057. Brookdale Senior Living Communities, Inc. and Brookdale Living Communities, Inc. provide retirement living services including home health services and skilled nursing services to Medicare recipients.

12.     Defendant Brookdale Senior Living, Inc. is a Delaware corporation with its principal address at Suite 400, 111 Westwood Place, Brentwood, Tennessee 37027-5057.

Brookdale Senior Living, Inc. provides retirement living services including home health services and skilled nursing services to Medicare recipients.

13.     Defendant Innovative Senior Care Home Health of Nashville, LLC d/b/a Innovative Senior Care Home Health ("ISC Home Health") is a Delaware limited liability company with its principal address at Legal Department, Suite 400, 111 Westwood Place, Brentwood, Tennessee 37027-5057.  Innovative Senior Care Home Health of Nashville, LLC d/b/a Innovative Senior Care Home Health provides home health care to Medicare recipients. According to documents provided to Brookdale employees, "Innovative Senior Care is Brookdale's ancillary rehabilitation and wellness organization."

14.     Defendant ARC Therapy Services, LLC d/b/a Innovative Senior Care ("ARC/ISC") is a Tennessee limited liability company with its principal address at Legal Department, Suite 400, 111 Westwood Place, Brentwood, Tennessee 37027-5057.  ARC Therapy Services, LLC d/b/a Innovative Senior Care provides outpatient and home health therapy services to Medicare recipients.

15.     Defendants are vicariously liable for the actions of their directors, officers, and agents acting in the course and scope of their duties on behalf of Defendants.

<u>**APPLICABLE FEDERAL LAWS AND REGULATIONS**</u>

**A.     The Medicare Program**

16.     The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*. (hereinafter "Medicare"), is a health insurance program administered by the Government of the United States

5

that is funded by taxpayer revenue.  Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

17.     Medicare was designed to be a health insurance program and to provide for the payment of, *inter alia*, hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age, and for certain others that qualify under the terms and conditions of the Medicare Program.  Individuals/patients who receive benefits under Medicare are commonly referred to as "beneficiaries."

18.     The Medicare program is divided into 2 parts relevant to this action.  Part A of the Medicare program covers certain health services provided by hospitals, skilled nursing facilities, and Medicare Certified Home Health Care Agencies ("CHHCA").   Part B of the Medicare program covers services provided by physicians in connection with home health care services, such as Care Plan Oversight.

19.     Home health care under Medicare Part A has no limitations on the number of episodes, no co-payments, and no deductibles.  Medicare covers many of the services provided by CHHCAs, including those provided by ISC Home Health.

20.     Reimbursement for Medicare claims under Medicare Part A is made by the United States through CMS, which originally contracted with private insurance carriers known as fiscal intermediaries ("FIs") to administer and pay claims from the Medicare Trust Fund.  *See* 42 U.S.C. § 1395u.   In this capacity, the FIs act on behalf of CMS.   Since 2003, Medicare Administrative Contractors ("MACs") fulfill this role for the processing of home health claims under Medicare.

21.     The most basic requirement for reimbursement eligibility under Medicare is that the service provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider. *See id.*

22.     Medicare requires every provider who seeks payment from the program to certify and ensure compliance with the provisions of the Anti-Kickback Statute, and with other federal laws governing the provision of health care services in the United States. That agreement represents an ongoing obligation, and the provider must notify the government of any change in information or certifications provided.

23.     CMS will not pay a claim if a provider tells CMS or its agent that it provided goods or services: in violation of the Anti-Kickback Statute; that were medically unnecessary; that were performed solely for the profit of the provider; and/or, that violated another relevant law.

24.     CMS will also not pay a claim relating to reimbursement for goods or services that were not actually provided.

25.     In order to obtain a Medicare provider number and to be eligible to file a claim for payment with Medicare, a home health care agency must submit a Medicare Enrollment Application for Institutional Providers. CMS Form 855A is used for this purpose.

26.     After obtaining a provider number, the home health care agency would then submit or cause to be submitted claims to a FI that processed those claims for CMS.

27.     As part of that agreement, without which these providers may not seek reimbursement from Medicare, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

28.     The "Certification Statement" that the provider must sign also contains the following provisions and requirements, *inter alia*, to remain enrolled in Medicare.   By signing the "Certification Statement" the provider agrees "to adhere to the following requirements stated in this Certification," including:

> 1.     I agree to notify the Medicare contractor of any future changes to the information contained in this application in accordance with the time frames established in 42 C.F.R. § 424.516(e).

> 2.     I have read and understand the Penalties for Falsifying Information . . . I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punished by criminal, civil or administrative penalties, including but not limited to the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment.

> 3.     I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

8

. . .

6.  I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

29.  The Certification Statement is executed by an "Authorized Official" of the Institutional Provider, which is defined as an

appointed official (for example, chief executive officer, chief financial officer, general partner, chairman of the board, or direct owner) to whom the organization has granted the legal authority to enroll it in the Medicare program, to make changes or updates to the organization's status in the Medicare program, and to commit the organization to fully abide by the statutes, regulations, and program instructions of the Medicare program.

30.  "By his/her signature(s), an authorized official binds the provider to all requirements listed in the Certification Statement and acknowledges that the provider may be denied entry to or revoked from the Medicare program if any requirements are not met."

31.  The certifications made by the provider in the Institutional Provider Agreement, which are mandatory for Medicare enrollment, expressly create a continuing duty to comply with the conditions of participation in and payment by the Medicare program.

