# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel*. **MARJORIE PRATHER,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| | ) | **Case No. 3:12-cv-0764** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **BROOKDALE SENIOR LIVING COMMUNITIES, INC., et al.,** | ) ) ) | |
| **Defendants** | ) | |

## MEMORANDUM

Marjorie Prather, as relator, brings this action against defendants Brookdale Senior Living, Inc. ("BSLI"), Brookdale Senior Living Communities, Inc. and Brookdale Living Communities, Inc. (together, "Brookdale Communities"), and Innovative Senior Home Health of Nashville, LLC d/b/a Innovative Senior Care Home Health ("ISC Home") (collectively, "Brookdale" or "defendants") under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733. Prather alleges that the defendants submitted false claims to Medicare for reimbursement of the cost of providing home health care services. Now before the court is the defendants' Motion to Dismiss Third Amended Complaint (Doc. No. 102). For the reasons explained herein, the motion will be granted.

In order to provide a basic vocabulary for understanding the plaintiff's claims, the court will first give a summary of the relevant legal framework, before laying out the procedural history, factual analysis, and then a discussion of the claims.

## I. LEGAL FRAMEWORK

### A. The FCA

"The False Claims Act, 31 U.S.C. § 3729 et seq., imposes significant penalties on those who defraud the Government." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar* ("*Escobar*"), 136 S. Ct. 1989, 1995 (2016). The FCA focuses primarily "on those who present or directly induce the submission of false or fraudulent claims." *Id.* at 1996; *see* 31 U.S.C. § 3729(a)(1)(A) (imposing civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"). It also imposes liability for knowingly or improperly avoiding or decreasing an obligation to pay or transmit money to the United States. 31 U.S.C. § 3729(a)(1)(G). Liability under § 3729(a)(1)(G) occurs when a party owes funds to the government but acts to avoid meeting its obligation to return those funds.

A "claim" includes direct requests to the government for payment and claims for reimbursement under federal benefits programs. *Id.* § 3729(b)(2)(A). The FCA defines "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). And the Act defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

Liability under the FCA is "essentially punitive in nature." *Escobar*, 136 S. Ct. at 196 (quoting *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 784 (2000)). Defendants who are found liable are subjected to treble damages plus civil penalties of up to $10,000 per false claim. 31 U.S.C. § 3729(a); 28 CFR § 85.3(a)(9) (2015) (adjusting penalties for inflation).

An FCA action may be commenced either by the government itself, 31 U.S.C. § 3730(a), or, alternatively, by a private person, referred to as a "relator." In the latter case, a relator brings

a *qui tam* civil action "for the person and for the United States Government" against the alleged false claimant, "in the name of the Government." *Id.* § 3730(b)(1).

**B.        Home Health Care Services Under Medicare**

The FCA applies to claims submitted by healthcare providers to Medicare. *U.S. ex rel. Hobbs v. MedQuest Assocs.*, 711 F.3d 707, 714 (6th Cir. 2013).

Medicare Part A "provides basic protection against the costs of . . . home health services" for qualified individuals aged 65 and over. 42 U.S.C. § 1395c. Medicare Part B is "a voluntary insurance program to provide medical insurance benefits," 42 U.S.C. § 1395j, and it, too, provides coverage for certain home health services. 42 U.S.C. § 1395k(a)(2)(A). *See United States ex rel. Prather v. Brookdale Senior Living Cmties., Inc.*, 838 F.3d 750, 755, 775 (6th Cir. 2016).

Medicare pays for home health services only if a physician certifies the patient's eligibility for and entitlement to those services. 42 U.S.C. § 1395n(a)(2); 42 C.F.R. § 424.22. Under the statute, payment for home health care "may be made . . . only if" a physician certifies that: (1) home health services "are or were required because the individual is or was confined to his home . . . and needs or needed" covered home-health services; (2) "a plan for furnishing such services to such individual has been established and is periodically reviewed by a physician"; (3) "such services are or were furnished while the individual is or was under the care of a physician"; and (4) "prior to making such certification the physician must document that the physician . . . has had a face-to-face encounter . . . with the individual during the 6-month period preceding such certification." 42 U.S.C. § 1395n(a)(2)(A); *see also* 42 U.S.C. § 1395f(a)(2)(C) (listing nearly identical requirements under Medicare Part A).

Under the Medicare regulations, "the certification of need for home health services must

be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan." 42 C.F.R. § 424.22(a)(2). The regulations state that the physician's certification of the necessity of services is "a condition for Medicare payment." *See* 42 C.F.R. § 424.10(a). Generally, "[d]elayed certification . . . statements are acceptable when there is a legitimate reason for delay [but] must include an explanation of the reasons for the delay." 42 C.F.R. § 424.11(d)(3).[1]

As the Sixth Circuit explained, "Medicare payments for home-health services are made pursuant to 'a prospective payment system,' 42 U.S.C. § 1395fff(a), which uses a 60-day 'episode of care' as its standard measurement." *Prather*, 838 F.3d at 756 (quoting 42 U.S.C. § 1395fff(a)). To be reimbursed for the costs of providing care, a home health agency submits an initial "request for anticipated payment," or "RAP," at the beginning of each 60-day episode of care, pursuant to which Medicare pays a percentage of the total anticipated payment. The home health agency later submits a request for a "final residual payment." *Id.* (citing 42 C.F.R. § 484.205(b); 2011 Medicare Claims Processing Manual § 10.1.12). "Payment . . . is not based on a fee-for-service model that would consider the precise treatments that were provided during the 60-day episode; rather, the entire episode payment 'represents payment in full for all costs associated with furnishing home health services previously paid on a reasonable cost basis.'" *Id.* (quoting 42 C.F.R. § 484.205(b)).

The Centers for Medicare and Medicaid Services ("CMS"), a subsidiary of the

---

[1] This regulatory subpart does not define the term "as soon thereafter as possible," but it appears to apply generally to the provision of home health care, among other services for which physician certifications are required. *See Prather*, 838 F.3d at 763 & n.4 (holding that "[c]ertifications of need may be completed after the plan of care is established, but only if an analysis of the length of the delay, the reasons for it, and the home-health agency's efforts to overcome whatever obstacles arose suggests that the home-health agency obtained the certification 'as soon thereafter as possible,'" and noting that this requirement is "consistent with" § 424.11(d)(3)).