32.  The authorized agent who signs the Certification Statement on behalf of the provider "agrees to immediately notify the Medicare fee-for-service contractor if any information furnished on this application is not true, accurate or complete.  In addition, an authorized official, by his/her signature, agrees to notify the Medicare fee-for-service contractor of any future changes to the information contained in this form, after the provider is enrolled in Medicare, in accordance with the timeframes established in 42 C.F.R. § 424.516(e)."

33.     Additionally, in the Provider Enrollment Application, and the Certification Statement set forth therein, Defendants agreed to abide by all Medicare laws, regulations and program instructions applicable to home health agencies.  Defendants also certified that they understood the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and applicable program instructions and on the home health care agency's compliance with all applicable conditions of participation in Medicare.  Accordingly, when Defendants submitted a claim for payment, they did so subject to and under the terms of their Certification to the United States that the services for which payment was sought were delivered in accordance with federal law.

34.     To bill Medicare for services purportedly rendered, Defendants submitted a claim form (Form 1450) to their Medicare Administrative Contractor and/or fiscal intermediary, which was responsible for administering Defendants' claims on behalf of the government.

35.     When a Form 1450 was submitted, Defendants certified that the contents of the claim were true, correct and complete, and that the form was prepared in compliance with all Medicare laws and regulations.

36.     When Defendants submitted Form 1450, Defendants specifically acknowledged that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.  That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

37.     When Defendants submitted Form 1450, Defendants specifically certified that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file."

38.    The information in the claim form is material to Medicare's payment of the claim to Defendants.

39.    Individual physicians and non-physicians who render services in connection with home health care, such as Care Plan Oversight, sign a Medicare Enrollment Application (CMS Form 855I) similar to the Medicare Enrollment Application signed by home health care agencies and other Institutional Providers (Form 855A).  CMS Form 855I and CMS Form 855A contain virtually identical representations and certifications and are incorporated herein by reference.

40.    In addition, individual physicians and non-physicians providing services in conjunction with home health services submit claims using CMS Form 1500.  This form contains the following representations and notices:  that the services rendered were "medically indicated and necessary for the health of the patient;" that the information on the claim form was true, accurate and complete; and  that the provider "understand[s] that payment and satisfaction of the claim will be from federal … funds, and that any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable Federal . . . laws."  The CMS 1500 form also contains the following notice:  "Any person who knowingly files a statement or claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

B.    **The Medicare Home Health Care Benefit**

41.    Providers of home health care services are typically known as home health care agencies ("HHAs").  HHAs may furnish home health care using their own staff, or they may contract with others to provide services.   Additionally, many HHAs are chains that have a

11

central, or "home," office that provides administrative and centralized management services to individual agencies within a chain.

42. For home health care services to be paid by Medicare, a beneficiary must (1) be homebound and in need of skilled nursing care, physical or speech therapy, and/or occupational therapy; (2) be receiving services under a plan of care created by a physician who periodically reviews the plan; (3) be under a physician's care; and (4) in cases certified after January 1, 2010, meet face-to-face with the physician or other medical professional prior to certification.

43. Pursuant to 42 C.F.R. § 409.41, "[i]n order for home health services to qualify for payment under the Medicare program the following requirements must be met: . . . (b) [t]he physician certification and recertification requirements for home health services described in § 424.22."

44. Pursuant to 42 C.F.R. § 424.22, "as a condition for payment of home health services under Medicare Part A or Medicare Part B, a physician must certify", *inter alia*, that

(a) the individual needs home health care services;

(b) "a plan for furnishing the services has been established and is periodically reviewed by a physician;"

(c) "the services were furnished while the individual was under the care of a physician;" and

(d) the required face-to-face encounter has taken place.

45. 42 C.F.R. § 424.22 further requires as a condition of payment that "the certification of need for home health services must be obtained at the time the plan of care is

established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan."

46.     Home health agencies typically use Medicare form CMS-485 to facilitate and document the required physician certifications.

47.     In 1998, the Office of Inspector General for the Department of Health and Human Services published its "Compliance Program Guidance for Home Health Agencies." *See* 63 Fed.Reg.No. 152, 42410 (August 7, 1998).   Identifying "Risk Areas," the report noted an "emphasis on areas of special concern that have been identified by the OIG through its investigative and audit functions.  Some of the special areas of OIG concern include: …Untimely and/or forged physician certifications on plans of care." *Id.* at 42414.    The OIG further explained that "[a] home health agency's compliance program should provide that claims should only be submitted for services that the home health agency has reason to believe are medically necessary and were ordered by a physician or other appropriately licensed individual." *Id.* at 42415-42156.  Explaining the physician certification requirement, the OIG stated that "[a] home health agency should take all reasonable steps to ensure that claims for home health services are ordered and authorized by a physician. The home health agency's written policies and procedures should require, at a minimum, that: . . .Home health services are only billed if the home health agency is acting upon a physician's certification attesting that the services provided to a patient are medically necessary and meet the requirements for home health services to be covered by Medicare." *Id.* at 42416-42417.

48.     In 1999, the Office of Inspector General  for the Department of Health and Human Services published a Special Fraud Alert emphasizing the "key role" physicians play to

facilitate Medicare reimbursement for home health services.  This Special Fraud Alert highlights the significance of the requirement that "the physician certification must be obtained at the time the plan of treatment is established or as soon thereafter as possible."  *See* 64 Fed.Reg.No. 7, 1814 (January 12, 1999).