Department of Health and Human Services, is the federal agency responsible for overseeing state compliance with federal Medicaid requirements. CMS is the government agency that makes the decision whether to pay a reimbursement claim under Medicare Part A. (Third Am. Compl. ¶¶ 16, 20, Doc. No. 98.)

## II.     PROCEDURAL HISTORY

Prather filed this lawsuit as a relator on July 24, 2012, asserting claims under the FCA as well as state law. (Compl., Doc. No. 1.) Generally, she alleged that the defendants knowingly submitted fraudulent statements and claims to Medicare seeking reimbursement for the provision of home health services beginning in 2011. After the United States declined to intervene (*see* Notice of Election to Decline Intervention, Doc. No. 23), the Complaint was unsealed and served on the defendants. (April 10, 2014 Order, Doc. No. 24.) Before the defendants responded to the initial Complaint, Prather filed an Amended Complaint. (First Am. Compl., Doc. No. 52.) The court granted the defendants' Motion to Dismiss the First Amended Complaint, but without prejudice to Prather's ability to amend her pleading to address the deficiencies identified by the defendants and the court at that time. (Doc. No. 71.)

Prather filed her Second Amended Complaint on June 1, 2015 (Doc. No. 73), narrowing the case to three legal claims: (1) the presentation of false claims to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A) (Count I); (2) the making or using of false records or statements that were material to the submission of those false claims, in violation of 31 U.S.C. § 3729(a)(1)(B) (Count II); and (3) the failure to return overpayments, in violation of 31 U.S.C. § 3729(a)(1)(G) (Count III). (*Id.* ¶¶ 106–22.)

In a ruling issued on November 5, 2015 (Doc. Nos. 89, 90), the court granted the defendants' Motion to Dismiss the Second Amended Complaint. (Doc. No. 78.) Prather

appealed, and the Sixth Circuit Court of Appeals reversed the dismissal of Counts I and III but affirmed the dismissal of Count II. *United States ex rel. Prather v. Brookdale Senior Living Cmties., Inc.*, 838 F.3d 750, 755, 775 (6th Cir. 2016). In reversing the dismissal of Counts I and III, the appellate court recognized that the Supreme Court's recent decision in *Escobar* might be relevant to the ultimate resolution of the case, but the court declined to analyze its effects, since the opinion had been issued after the briefs were filed in *Prather*.

Following remand, this court conducted a case management conference at which the defendants stated their intent to file a motion to dismiss the Second Amended Complaint for failure to meet the standards set forth in *Escobar*. Because the Second Amended Complaint was filed before *Escobar* was issued, the court afforded the relator an opportunity to amend her complaint again, specifically to attempt to satisfy the pleading obligations identified in that case.

Prather filed her Third Amended Complaint ("TAC") on March 1, 2017. (Doc. No. 98.) Consistent with the dismissal of Count II, the TAC contains only two claims for relief: Count I, asserting liability under 31 U.S.C. § 3729(a)(1)(A) for the knowing presentment of false or fraudulent claims for approval; and Count II, asserting liability under 31 U.S.C. § 3729(a)(1)(G) for the failure to return overpayments made by the government as a result of the defendants' alleged violations of § 3729(a)(1)(A).

Now before the court is the defendants' Motion to Dismiss the Third Amended Complaint on the basis that it fails to satisfy *Escobar*'s standards for pleading materiality and scienter as they pertain to FCA claims.

## III.    FACTUAL ALLEGATIONS

The basic facts underlying this matter have now been recited by this court in its rulings on two prior motions to dismiss as well as by the Sixth Circuit. The court presumes familiarity

with the facts and will summarize them here only insofar as necessary for resolution of the issues now before the court.

Prather, who resides in Tennessee, is a registered nurse who was employed by defendant BSLI as a Utilization Review ("UR") Nurse from September of 2011 until November 23, 2012. BSLI and the other defendants "are interconnected corporate siblings who operate senior communities, assisted living facilities and home health care providers" within the Middle Tennessee area and throughout the United States. (TAC ¶¶ 3, 66.) The defendants provide home health care services that are subject to reimbursement under Medicare Part A.

Prather alleges generally that Brookdale engaged in "aggressive marketing and solicitation policies" to generate demand for home health services. (TAC ¶ 74.) Brookdale sought to enroll "as many of [its] assisted living facility residents as possible in home health care services that were billed to Medicare." (TAC ¶ 3.) As a result of the scheme to increase the number of Brookdale residents receiving home health care services, Brookdale was left with "a backlog of thousands of claims for home health care services that did not comply with Medicare regulations." (TAC ¶ 74.) As of September 2011, Brookdale had a backlog of "about 7000 unbilled Medicare claims"—referred to as "held claims"—"worth approximately $35 million." (¶¶ 76, 77.) Brookdale represented to Prather that this backlog constituted a "looming financial crisis." (TAC ¶¶ 3, 97.)

To deal with this backlog of claims, Brookdale implemented the "Held Claims Project" in September 2011. (*Id.*). Prather was hired as a UR Nurse by Brookdale in September 2011 to work on the Held Claims Project, and she was terminated when the project ended. (TAC ¶ 75.) Prather's responsibilities in working on the Held Claims Project included, among other things, (1) conducting pre-billing chart reviews to ensure compliance with Brookdale's requirements

and established policies, as well as state, federal, and insurance guidelines; (2) working to resolve documentation, coverage, and compliance issues; and (3) keeping Brookdale supervisory personnel apprised of problem areas requiring intervention. (TAC ¶ 80.) These responsibilities "directly related to Defendants' efforts to bill the held claims to Medicare." (*Id.*)

Prather worked with employees in Brookdale's central billing office. (TAC ¶ 81.) She and her colleagues followed a "billing release checklist" of "items that needed to be completed before the claim could be released for final billing to Medicare." (TAC ¶ 82.) "Once the checklist was finished," it would be combined with other relevant materials, "taken to the employees in the billing office," and "immediately submitted . . . to Medicare." (*Id.*)