49.     In another report, "The Physician's Role in Medicare Home Health 2001," the Office of Inspector General for the Department of Health and Human Services explained that the 1999 Special Fraud Alert "stresses the significance of [the physician's] responsibility as the party who certifies the medical necessity for home health care, signs off on the level of services needed, and certifies that the patient is homebound." *See* The Physician's Role in Medicare Home Health 2001" at 3  (https://oig.hhs.gov/oei/reports/oei-02-00-00620.pdf).    This report explains the "dual role" fulfilled by physicians under Medicare's prospective payment system ("PPS") for home health services:  "under PPS the physician role has become one of 'gatekeeper' at the onset, ensuring that the patient is eligible for Medicare home health services, then, subsequent to the start of home health, physicians are expected to ensure that the patient is not short-changed with regard to the services that Medicare is paying the agency to provide." *Id.* at 4.

50.     Emphasizing the importance of the timing requirement for physician certifications, CGS (a Medicare Administrative Contractor) has noted that "[i]f the physician's order and certification are not obtained prior to providing the care, no Medicare payment can be made." *See* "Home Health Denial Fact Sheet" (http://cgsmedicare.com/hhh/education/materials/pdf/hh_5hpln-5hord_factsheet.pdf).

51.     Explaining the certification requirement, CMS has stated that "The certification must be complete prior to when an HHA bills Medicare for reimbursement; however, physicians should complete the certification when the plan of care is established, or as soon as possible thereafter. This is longstanding CMS policy as referenced in Pub 100-01, Medicare General Information, Eligibility, and Entitlement Manual, chapter 4, section 30.1. It is not acceptable for HHAs to wait until the end of a 60-day episode of care to obtain a completed certification/recertification." *See* Medicare Benefit Policy Manual (CMS Pub 100-02), Ch. 7, § 30.5.1 (May 2015).

52.     As directed by CMS, a home health care provider "may not add late signatures to medical records (beyond the short delay that occurs during the transcription process). Medicare does not accept retroactive orders." *See* "Complying with Medicare Signature Requirements" (http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/Signature_Requirements_Fact_Sheet_ICN905364.pdf)

53.     On October 1, 2000, a Home Health Prospective Payment System ("PPS") was implemented pursuant to § 4603 of the Balanced Budget Act ("BBA") and as subsequently amended by § 5101 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act ("OCESAA").

54.     In order for CMS to accurately administer the episode payment rate methodologies described in 42 C.F.R. § 484.215, HHAs are required to submit patient specific comprehensive  assessments including the use of standardized classifications as set forth in the Outcome and Assessment Information Set ("OASIS") instrument.  *See* 42 C.F.R. § 484.250, 484.55(b)(1).

55.     Under the PPS, Medicare pays HHAs a predetermined base rate per Medicare patient/beneficiary which represents payment in full for all costs associated with furnishing home health services previously paid on a "reasonable cost" basis for a single 60 day episode.  *See* 42 C.F.R. § 484.200, 484.205.  The episode is paid in a 60%-40% manner; 60% upon patient intake or admission and 40% at the end of the episode.  Requests for Anticipated Payment ("RAPs") are submitted at the beginning of every 60-day episode and may only be submitted to Medicare for payment when:  (1) the OASIS assessment is complete, locked or export ready; (2) a physician's verbal orders for home care have been received and documented; (3) a plan of care has been established and sent to the physician; and (4) the first visit under the plan of care has been delivered.

56.     Pursuant to 42 C.F.R. § 409.43(c)(2), a   RAP "will be canceled and recovered unless the claim is submitted within the greater of 60 days from the end of the episode or 60 days from the issuance of the request for anticipated payment."

57.     According to Medicare Administrative Contractors, including Palmetto GBA, which processes claims for Defendants, "[i]nstances where the RAP is canceled because the final claim was not submitted should be minimal.   Home Health Agencies (HHAs) with an excessively high RAP cancellation rate will have their RAPs set to process with zero payment."

58.     RAPs are "claims" for purposes of the False Claims Act.    *See* 42 C.F.R. § 409.43(c)(2).

59.     The 60 day episode base payment is subject to predetermined adjustments for geographic variation in wage levels at HHAs through the country, as well as for variations in the

health condition and service needs of the beneficiary. *See* 42 C.F.R. §§ 484.215, 484.220, 484.225.

60. If, at the end of the first 60 day episode, the beneficiary is still eligible for care, and the patient is recertified within the final 5 days of the initial episode, a second episode can begin. Pursuant to 42 C.F.R. § 424.22(b)(1), "[r]ecertification is required at least every 60 days, preferably at the time the plan is reviewed, and must be signed and dated by the physician who reviews the plan of care." There are no limits to the number of recertifications so long as the beneficiary remains eligible for the home health benefit.

### C. The False Claims Act

61. The False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

62. 31 U.S.C. § 3729(a)(1)(G) makes any person who knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government liable for three times the amount of damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

63. The FCA defines "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other

17

recipient for any portion of the money or property which is requested.  *See* 31 U.S.C. § 3729(b)(2).  RAPs are "claims" for purposes of the False Claims Act.  *See* 42 C.F.R. § 409.43(c)(2).

64.    31 U.S.C. § 3729(b)(1) provides that "the terms 'knowing' and 'knowingly' — (A) mean that a person, with respect to information — (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or  falsity of the information; and (B) require no proof of specific intent to defraud."

65.    31 U.S.C. § 3729(b)(4) provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

## FACTS AND ALLEGATIONS

### A.    Background

66.    Brookdale Senior Living owns retirement communities and assisted living facilities within the Middle District of Tennessee and throughout the United States where it offers skilled nursing services to Medicare patients.