Initially, Prather and the other UR Nurses "sent attestation forms to doctors for them to sign to correct the problem of missing signatures," but they received few responses, and Brookdale's management felt the process was too slow. (TAC ¶ 86.) In order to expedite the process, Prather and other UR Nurses were told that they needed to "just make sure the orders are signed, the face to face documentation is complete, and the therapy reassessments are present in the charts, and to ignore any compliance issues regarding the information in the records." (TAC ¶ 87.) In addition, Brookdale announced that all claims older than 120 days would be sent back to the agencies that generated them. The agencies were "instructed to get the doctors to sign the old documents [and] complete the face to face documentation." (TAC ¶ 88.) The same announcement noted that there was "a high sense of urgency to get these released ASAP." (*Id.*)

Once the individual agencies got all the necessary documentation together, they would forward them to the UR Nurses to complete final reviews and checklists in order to release the claims for billing to Medicare. The nurses were instructed to do "quick reviews" for missing signatures and dates; they were told not to look for—and in fact to ignore—any other problems

related to Medicare billing. (TAC ¶ 91.) Prather tried to raise concerns with her supervisor about compliance problems, but she was told that it was the agencies' responsibility to correct the charts, not hers, and that there was just "such a push to get the claims through." (TAC ¶¶ 92, 96.) She was specifically instructed not to read the underlying documentation for billing (such as plans of care and face-to-face documentation) "but to make sure only that orders affecting billing were signed and dated (despite requirements that all orders be signed and dated), that the plans of care were signed and dated by a physician, and that face to face documentation contained an encounter date in the right time period, clinical findings, and a reason why the patient was homebound." (TAC ¶ 93.) The UR Nurses were instructed not to read the underlying chart for content other than to confirm that the documentation did not indicate that the patient was "not homebound" (TAC ¶ 94); they were also told not to consider whether the reason for home care documented by the physician's office matched the start-of-care or plan-of-care orders. (TAC ¶ 95.)

In May 2012, apparently still concerned about a "looming financial crisis" related to old unbilled claims, Brookdale announced a new initiative to help expedite the process of releasing the oldest claims for billing to Medicare: it would start compensating physicians "for the time they will spend with us to release these claims." (TAC ¶ 97.) Under this new policy, Brookdale "paid physicians to review outstanding held claims and sign orders for previously provided care." (TAC ¶ 98.) Brookdale also provided guidance for employees who encountered physicians who "did not want to sign a document," implicitly anticipating that some doctors would not be "comfortable" with the policy of "paying doctors to certify stale claims for home health care services." (TAC ¶ 98.) The same guidance acknowledged that Brookdale could not force doctors to sign the documentation. (*Id.*)

The TAC, compared with the Second Amended Complaint, contains only four new paragraphs in the "Facts and Allegations" section—as distinct from sections devoted to describing Medicare's legal framework and articulating the claims for relief. In the first of these, Prather alleges that Miaona Osborne, the supervisor of the employees in the billing offices submitting claims to Medicare, was directly involved in billing RAPs and in rebilling RAPs that were canceled if the final bill was not submitted within the time prescribed by 42 C.F.R. § 409.32(c)(2) ("the greater of 60 days from the end of the episode or 60 days from the issuance of the request for anticipated payment"). (TAC ¶ 99.) Prather alleges that Brookdale repeatedly, with respect to the held claims, "billed RAPs without having physician certifications, and then re-billed them immediately after the RAPs were canceled in order to keep the funds received through the RAPs, while still lacking the physician certifications." (TAC ¶ 99.)

Second, Prather points to an email issued by Osborne in June 2012, notifying the UR Nurses that there was a "trend" at one of the Brookdale facilities

> of no orders for nursing in the recert episode and there are a lot of 1st billable charges in the recert episode that we have had to delete. When we are doing this we are having to cancel the Rap with Medicare, wait until the cancellation is complete, then bill the correct rap and then either re-bill the final or correct the final that was rejected. I just wanted everyone aware that this may trigger a probe or review by Medicare.

(TAC ¶ 100.)

Third, Prather alleges that Sonja Nolan sent an email in June 2012, notifying "others working on the Held Claims Project" that she had "sent over 100 pages of Physicians orders to be signed. We have a follow up plan in place to get these expedited. We are working the oldest claims and while waiting on signed documents plan to grab the low hanging fruit, this way we will stop the newer claims from aging." (TAC 102.) And finally, Prather alleges that Nolan, a few weeks later, sent a follow-up email, reflecting that "21 physician certification orders were

obtained that day, including one for an episode of care dated May 25, 2011, through July 23, 2011, and another for an episode dated June 29, 2011, through August 27, 2011. Out of the 21 patients identified in this email, 14 involved episodes of care that ended in 2011." (TAC ¶ 104.)

As she did in the Second Amended Complaint, Prather references as examples of Brookdale's fraudulent billing practices the billing history of four specific patients, referred to in the TAC as Patients A, B, C, and D (collectively, the "Exemplar Patients"). Patient A, for example, received home health care services from December 14, 2011 through February 11, 2012, but her face-to-face encounter documentation was not signed by the physician until February 24, 2012 (TAC ¶ 109), and no doctor signed the certification for home health care services until June 29, 2012 (TAC ¶ 105).

Brookdale submitted the RAP for Patient A in December 2011 and billed Medicare at that time for 60 percent of the episode rate. According to Prather, this RAP violated Medicare conditions of payment because

> (1) no physician certified Patient A's need for home health care services until June 29, 2012; and (2) there was no properly attested verbal order from the physician to start care, or a signed plan of care. Additionally, on or about July 10, 2012, Defendants billed Medicare $800 for the final episode payment. Sally Horvath, ISC's Regional Director, released the claim for final billing. Defendants' claim for the final episode payment violated Medicare conditions of payment for the same reasons that the RAP did.