67.    Brookdale Senior Living is a principal of ISC Home Health and ARC/ISC.  All defendants share the same corporate office.  According to documents provided to Brookdale employees, "Innovative Senior Care is Brookdale's ancillary rehabilitation and wellness organization."  ISC Home Health provides home health care services to Medicare beneficiaries.

68.    A large number of the Brookdale Senior Living or Brookdale Communities retirement communities have nursing care and other health care services (such as secured memory care units for dementia and Alzheimer's patients) on site for which the residents pay a

"monthly fee" to live at the facilities.   ISC Home Health and/or ARC/ISC also maintain offices in many of these facilities.

69.     ISC Home Health and/or ARC/ISC staff solicit referrals from the retirement community staff members on a daily basis.

70.     If ISC Home Health is on site at an assisted living facility, its nurses treat skin tears that would otherwise have been provided by assisted living facility nurses.  Although the assisted living facility nurses were available to provide this treatment (at no cost to Medicare), the ISC Home Health nurses performed the services, which were ultimately billed to Medicare.

71.     To generate additional home health care and therapy revenue, Brookdale Senior Living offered wellness "checks" in its communities as part of the Care3 Wellness Program as well as other options that help staff members target patients for home care services.  Brookdale Communities with home care and/or outpatient clinics provided free "screenings"  in order to identify patients for home care and therapy services.   According to ISC Home Health,   its "reigning philosophy should be that most every resident would benefit from Therapy or Nursing intervention at some point.  This is the key to what makes ISC successful, much like visiting your doctor, you will need therapy or nursing intervention at some point."

72.     Brookdale Senior Living communities held collaborative care meetings to identify patients for services to be billed to Medicare.

73.     The ISC Home Health and/or ARC/ISC corporate model "70/30" also promotes over-utilization  of services to be billed to Medicare.  The goal of this model is reflected in its training manual:  "We also have the ability to leverage our current customer base in senior living with expanded ancillary services and share in the revenue produced."   The manual also states

that "ISC's approach to care is both reactive and proactive in nature. Our clinical experience has shown that some thirty percent of seniors' needs are obvious while seventy percent must be uncovered through continual screening and assessment, thus our 70/30 theory."

74. Ultimately, Defendants' aggressive marketing and solicitation policies generated a backlog of thousands of claims for home health care services that did not comply with Medicare regulations. To facilitate billing Medicare for these claims, Defendants implemented the Held Claims Project.

**B.      The Held Claims Project**

75. Relator was employed by Brookdale Senior Living as a utilization review nurse ("UR nurse") from September of 2011 through November 23, 2012. Relator was hired to work on the "Held Claims Project" and she was terminated when it ended.

76. In September of 2011, each office location of ISC Home Health and ARC/ISC submitted its own claims directly to Medicare. At that time, Brookdale Senior Living made the decision to centralize the billing of most of the office locations ("agencies") into its Brentwood, Tennessee corporate headquarters.

77. In September of 2011, there was a large backlog of about 7,000 unbilled Medicare claims worth approximately $35 million. These claims were referred to as "held claims." The claims were backlogged because they were not in compliance with Medicare rules, primarily because they related to care that was provided without physician certifications of need for home health services; without properly certified 485 plans of care; and/or without required face to face encounter documentation. The agencies with the most held claims included Denver, Colorado;

Loveland, Colorado; Colorado Springs, Colorado; Tampa, Florida; Kansas City, Kansas; Oklahoma City, Oklahoma; and Chandler, Arizona.

78.     Following the transition, copies of patient charts concerning the held claims were forwarded to the Brentwood office to be audited and billed to Medicare.   This project was referred to as the "Held Claims Project."

79.     Defendants issued weekly reports, called the "Home Health Held Claims Report," that showed how many claims were being held and how many claims had been released for billing to Medicare.

80.     Relator was directly involved in the Held Claims Project.   Relator's primary responsibilities included without limitation (1) pre-billing chart reviews in order to ensure compliance with the requirements and established policies of Defendants, as well as state, federal and insurance guidelines; (2) working directly with the Regional Directors, Directors of Professional Services, and clinical associates to resolve documentation, coverage, and compliance issues; (3) acting as resource person to the agencies for coverage and compliance issues; (4) reviewing visits utilization for appropriateness pursuant to care guidelines and patient condition; and (5) keeping Directors of Professional Services apprised of problem areas requiring intervention.   All of these responsibilities directly related to Defendants' efforts to bill the held claims to Medicare.

81.     On a daily basis, Relator worked with employees in Brookdale's central billing office, located on the second floor of the corporate offices at 111 Westwood Place, Brentwood, Tennessee 37027.   Relator's office was located on the second floor, and the billing employees occupied cubicles on the same floor.   Also located on the second floor were the following ISC

senior managers who worked on the Held Claims Project: Debra Dunigan, Regional Vice President ISC; Lance Blackwood, Senior Director Home Health Product Line ISC; Denise Tucker, UR nurse; Brandi Tayloe, Regional Vice President ISC; Pat Smith, Regional Vice President ISC; Jack Carney, Regional Vice President ISC; Sheri Easton-Garrett, Regional Vice President ISC; Katy Wiseman, Regional Vice President ISC; Zach Zerbonia, Regional Vice President ISC; and Shad Morgheim, Senior Vice President ISC.