(TAC ¶ 106.) [2]

Similarly, Prather alleges that other Exemplar Patients received home health care services, but, in each case, no physician certified that the patient needed such services until long

---

[2] Prather also alleges that the treatment provided pursuant to the plan of care was inconsistent with the primary diagnosis indicated on the plan of care, or even medically inappropriate. (TAC ¶ 105.) As the Sixth Circuit noted, however, Prather makes it clear that she is not attempting to "state a claim of medically unnecessary care as an independent ground of recovery." *Prather*, 838 F.3d at 758 n.1.

after the services had been provided. In addition, in some cases, the start-of-care and face-to-face encounter documentation was not signed by the doctor until a few weeks or even several months after the services had been provided. For each of these patients too, Prather asserts that the RAP was submitted around the date of the start of care, at which time Medicare was billed fifty or sixty percent of the episode rate, and the final bill was submitted months later. She alleges that the RAPs violated Medicare conditions of payment, because no physician had certified a need for home health care services prior to the submission of the RAP. She alleges that the requests for final payment violated Medicare conditions of payment because the physician certifications were not signed until several months after the episode of payment ended, and in most cases the certifications were obtained just prior to the submission of the claim for final payment. (TAC ¶¶ 108–13.)

In addition to the Exemplar Patients identified in the body of the TAC, the plaintiff attached to her pleading two exhibits listing additional patients whose billing, she alleges, violated Medicare's conditions of payment. Exhibit A consists of a list of 489 claims that, she asserts, were submitted in violation of the Medicare requirement that the physician certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible. (*See* Doc. No. 38-1.)

Exhibit A reflects only patient names (redacted), episode beginning date, episode end date, the particular home health network involved, and the Brookdale Community of which the patient was a resident. However, Prather alleges that, "[f]or every patient reflected in Exhibit A, at the beginning of the episode, [Brookdale] submitted a RAP to Medicare that violated the condition of payment requiring that a doctor certify that the patient needed home health services." (TAC ¶ 116 (citing 42 C.F.R. §§ 424.22(a) and 409.41(b)).) She asserts that each RAP

is a claim for purposes of the FCA and that each RAP violated a Medicare condition of payment because, in each case, Brookdale "did not obtain the required certification until several months after the patient had been discharged and/or the episode was complete." (TAC ¶ 117.) She alleges that, even though Brookdale "knew that this condition of payment was not satisfied," it nonetheless submitted the RAPs for payment and actually received Medicare reimbursement. (*Id.*)

In Exhibit B, Prather identifies an additional 771 Brookdale patients who received home health care with respect to which Medicare reimbursement claims were processed through the Held Claims Project. She alleges that these claims were fraudulent because they were submitted "in violation of the condition of payment that an appropriate physician document a face-to-face encounter with the patient." (TAC ¶ 118.) To be clear, she does not allege that there was no timely face-to-face encounter or that there was no documentation of the face-to-face encounter. Rather, she states that, for each patient listed in Exhibit B, Brookdale submitted a RAP that violated the Medicare timing requirement for the documentation of the face-to-face encounter, which is supposed to take place before the physician's certification of need for home health services. (TAC ¶ 119 (citing 42 C.F.R. §§ 424.22(a) 409.41(b), 42 U.S.C. § 1395f(a)(2)(C)).) She alleges that, for each patient/claim reflected in Exhibit B, Brookdale submitted a RAP to Medicare at the beginning of the episode but "did not obtain the required documentation [of the face-to-face encounter] until several months after the patient had been discharged and/or the episode was complete." (TAC ¶ 120.) She further alleges that the timing requirement that pertained to documenting the face-to-face encounter was a condition of payment and that Brookdale knew that this condition was not satisfied at the time it submitted the RAPs and received payment from Medicare. (*Id.*)

## IV.    STANDARD OF REVIEW

The factual allegations supporting FCA claims must be pleaded with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure, "because 'defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts.'" *Prather*, 838 F.3d at 760 (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)). Dismissal of a complaint for failure to comply with Rule 9(b) is reviewed as a dismissal for failure to state a claim. *See United States ex rel Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 502 (6th Cir. 2007).

In the *qui tam* context, "the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the special pleading rules contained in Rule 9(b), a complaint alleges sufficient facts to survive a motion to dismiss when the plaintiff states "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

## V.    DISCUSSION

Boiled down to its essence, the TAC alleges that Brookdale violated the False Claims Act ("FCA") by (1) billing Medicare for home health services, despite knowing that it had not obtained face-to-face documentation or physician signatures on certifications at the time that the physician established the patient's plan of care "or as soon thereafter as possible," as required by 42 C.F.R. § 424.22(a)(2); and (2) retaining such payments after reimbursement by Medicare, despite knowing that Medicare would not have paid the claims if it had known about the regulatory violations, that is, Brookdale's failure to comply with the "as soon as possible" requirement in § 424.22(a)(2). The relator proceeds under an implied-false-certification theory,

based upon which a claimant may be liable for "knowingly falsely certify[ing] that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013) (quoting *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011)). This court initially dismissed Prather's claims on the grounds that obtaining late signatures on certifications and face-to-face documentation—as opposed to not obtaining the signatures at all—did not constitute a violation of Medicare regulations or laws. (Doc. No. 89, at 41.) On appeal, the Sixth Circuit reversed and remanded, holding that late physician signatures could violate 42 C.F.R. § 424.22(a)(2), depending on "the length of the delay, the reasons for it, and the home-health agency's efforts to overcome whatever obstacles arose." *Prather*, 838 F.3d at 763.

In a footnote, the Sixth Circuit recognized the Supreme Court's recent holding that "an implied-false-certification claim may be brought only in relation to a misrepresentation regarding a legal or contractual violation that was 'material to the other party's course of action.'" *Prather*, 838 F.3d at 761 n.2 (quoting *Escobar*, 136 S. Ct. at 2001). However, because *Escobar* was decided after the parties briefed their positions in the Sixth Circuit, that court expressly declined to consider what effect *Escobar* might have on Prather's theories of recovery.