82. For each held claim, Defendants used a "billing release checklist" to identify items that needed to be completed before the claim could be released for final billing to Medicare. Once the checklist was finished, it would be attached to the AR Transaction Report, which listed the nursing and therapy visits and the charges to be billed to Medicare. The combined document would then be taken to the employees in the billing office (also located on the second floor at 111 Westwood Place, Brentwood, Tennessee 37027). As soon as the Medicare billing employees received this documentation, they immediately submitted the final bill to Medicare. Miaona Osborne was the Medicare supervisor of the employees in the billing office.

83. Relator worked with Denise Tucker, another UR nurse, on the Held Claims Project.

84. The UR nurses reported directly to Lance Blackwood, Senior Director of Home Health Product Line for ISC Home Health.

85. Brookdale Senior Living hired a group of temporary employees to help audit the held claims. Diana Sharp, Interim Director of Professional Services for ISC Home Health, headed up the group of temporary employees. Diana Sharp's responsibilities also included

supervision of the employees who inputted data into spreadsheets that monitored the progress of the Held Claims Project.   The spreadsheets were updated on a daily basis.   Relator regularly worked with the spreadsheets as part of her duties as a UR nurse.

86.    The UR nurses, for a short time, sent attestation forms to doctors for them to sign to correct the problem of missing signatures, but the UR nurses only received a few signed and completed forms back from the doctors.   Defendants' management felt that this was "a slow process."

87.    Lance Blackwood showed Relator an email on April 2, 2012, from Shad Morgheim, Senior Vice President of ISC Home Health, that asked if the UR nurses were doing just a "quick review" on the billing release checklists to release claims.   Blackwood said that he thought the charts were being reviewed too closely.   Blackwood further informed Relator that the UR nurses needed to just make sure the orders are signed, the face to face documentation is complete, and the therapy reassessments are present in the charts, and to ignore any compliance issues regarding the information in the records.

88.    To expedite the billing of old claims to Medicare, on April 25, 2012, Shad Morgheim, Senior Vice-President of ISC Home Health,   sent an email to Relator and others working on the Held Claims Project, in which he announced the decision to move the audit process back to the agencies for all claims older than 120 days.   Mr. Morgheim explained that "[m]ost held claims that are older than 120 days, typically are being held up for FTF, orders, or certifications," and "we need to get these released in a quicker fashion."   The agencies were then instructed to get the doctors to sign the old documents, as well as ask them to complete the face

to face documentation. Mr. Morgheim emphasized that "[t]here is a high sense of urgency to get these released ASAP."

89.     Attached to Shad Morgheim's email of April 25, 2012, was a document named "Held Claims Initiative.doc." This document explained that

> Most claims over 120 days held are being held due to orders out of compliance, unsigned 485s or FTF needs. In other words most of the 120+day held claims have all of their visit notes entered and are waiting on the agency to finalize physician related issues. . . . Since so many of these claims are so old, the COA literally has to "refresh" themselves on the outstanding items. This results in inefficiency.

90.     Once the agencies received the documents, they forwarded them to Relator and the UR nurses, who completed the final reviews and checklists in order to release the claims for billing to Medicare.

91.     The UR nurses were instructed to only do a "quick review" for missing signatures and dates, and were specifically instructed not to look for any other problems related to Medicare billing. When the UR nurses noted problems, they were told to ignore them.

92.     Relator raised concerns with the manner in which the agencies were auditing the charts, as she was finding compliance problems with face to face documentation, doctors orders and plans of care, and therapy evaluations. In response, Lance Blackwood told her that that it was the agencies' responsibility to correct the charts, not hers.

93.     Lance Blackwood told the UR nurses not to read documents (such as plans of care and face to face documentation), but to make sure only that orders affecting billing were signed and dated (despite requirements that all orders be signed and dated), that the plans of care were

signed and dated by a physician, and that face to face documentation contained an encounter date in the right time period, clinical findings, and a reason why the patient was homebound.

94.     The UR nurses were instructed not to read the content other than to confirm that the documentation did not say such things as "not homebound."

95.     The UR nurses were instructed not to consider whether the reason for home care documented by the physician's office matched the start of care order and the plan of care orders.

96.     Relator raised her concerns numerous times with the supervisors of the Central Office Associates ("COAs") in the billing department at Brookdale's headquarters in Brentwood, Tennessee.  Relator spoke to David Simmons, a COA supervisor, and was told that "there is such a push to get the claims through."

97.     On May 17, 2012, Mr. Morgheim sent an email to Relator and others working on the Held Claims Project, thanking employees for the momentum they had developed in releasing stale claims for billing to Medicare.   Nevertheless, he acknowledged that Defendants faced a "looming financial crisis related to the held claims issue."   In order to expedite the process of releasing the oldest held claims, he announced a new "strategy to help compensate physicians for the time they will spend with us to release these claims."

98.     On May 23, 2012, Mr. Morgheim followed up with another email to Relator and others working on the Held Claims Project.   This email outlined the program to compensate doctors for signing orders to facilitate billing to Medicare of old claims (nearly a year old in some cases).   Pursuant to this policy, Defendants paid physicians to review outstanding held claims and sign orders for previously provided care.  The set rate of physician compensation was $150 an hour with a 1/2 hour minimum.    This email included several attachments, including a

"Physician Consulting Power Point," an "F2F Physician Tip Sheet," and sample invoices and check requests. Notably, the Physician Consulting Power Point contained guidance for employees who encountered physicians who did "not want to sign a document," acknowledging that "if the physician is not comfortable with signing a document then we can not force this process." Clearly, Defendants anticipated that doctors would not be "comfortable" with Defendants' policy of paying doctors to certify stale claims for home health care services.