Following remand to this court, Brookdale immediately signaled its intent to file a renewed motion to dismiss based on *Escobar*. Because Prather could not have taken *Escobar* into account in drafting the Second Amended Complaint, the court permitted her to amend her pleading again to satisfy *Escobar*'s requirements. She has now done so, but Brookdale maintains in its present motion that, even as amended for the third time, the relator's allegations are insufficient to state a claim under the standards imposed by *Escobar* for pleading materiality and

scFénter.

More specifically, Brookdale argues under *Escobar* that the alleged failure to comply with an applicable statute or regulation can give rise to liability under the FCA only if "rigorous" materiality and scienter requirements are satisfied. *Escobar*, 136 S. Ct. at 2002. Brookdale asserts that Prather has failed to adequately allege facts showing that the timing requirements in 42 C.F.R. 424.22(a)(2) are material to Medicare's decision to pay claims or that Brookdale had actual or constructive knowledge that the timing requirements are material, for purposes of the FCA's scienter requirement. Prather insists, to the contrary, that she has adequately alleged facts supporting both materiality and scienter.

### A.    *Escobar*

In *Escobar*, the Supreme Court confirmed that the implied-false-certification theory can be a basis for liability under the FCA under certain circumstances. 136 S. Ct. at 1995. Specifically, the Court held that, "[w]hen . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.* at 1999. The Court made clear that courts should continue to police expansive implied certification theories "through strict enforcement of the [FCA's] materiality and scienter requirements." *Id.* at 2002 (citation omitted). In particular, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Id.*

The FCA defines the term "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

The Supreme Court provided some guidance for determining whether a particular statutory or regulatory provision is material under that definition:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.
>
> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04 (internal citations and footnote omitted).

In sum, in considering the question of materiality, courts should consider, but are not bound by, the questions of (1) whether the statute or regulation at issue has been expressly designated by the government as a condition of payment; (2) whether the government has consistently refused to pay claims based on non-compliance with the particular statute or regulation; and (3) conversely, whether the government has regularly paid claims despite knowledge of technical violations, without signaling a change in position. *Id.*

Courts are to apply a holistic approach in determining materiality; no one factor is necessarily determinative. *Id.* at 2001. Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002–03 (citing Williston on Contracts § 69:12 (4th ed. 2003) and the Restatement (Second) of Torts, § 538). Materiality is

more likely to be found where the information at issue goes "to the very essence of the bargain," *id.* at 2003 n.5 (quoting *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 673 (N.Y. 1931)). Materiality "cannot be found where noncompliance is minor or insubstantial." *Id.* "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* Moreover, the Court expressly affirmed that the question of materiality is not "too fact intensive" to be addressed in the context of a motion to dismiss. *Id.* at 2004 n.6 ("The standard for materiality that we have outlined is a familiar and rigorous one. And False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality.").

The *Escobar* Court also touched upon the FCA's scienter requirement, noting that the Act imposes liability on any person who "knowingly" presents a false claim for payment to the government, 31 U.S.C. § 3729(a), and defines "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). The Court appeared to construe the scienter requirement together with the materiality requirement to mean that a claimant must not only "know," as the term is defined by the FCA, about a violation of a particular statutory or regulatory provision, but also must "know" that compliance with that provision is "material" to the government's payment decision. *See* 136 S. Ct. at 2001–02 ("A defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment. . . . Likewise, [where] a reasonable person would realize the imperative of a [particular condition], a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard'

of the 'truth or falsity of the information' even if the Government did not spell this out." (quoting 31 U.S.C. § 3729(b)(1)(A)).

Finally, the Court emphasized that the Act's materiality and scienter requirements are "rigorous," and "demanding," largely because the FCA is not intended to be "'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2002–03 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

### B.      Materiality

In support of its Motion to Dismiss the Third Amended Complaint, Brookdale argues that the TAC fails to plead materiality as required by *Escobar*, because (1) the text of 42 C.F.R. § 424.22 makes it clear that its timing and signature provisions are not conditions of payment; (2) the TAC does not allege that the government has ever denied claims based on violations of the timing requirements of § 424.22(a)(2); (3) the allegations in the TAC and the authority cited therein fail to establish materiality; and (4) a violation of the signature timing requirement does not go to the "essence of the bargain" between CMS and Brookdale.

Prather disputes all of those contentions in her response, arguing that (1) the regulations indicate that the timing requirement is an express condition of payment; (2) *Escobar* does not mandate a showing that the government has refused to pay claims based on the violation alleged; (3) she has adequately alleged that the United States was "unaware of the falsity of the claims that Defendants submitted" and that it paid Brookdale on "claims that would otherwise not have been allowed" (Doc. No. 106, at 14 (quoting TAC ¶ 125)); and (4) the authorities she identified in the TAC demonstrate materiality.

After consideration of each of these arguments, the court concludes that the allegations in

the TAC fail to establish that the certification-timing requirement is material to CMS's payment decision.

### (1)    42 C.F.R. § 424.22

The parties argue heatedly about whether the regulatory provision containing the certification timing requirement is or is not expressly designated as a condition of payment. The primary provision in question, 42 C.F.R. § 424.22, is labeled "Requirements for home health services," and it states, in pertinent part, as follows:

> Medicare . . . pays for home health services only if a physician certifies and recertifies the content specified in paragraphs (a)(1) and (b)(2) of this section, as appropriate.
>
> (a) Certification—
>
>> (1) Content of certification. As a condition for payment of home health services . . . , a physician must certify the patient's eligibility for the home health benefit . . . as follows in paragraphs (a)(1)(i) through (v) of this section. The patient's medical record, as specified in paragraph (c) of this section, must support the certification of eligibility as outlined in paragraph (a)(1)(i) through (v) of this section.
>
>>> (i) The individual needs or needed intermittent skilled nursing care, or physical therapy or speech-language pathology services as defined in § 409.42(c) of this chapter. . . .
>>>
>>> (ii) Home health services are or were required because the individual is or was confined to the home . . . .
>>>
>>> (iii) A plan for furnishing the services has been established and will be or was periodically reviewed by a physician . . . .
>>>
>>> (iv) The services will be or were furnished while the individual was under the care of a physician . . . .
>>>
>>> (v) A face-to-face patient encounter, which is related to the primary reason the patient requires home health services, occurred no more than 90 days prior to the home health start of care date or within 30 days of the start of the home health care and was performed by a physician or allowed non-physician practitioner . . . . The certifying physician must also document the date of the encounter as part of the certification. . . .
>
>> (2) Timing and signature. The certification of need for home health services

must be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan.