99. As the Medicare supervisor of the employees in the billing office, Miaona Osborne was directly involved in billing RAPs, including re-billing them when they were canceled because the final bill was not submitted timely pursuant to 42 CFR 409.43(c)(2), which states that RAPs "will be canceled and recovered unless the claim is submitted within the greater of 60 days from the end of the episode or 60 days from the issuance of the request for anticipated payment." Pursuant to this process, Defendants billed RAPs without having physician certifications, and then re-billed them immediately after the RAPs were canceled in order to keep the funds received through the RAPs, while still lacking the required physician certifications. This was done repeatedly on a widespread basis for the subject held claims.

100. Miaona Osborne's participation in RAP billing and re-billing is reflected in her email dated June 8, 2012, in which she states: "[j]ust wanted everyone to know that there is a ongoing issue at IMP/RCH. It seems as though there is a trend of no orders for nursing in the recert episode and there are a lot of 1st billable charges in the recert episode that we have had to delete. When we are doing this we are having to cancel the Rap with Medicare, wait until the cancellation is complete, then bill the correct rap and then either re-bill the final or correct the

final that was rejected.  I just wanted everyone aware that this may trigger a probe or review by Medicare."

101.    On June 21, 2012, Diana Sharp sent an email to ISC management, Relator, Miaona Osborne, Leshia Dunn, Steve McGill, Denise Tucker, Jerry Everett, David Simmons, Sally Horvath, Robin Breslin, Julie Butsch, Chantel Rose, Jessica Miller and Amanda Rodriguez, gleefully reporting: "[we] have processed and released over **10,000** claims since 2/7!!" Attached to that email was a spreadsheet titled "RELEASED CLAIMS 6-21-2012.xlsx."

102.    In an email dated June 21, 2012, Sonja Nolan informed others working on the Held Claims Project that she had just "sent over 100 pages of Physicians orders to be signed.  We have a follow up plan in place to get these expedited.   We are working the oldest claims and while waiting on signed documents plan to grab the low hanging fruit, this way we will stop the newer claims from aging."

103.    In the rush to get held claims paid by Medicare, Brookdale Senior Living implemented incentive programs for COAs and the management of home care agencies for completion of home care plans.   For example, a COA received one hundred dollars ($100) a week if ten (10) claims were submitted to the utilization review department for billing and twenty-five ($25) for every claim over and above the first ten (10).  Angela Spalding, a COA, told Relator that during the week of July 9 through 13, 2012, she completed more than fifty (50) releases to UR nurses resulting in a bonus to her of $1,200 that she shared among her office peers.

104.    In an email dated July 11, 2012, Sonja Nolan updated her co-workers regarding "the plot to visit Physicians for orders."  This email reflects that 21 physician certification orders

were obtained that day, including one for an episode of care dated May 25, 2011, through July 23, 2011, and another for an episode dated June 29, 2011, through August 27, 2011. Out of the 21 patients identified in this email, 14 involved episodes of care that ended in 2011.

105.    With many of the held claim plan of care orders (the "485s"), the primary diagnosis justifying home health care billing to Medicare was inconsistent with the care actually provided to the patient. For example, Patient A, a resident of a secured memory unit in a Brookdale facility in Chandler, Arizona, was diagnosed with "abnormality of gait" on the 485, but she did not receive physical therapy. Although Patient A suffered with dementia, the skilled nursing services she received included medication teaching that was inappropriate and unnecessary for a dementia patient. Significantly, Patient A received her medication from a nurse in the secured memory unit, further demonstrating that services billed for medication teaching were unnecessary. Although Patient A received home health care services from December 14, 2011, through February 11, 2012, no doctor certified that she needed home health services until June 29, 2012.

106.    In December of 2011, Defendants submitted a Request for Anticipated Payment ("RAP") for Patient A, and thereby billed Medicare for 60 percent of the episode rate. This RAP violated Medicare conditions of payment because (1) no physician certified Patient A's need for home health care services until June 29, 2012; and (2) there was no properly attested verbal order from the physician to start care, or a signed plan of care. Additionally, on or about July 10, 2012, Defendants billed Medicare $800 for the final episode payment. Sally Horvath, ISC's Regional Director, released the claim for final billing. Defendants' claim for the final episode payment violated Medicare conditions of payment for the same reasons that the RAP did.

28

107.    In a large number of claims involved in the Held Claims Project, Medicare was billed for therapy and home health care services that were not provided under a doctor certified plan of care.  In addition to Patient A, Patient B is another example.  Patient B was a resident of the Freedom Square Brookdale community in Tampa, Florida, and he received physical therapy, occupational therapy, and skilled nursing services from September 9, 2011, to November 7, 2011.  In contradiction of Medicare conditions of payment, all of this care was provided without proper certifications and orders from a physician.  The start of care order and the face to face encounter documentation were not signed by the doctor until June 4, 2012, and no physician certified that Patient B needed home health services until July 10, 2012, several months after the patient had been discharged.

108.    Defendants submitted a RAP for Patient B on or about September 9, 2011, and thereby billed Medicare for 60 percent of the episode rate.   This RAP violated Medicare conditions of payment because (1) no physician certified Patient B's need for home health care services until July 10, 2012; and (2) there was no properly attested verbal order from the physician to start care, or a signed plan of care.   Additionally, on or about July 12, 2012, Defendants billed Medicare $3,200 for the final episode payment. Alina Moser, RN,  released the claim for final billing.   Defendants' claim for the final episode payment violated Medicare conditions of payment for the same reasons that the RAP did.