(b) Recertification—

(1) Timing and signature of recertification. Recertification is required at least every 60 days when there is a need for continuous home health care after an initial 60-day episode. Recertification should occur at the time the plan of care is reviewed, and must be signed and dated by the physician who reviews the plan of care. Recertification is required at least every 60 days . . . .

(2) Content and basis of recertification. The recertification statement must indicate the continuing need for services and estimate how much longer the services will be required.

42 C.F.R. § 424.22(a)–(b).

In addition, 42 C.F.R. § 409.41, titled "Requirement for payment," states: "In order for home health services to qualify for payment under the Medicare program . . . [t]he physician certification and recertification requirements for home health services described in § 424.22" "must be met." *Id.* § 409.41(b). And, as also noted above, another provision specifies that "[d]elayed certification and recertification statements are acceptable when there is a legitimate reason for delay." 42 C.F.R. § 424.11(d)(3).

Brookdale argues that the plain language of § 424.22 makes it clear that only the *contents* requirements contained in § 424.22(a)(1) and (b)(2) are conditions of payment, but the *timing* requirements in § 424.22(a)(2) and (b)(1) are not expressly identified as conditions of payment. It argues that this conclusion is further supported by 42 U.S.C. § 1395n(a)(2)(A) and other Medicare statutes that cover the contents of the regulations but do not incorporate a timing requirement for the physician certification. It also points out that the Medicare statute expressly conditions reimbursement on the making of a request for payment "no later than the close of the period ending 1 calendar year after the date of service," 42 U.S.C. § 1395n(a)(1), thus demonstrating that, "[w]hen Congress or CMS wants to make timing a condition of payment, it

knows how to do so." (Doc. No. 103, at 18.) Brookdale further argues that the language of 42 C.F.R. § 409.401(b), generally requiring compliance with the "certification and recertification requirements . . . described in § 424.22," does not create new conditions of payment simply by cross-referencing § 424.22(a) and that the more specific language in § 424.22 trumps the more general language of § 409.41(b). In short, Brookdale argues that the government did not expressly condition payment on compliance with § 424.22(a)(2), thus strongly suggesting that the signature-timing requirement is not material.

The relator insists, to the contrary, that the signature-timing requirement is an express condition of payment. She argues that "the unmistakable language employed by CMS in 42 C.F.R. § 409.41 (labeled 'Requirement for Payment')" shows that CMS intended the timing requirement to be a condition of payment. She also points out that the Sixth Circuit noted that "'the same certification requirement—and the same timing requirement for that certification—is applied by' 42 C.F.R. § 409.41." (Doc. No. 106, at 12 (quoting *Prather*, 838 F.3d at 766).)

The court agrees with the relator that the regulations, read together, make compliance with the timing requirement an express condition of payment. Part 424 of Title 42 of the Code of Federal Regulations is titled "Conditions for Medicare Payment," and Section 424.22 is titled "Requirements for home health services." Section 409.41, titled "Requirement for payment," unambiguously makes payment conditional upon compliance with "[t]he physician certification and recertification requirements for home health services described in § 424.22," 42 C.F.R. § 409.41(b), without distinguishing among those requirements. *Accord Prather*, 838 F.3d at 766 ("The certifications are made a condition of Medicare payment, in a provision that does not distinguish between requests for final payment and requests for anticipated payment.").

However, under *Escobar*, the fact that the requirement is expressly designated a condition

of payment is not dispositive to liability under the FCA. *See Escobar*, 136 S. Ct. at 2001 ("[W]e . . . conclude that not every undisclosed violation of an express condition of payment automatically triggers liability. Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry."). While this factor weighs somewhat in favor of a finding in favor of the relator, the ultimate question remains whether the alleged misrepresentation was "material to the other party's course of action." *Id.*

### (2) Government Action

Brookdale also argues that Prather fails to allege that the government has ever denied a claim based on a violation of the timing requirements of § 424.22. Prather does not dispute that assertion. She simply argues that *Escobar* does not mandate a showing that the government has refused to pay claims based on the alleged regulatory violation. She also argues that Brookdale's reference to *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027 (D.C. Cir. 2017), is inapposite, because that case was decided at the summary judgment stage after discovery had been conducted.[3] For its part, the United States contends that there are no allegations in the TAC suggesting that CMS knew of the violations alleged here at the time it paid the home health care claims and that CMS's failure to act is relevant only where it is shown that CMS approved payment with actual knowledge of the alleged misrepresentations in the payment demands.[4] (*See*

---

[3] In *McBride*, the government agency charged with auditing defense contracts investigated the relator's allegations of fraud after the relator filed the complaint but before it was unsealed. The agency did not issue formal findings but neither did it disallow any of the amounts billed under the defendant's contract. The D.C. Circuit, in considering the question of materiality, noted that it had the "benefit of hindsight and should not ignore what actually occurred" and considered it "very strong evidence" that the government did not disallow charges and in fact awarded the defendant an award fee for exceptional performance even after learning of the allegations. 848 F.3d at 1034.

[4] The government filed a Statement of Interest in which it declines to take a position as to the overall merits of the case or the sufficiency of the TAC but nonetheless raises several arguments in opposition to dismissal. (Doc. No. 107.)

Doc. No. 107, at 7 ("[*Escobar*] is clear that the government's decision to pay claims despite violations of a regulatory requirement is only evidence of a lack of materiality where the government has 'actual knowledge' of the violation." (citing *Escobar*, 136 S. Ct. at 2003–04)).) The United States further argues that the relator should not be charged with having access to this type of information at this stage of the litigation and that discovery is required to permit the relator to obtain information "concerning the government's 'actual knowledge' and the resulting pattern of action (or inaction) with respect to the types of violations alleged." (*Id.*)

This latter argument ignores the *Escobar* Court's determination that the materiality inquiry is not "too fact intensive" to be addressed in the context of a motion to dismiss. *136 S. Ct.* at 2004 n.6 ("We reject [the defendant's] assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss . . . . The standard for materiality that we have outlined is a familiar and rigorous one. And False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality.").