109.    Additionally, the UR nurses noted that face to face encounter documentation was often incomplete, and in many cases was not completed until after the care was provided.  For example, Patient A's home health care services were provided from December 14, 2011, through

February 11, 2012, but her face to face encounter documentation was not signed by the physician until February 24, 2012.

110.     Patient C was a resident in the Brookdale Senior Living community in Austin, Texas.   Patient C received skilled nursing services, physical therapy and occupational therapy from ISC Home Health from July 25, 2011, to September 22, 2011.   The 485 plan of care reflected a primary diagnosis of pressure ulcer, with a secondary diagnosis of weakness. Although therapy was not indicated for his pressure ulcer, and the OASIS assessment reflected no need for therapy, he received 12 combined therapy visits.  He also received 24 skilled nursing visits.  Following this initial episode, Patient C was re-certified for another 60 day episode from September 23, 2011, to November 21, 2011.   During this episode, Patient C received skilled nursing services, occupational therapy, and physical therapy.   No physician certified Patient C's need for home health care services until December 12, 2011.

111.     Defendants submitted a RAP for Patient C's initial episode on or about July 25, 2011, and thereby billed Medicare for 60 percent of the episode rate.   This RAP violated Medicare conditions of payment because no physician certified Patient C's need for home health care services until December 12, 2011.  Additionally, on or about July 5, 2012, Defendants billed Medicare $5,760 for the final payment for this episode. Defendants' claim for this final episode payment violated Medicare conditions of payment for the same reason that the RAP did.

112.     Additionally, on or about September 23, 2011, Defendants submitted a RAP for Patient C for the second episode (September 23, 2011, to November 21, 2011) and thereby billed Medicare for 50 percent of the episode rate.  This RAP violated Medicare conditions of payment

because no physician certified Patient C's need for home health care services until December 12, 2011.

113.    Patient D was a resident of a Brookdale facility in Denver, Colorado. Patient D's certification period was from January 10, 2012, through March 9, 2012. On or about January 10, 2012, Defendants submitted a RAP for Patient D, and thereby billed Medicare for 50 percent of the episode rate. Additionally, on or about June 22, 2012, Defendants billed Medicare $1,920 for the final episode payment. Following the instructions dictated by Defendants, Relator released this claim for final billing. The RAP and the final bill for Patient D violated Medicare conditions of payment because the doctor did not certify Patient D's need for home health care services until June 12, 2012, several months after Patient D had been discharged.

114.    Relator repeatedly told Blackwood and others that she had discovered problems that needed to be addressed, and that Relator was not comfortable knowing the work was not right but still forwarding the claims for billing to Medicare. On more than one occasion during these discussions, Brandi Tayloe, Regional Vice President East-Central Division for ISC Home Health, responded to Relator's concerns with the statement that "We can just argue in our favor if we get audited."

**SPECIFIC FALSE CLAIMS SUBMITTED TO MEDICARE**

115.    Defendants' fraudulent claims consist of the RAPs billed to Medicare in violation of Medicare conditions of payment, as well as the final episode payments. In addition to the specific fraudulent claims identified above, Relator has identified 489 claims that were submitted to Medicare in violation of the condition of payment that the physician certification of need for home health services must be obtained at the time the plan of care is established or as soon

31

thereafter as possible. These claims were processed through the Held Claims Project, and are identified in the attached Exhibit A, which is incorporated herein by reference. Exhibit A identifies each claim by patient, certification period, the ISC Home Health Network that provided the subject home health services (using Defendants' internal abbreviations), and the Brookdale community where the patient received the home health services (using Defendants' internal abbreviations). Patient names have been redacted from Exhibit A, but Relator has provided this information to Defendants.

116. For every patient reflected in Exhibit A, at the beginning of the episode Defendants submitted a RAP to Medicare that violated the condition of payment requiring that a doctor certify that the patient needed home health services. *See* 42 C.F.R. § 424.22(a); and 42 C.F.R. § 409.41(b). Pursuant to this condition of payment, the required physician "certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan." *See* 42 C.F.R. § 424.22(a)(2). This certification is a forward-looking projection of medical need at the time the patient's plan of care is established prior to the start of the episode.

117. For every claim reflected in Exhibit A, Defendants did not obtain the required physician certification until after the episode was complete and/or the patient was discharged. For many of the patients, Defendants did not obtain the required certification until several months after the patient had been discharged and/or the episode was complete. Although Defendants knew that this condition of payment was not satisfied, they nevertheless submitted RAPs for these patients and received Medicare reimbursement. As noted above, RAPs are "claims" for purposes of the False Claims Act. *See* 42 C.F.R. § 409.43(c)(2).

118.    In addition to the specific fraudulent claims identified above, Relator has identified 771 claims that were submitted  to Medicare in violation of the condition of payment that an appropriate physician document a face-to-face encounter with the patient.  These claims were processed through the Held Claims Project, and are identified in the attached Exhibit B, which is incorporated herein by reference.   Exhibit B identifies each claim by patient, certification period, the ISC Home Health Network that provided the subject home health services (using Defendants' internal abbreviations), and the Brookdale community where the patient received the home health services (using Defendants' internal abbreviations).   Patient names have been redacted from Exhibit B, but Relator has provided this information to Defendants.