Moreover, as Brookdale points out, the timing requirement in § 424.22 has been part of the Medicare regulations for fifty years, and home health care is a huge industry making up a significant portion of the millions of Medicare claims submitted every year. In light of the sheer volume of claims, the relator's inability to point to a single instance where Medicare denied payment based on violation of § 424.22(a)(2), or to a single other case considering this precise issue, weighs strongly in favor of a conclusion that the timing requirement is not material.

### (3) *Authorities Cited in the Complaint*

Brookdale argues that the allegations in the TAC and the authority cited therein fail to establish materiality. Prather insists that the TAC adequately alleges facts and law supporting a

finding of materiality.

She points, for instance, to the allegation that Medicare paid Brookdale's claims "that would otherwise not have been allowed" if Medicare had been aware of the false representations (TAC ¶ 125)—that is, if it had known that the physicians' signatures on certifications were not obtained within the time-frame required by § 424.22. Because this statement is nothing more than a conclusory assertion unsupported by actual facts, however, the court cannot presume its truth for purposes of the Motion to Dismiss. *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (quoting *Twombly*, 550 U.S. at 557)). Likewise, the relator's argument that "there is nothing in the record to indicate otherwise" (Doc. No. 106, at 14) is a red herring. Brookdale has no obligation to prove a negative; rather, it is the relator's obligation to allege facts establishing materiality.

The relator also refers the court to allegations in the TAC that, to bill Medicare for home health care services, Brookdale must submit a claim form, Form 1450, to its Medicare Administrative Contractor and/or fiscal intermediary. (TAC ¶ 34.) By submitting Form 1450, Brookdale "certified that the contents of the claim were true, correct and complete, and that the form was prepared in compliance with all Medicare laws and regulations," and further certified that it did not "knowingly or recklessly disregard or misrepresent or conceal material facts." (TAC ¶¶ 35–36.) In addition, with Form 1450, Brookdale certified that the physician certifications and recertifications "are on file." (TAC ¶ 37.) Finally, Prather asserts, in wholly conclusory fashion, that the information in Form 1450 "is material to Medicare's payment of the claim." (TAC ¶ 38.)

While submission of the Form 1450 is clearly relevant to an implied-false-certification theory of recovery under the FCA, insofar as it may constitute the necessary certification, it does

not establish materiality. To find otherwise would make every technical misstatement or misrepresentation in a particular claim "material," a result that *Escobar* clearly did not countenance. *See Escobar*, 136 S. Ct. at 2004 ("Likewise, if the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations, then under this view, failing to mention noncompliance with any of those requirements would always be material. The False Claims Act does not adopt such an extraordinarily expansive view of liability.").

The TAC also incorporates reference to CMS Form 855A, the Medicare Enrollment Application, in which the applicant provider acknowledges being legally bound by Medicare laws and regulations, and CMS Form 1500, which individual health care practitioners providing home health care services use to submit claims and on which they certify that the services rendered were medically necessary, that the information on the claim form is true, and "that the provider 'understand[s] that . . . any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable Federal . . . laws.'" (TAC ¶ 40.) Submission of these forms, like submission of Form 1450, is insufficient to establish the materiality of any particular provision of the Medicare laws and regulations. *Accord U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 676–77 (S.D. Tex. 2013) (citing *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 775 F. Supp. 2d 709, 720–21 (N.D. Tex. 2011)).

The relator also points to the "Compliance Program Guidance for Home Health Agencies" issued by the Office of the Inspector General ("OIG") for the Department of Health and Human Services in August 1998. (TAC ¶ 47 (citing 63 Fed. Reg. 42410 (Aug. 7, 1998) ("OIG Guidance")).) According to the TAC, the OIG Guidance identifies as a "Risk Area" "[u]ntimely and forged physician certifications on plans of care." (TAC ¶ 47.) The OIG

Guidance further confirmed that home health agencies should only submit claims for services the agency believes are medically necessary and that were ordered by a physician or other appropriately licensed medical provider. (*Id.*) Further, at a minimum, home health agencies should ensure that services are only billed "if the home health agency is acting upon a physician's certification . . . that the services . . . are medically necessary and meet the requirements for home health services to be covered by Medicare." (*Id.* (quoting OIG Guidance at 42416–17).

This OIG Guidance was intended to assist home health care agencies in the adoption of a voluntary compliance program in an effort to combat fraud and abuse, specifically through "[i]mplementing written policies, procedures and standards of conduct; [d]esignating a compliance officer and compliance committee; [c]onducting effective training and education; [d]eveloping effective lines of communication; [e]nforcing standards through well-publicized disciplinary guidelines; [c]onducting internal monitoring and auditing; and [r]esponding promptly to detected offenses and developing corrective action." 63 Fed. Red. 42410-01, at 42410, 1998 WL 453988 (Aug. 7, 1998). While its fleeting reference to the timeliness of physician certifications as an area of concern is relevant and noteworthy, it is not sufficient on its own to establish that timeliness *per se* is a material condition of payment, particularly in light of the OIG Guidance's overall emphasis on certification of the necessity of care for patients that are actually homebound and on accurate billing.

The relator alleges that an OIG publication titled "The Physician's Role in Medicare Home Health 2001," emphasized "the significance of [the physician's] responsibility as the party who certifies the medical necessity for home health care, signs off on the level of services needed, and certifies that the patient is homebound." (TAC ¶ 49 (citing https://oig.hhs.gov/oei/

reports/oei-02-00-00620.pdf).) According to the relator's allegations, however, this publication, too, highlights the importance of the *contents* of the physician certification, rather than its *timing*.