119.    For every patient reflected in Exhibit B, at the beginning of the episode Defendants submitted a RAP to Medicare that violated the condition of payment requiring face-to-face encounter documentation.   *See*   42 C.F.R. §   424.22(a); and 42 C.F.R. § 409.41(b). Pursuant to 42 U.S.C. § 1395f(a)(2)(C), the face-to-face encounter documentation must take place prior to the physician's certification of need for home health services.

120.    For every claim reflected in Exhibit B, Defendants did not obtain the required physician face-to-face encounter documentation until after the patient had been discharged and/ or the episode was complete.  For many of the patients, Defendants did not obtain the required documentation until several months after the patient had been discharged and/or the episode was complete.   Although Defendants knew that this condition of payment was not satisfied, they nevertheless submitted RAPs for these patients and received Medicare reimbursement.  As noted above, RAPs are "claims" for purposes of the False Claims Act.   *See* 42 C.F.R. § 409.43(c)(2).

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)

121.   Relator, on behalf of the United States, re-alleges and incorporates by reference all preceding paragraphs of this Third Amended Complaint.

122.   This claim is brought by Relator and the United States to recover treble damages, civil penalties, and the cost of this action, under the False Claims Act.

123.   By virtue of the above-described acts, among others, since at least 2011 Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, and continue to present or cause to be presented false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

124.   In submitting the subject claims to Medicare, Defendants certified that the contents were true, correct and complete, and that the claim forms were prepared in compliance with all Medicare laws and regulations.   Additionally, Defendants explicitly certified that they did not "misrepresent or conceal material facts," and that "Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file."   These certifications were false   and misleading because the physician certifications in connection with the subject claims did not satisfy the material requirement that they be obtained at the time the plans of care were established or as soon thereafter as possible.

125. The United States, unaware of the falsity of the claims that Defendants submitted, and in reliance on the accuracy thereof, paid Defendants and other health care providers for claims that would otherwise not have been allowed.

126. For those claims that Defendants submitted or caused to be submitted, it was foreseeable and in fact the intended result that those claims would be submitted. Further, at all times relevant to the Third Amended Complaint, Defendants acted with the requisite scienter.

127. As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by Defendants.

## COUNT II

## VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(G)

128. Relator, on behalf of the United States, re-alleges and incorporates by reference all preceding paragraphs of this Third Amended Complaint.

129. This claim is brought by Relator and the United States to recover treble damages, civil penalties, and the cost of this action, under the False Claims Act.

130. By virtue of the above-described acts, among others, Defendants knowingly and improperly avoided or decreased obligations to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G). Defendants knew that they had been overpaid by Medicare, but did not take the required and appropriate steps to satisfy the obligation owed to the United States, refund or return such overpayments, or to inform Medicare of the overbilling, and instead continued to retain the same, and to overbill the Medicare program. More

35

specifically, Defendants improperly submitted RAPs to Medicare for claims that Defendants knew did not comply with Medicare conditions of payment. For every claim identified in Exhibit A, Defendants wrongfully retained reimbursements obtained through RAPs that were submitted notwithstanding the fact that no doctor had certified the need for home health services as required by 42 C.F.R. § 424.22(a)(2) and 42 C.F.R. § 409.41(b). For every claim identified in Exhibit B, Defendants wrongfully retained reimbursements obtained through RAPs that were submitted notwithstanding the fact that there was no documentation of the required face-to-face encounter. Further, at all times relevant to the Third Amended Complaint, Defendants acted with the requisite scienter.

131.　　As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered substantial losses and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendants.

### **PRAYER**

WHEREFORE, Relator acting on her own behalf and on behalf of the United States demands and prays that this Court enter judgment against Defendants as follows:

1.　　In favor of the United States and against Defendants jointly and severally in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each False Claims Act violation;

2.　　In favor of Relator for the maximum amount allowed as a Relator's share pursuant to 31 U.S.C. § 3730(d);

3.      In favor of Relator against Defendants jointly and severally for all reasonable expenses, attorneys' fees and costs incurred by Relator pursuant to 31 U.S.C. § 3730(d); and

4.      In favor of Relator and the United States against Defendants for any such other relief as the Court deems just and proper, or that is necessary to make Relator and/or the United States whole.

## **TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.

                                        Respectfully Submitted,

                                        /s/ Patrick Barrett
                                        Patrick Barrett (BPR # 020394)
                                        Barrett Law Office, PLLC
                                        4205 Hillsboro Pike, Suite 303
                                        Nashville, TN 37215
                                        615-463-4000
                                        pbarrett@barrettlawofficetn.com

                                        /s/ Michael Hamilton
                                        Michael Hamilton (BPR # 10720)
                                        Provost Umphrey Law Firm, LLP
                                        4205 Hillsboro Pike, Suite 303
                                        Nashville, TN 37215
                                        615-297-1932
                                        mhamilton@pulf.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Third Amended Complaint was filed and served upon the following counsel via the Court's electronic filing system on this 1st day of March, 2017.

Brian Roark
Taylor Chenery
Angela Bergman
Bass Berry & Sims, PLC
150 Third Ave., South, Ste. 2800
Nashville, TN 37201-3001
Telephone: 615- 742-6200
Facsimile: 615-742-0442
broark@bassberry.com
tchenery@bassberry.com
abergman@bassberry.com

Mark H. Wildasin
Assistant United States Attorney
United States Attorney's Office
110 Ninth Ave., South, Ste A961
Nashville, TN 37203
Telephone: 615-736-5151
Facsimile: 615-736-5323
Mark.Wildasin@usdoj.gov

/s/ Patrick Barrett

38