The relator also refers to several CMS publications issued well after the events giving rise to her claims, including a Medicare Benefit Policy Manual (CMS Pub 100-02), Ch. 7, § 30.5.1 (May 2015) (available online at https://www.cms.gov/Regulations-and-Guidance/ Guidance/Manuals/Internet-Only-Manuals-Ioms-Items/Cms012673.html); and a publication dated March 2016 titled "Complying with Medicare Signature Requirements," http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/ downloads/Signature_Requirements_Fact_Sheet__ICN905364.pdf. This court already held, regarding the relator's citation to the same publications, that new guidance from CMS does not apply retroactively to conduct that predates it. (Doc. No. 89, at 39.)[5] Consequently, these publications are not relevant to the question of materiality during the relevant time frame or Brookdale's knowledge of such materiality.

In sum, none of the references cited by Prather in the TAC supports a finding that the certification-timing requirement is material.

### (4)    *The Regulatory Scheme and the Essence of the Bargain*

To be clear, the relator does not allege that physicians lied when they completed certifications stating that patients were under their care, home-bound, and under a plan of care established or to be established by the physician, that the patients required medically necessary services, or that the physicians had seen the patients in timely face-to-face encounters. The relator only alleges that the signatures on those documents were sometimes obtained late.

---

[5] Although not addressed in the majority opinion, Judge McKeague likewise noted in his partial dissent that a guidance issued in 2015 "could not establish that defendants were required *in 2010 and 2011* to obtain certifications before care had ended." *Prather*, 838 F.3d at 777.

The relator asserts generally that compliance with the certification-timing requirement is necessary to prevent Medicare fraud and that the language in the regulation, requiring that the certification of need be obtained at the time the plan of care is established or *as soon thereafter as possible*," 42 C.F.R. § 424.22(a)(2) (emphasis added), "suggests urgency." (Doc. No. 106, at 15 (quoting *Prather*, 838 F.3d at 764).) The United States further argues that "the timing requirements are fundamental to the certification requirement, which in turn is a fundamental part of the bargain between a home health care provider and the Medicare program." (Doc. No. 107, at 5.) The Sixth Circuit, in *Prather*, likewise seemed to suggest that the timing requirement went to the essence of the bargain and was key to the prevention of fraud:

> The deadline also makes it more difficult to defraud Medicare. Absent a deadline, a home-health agency might be able to provide unnecessary treatment absent a doctor's supervision and take the time to find doctors who are willing to validate that care retroactively. A deadline allowing only a short—and justified—delay between the beginning of care and the completion of the physician certification could make such a scheme difficult to pull off.

838 F.3d at 764.

On the other hand, as this court noted in the vacated opinion dismissing the Second Amended Complaint, numerous CMS publications from the relevant time period suggest that, while the certification of need is, indeed, a critical part of the bargain between home health care providers and Medicare, the timing of such certification is not. Instead, CMS appeared to require only that the certification be obtained prior to the submission of the claim for reimbursement at the end of the episode:

> CMS permits claims to be filed up to one year after the date of service. *See* 42 C.F.R. § 424.44(a). In 2011 (the relevant time period . . .), CMS provided specific guidance that, for purposes of billing Medicare, the physician signature only needed to be obtained prior to the submission of the final claim. *See* Medicare General Information, Entitlement, and Eligibility Manual ("MGIEEM") (CMS Pub. 100-01, Ch. 4, § 30.1 (April 2011) (stating that "the attending physician signs and dates the POC/certification *prior to the claim being submitted for*

*payment*") (emphasis added). Moreover, in 2013, in connection with CMS and the Medicare Learning Network, the American Medical Association published advisory guidance to the same extent. *See* Medicare Learning Network, MLN Matters Article SE1436 at p. 4, available at http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE1436.pdf ("The certification must be complete *prior to when an HHA bills Medicare for reimbursement*.") (emphases added). FIs – the contractors working under CMS supervision who must comply with Medicare billing rules – have also issued similar guidance. *See, e.g.*, Ask-the-Contractor (ACT) Questions and Answers, June 21, 2015 at No. 5 (citing MLN Matters Article SE1436 and CMS Pub. 100-01, Ch. 4, § 30.1) ("The physician certification must be signed prior to billing. . . . *The physician certification must be signed before the final claim is submitted*.") (available at https://www.cgsmedicare.com/hhh/education/faqs/act/act_qa062415.html) (emphasis added).

(Doc. No. 89, at 38–39.)

In short, the physician certification itself is clearly an essential and material component of the bargain between home health providers and Medicare. The relator however, has not pointed to facts in the record, including conduct on the part of CMS, legal precedent, or relevant Medicare guidance supporting a conclusion that the timing requirement is likewise material. Based on weighing all of the factors identified in *Escobar* as relevant to the question of materiality, the court concludes that Brookdale's alleged implied misrepresentations about compliance with the certification-timing requirement are not material to CMS's payment decision and therefore are not actionable under the FCA.

Having found that the misrepresentations in question were not material, the court has no need to reach the scienter component of the relator's claims.

## C.     Count Two

The FCA's reverse false claims provision extends liability to persons who "knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the United States." 31 U.S.C. § 3729(a)(1)(G). An "obligation" under the FCA includes, inter alia, "the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

For purposes of its motion, Brookdale does not distinguish between the RAPs and final billed claims. It argues that Prather's failure to adequately plead materiality requires dismissal of all of her claims under § 3729(a)(1)(A) and (a)(1)(G). It argues that, because Prather failed to plead the materiality of the signature-timing requirement, she likewise cannot allege that Brookdale improperly retained any payments that it might have received from RAP billing.

In response, Prather effectively concedes that her cause of action under 31 U.S.C. § 3729(a)(1)(G) is valid only to the same extent as her claim under 31 U.S.C. § 3729(a)(1)(A). (Doc. No. 106, at 19.) As the court has already determined that the alleged conduct did not amount to a materially false claim and therefore did not give rise to an overpayment, Count Two also fails as a matter of law.

## V.     CONCLUSION

For the reasons set forth herein, the TAC will be dismissed. Because the relator has had the opportunity to amend the Complaint to bring it into compliance with the pleading requirements established by *Escobar*, the dismissal will be with prejudice.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge